# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **PHARMACYCHECKER.COM LLC**, | Case No. 3:22-cv-252-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **LEGITSCRIPT LLC**, | |
| Defendant. | |

Philip S. Van Der Weele, K&L GATES LLP, One SW Columbia Street, Suite 1900, Portland, OR 97204; Aaron R. Gott, BONA LAW PC, 331 Second Avenue South, Suite 420, Minneapolis, MN 55401; and James F. Lerner, BONA LAW PC, 287 Park Avenue South, Suite 422, New York, NY 10010. Of Attorneys for Plaintiff PharmacyChecker.com LLC.

Richard P. Sybert, GORDON REES SCULLY MANSUKHANI LLP, 1300 SW Fifth Avenue, Suite 2000, Portland, OR 97201; and John T. Mills, GORDON REES SCULLY MANSUKHANI LLP, One Battery Park Plaza, 28th Floor, New York, NY 10004. Of Attorneys for Defendant LegitScript LLC.

**Michael H. Simon, District Judge.**

Earlier this year, the Ninth Circuit issued a decision in a federal antitrust case brought by a company that sold clear teeth aligners through a direct-to-consumer online platform. The company had sued dentists and orthodontists who provided competing teeth-alignment services and were members or employees of a California dental board. A district court dismissed the antitrust claim, and the Ninth Circuit reversed that decision. At the beginning of the Ninth

Circuit's opinion, U.S. Circuit Judge Margaret M. McKeown, writing for a unanimous panel, put the case in the following context:

> It is easy to recall examples of consumer-oriented business models in the medical field that were once resisted by incumbents but ultimately—through litigation, regulation, and legislation—resulted in cheaper and more accessible services. Take, for example, eyeglass prescriptions. At one time, the consumer had to purchase eyeglasses from the prescribing doctor. Now doctors must provide a copy of the prescription, so consumers can get their eyeglasses at Costco, Warby Parker, or a host of online suppliers. Hearing aids represent another consumer advance. Once approved by the Food and Drug Administration, certain over-the-counter hearing aids can be purchased without seeing a healthcare professional. In the dental field, hygienists in some states can sometimes provide services without the supervision of a dentist. In each case, entrenched interests fought to preserve the status quo and to stifle the innovators' entry into the market.
>
> In a similar vein, this appeal involves a company that developed an online service model that, according to the company, makes it cheaper, easier, and more convenient for patients to access certain orthodontic services, namely clear teeth aligners. The company alleges that incumbents in the dental and orthodontia markets have illegally conspired to shut down its disruptive business model. What distinguishes this case from most run-of-the-mill antitrust lawsuits is that it involves not only business competitors, but competitors who sit on a regulatory board that oversees the practice of dentistry.

*SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110, 1115 (9th Cir. 2022).

As the facts develop in the federal antitrust case now before this Court, they may reveal important similarities with the *SmileDirect* lawsuit. Here, PharmacyChecker.com LLC (PharmacyChecker) alleges that the cost of prescription medicine in the United States is higher than anywhere in the world, and the effect on public health is disastrous. Millions of Americans each year do not fill prescriptions because of cost, and many become sicker or even die as a result. Others—about four million people each year—seek their medications from pharmacies abroad. Although prescription drug importation is restricted under some circumstances in the

United States, PharmacyChecker contends that the law is generally applied only to bulk commercial importations and not to personal importation by consumers. Amended Complaint (AC) (ECF 82), at 2; *see also id.* ¶¶ 15-19.

PharmacyChecker alleges that it is the victim of an alleged conspiracy and that two of the alleged coconspirators are direct competitors of PharmacyChecker in one of the two alleged relevant markets. PharmacyChecker contends that the alleged coconspirators—and the interests behind them—benefit from higher U.S. drug prices and do not want competition from international pharmacies. Relying heavily on their contention that importation is illegal, the alleged coconspirators reached private agreements with key gatekeepers of online commerce, including search engines, social media networks, shipping companies, and payment intermediaries, to manipulate and suppress information available to consumers worldwide seeking information about cheaper prescription medicine from safe online pharmacies. According to PharmacyChecker, the purpose and effect of the alleged conspiracy is to choke off information about affordable prescription medications from regulated, reputable pharmacies worldwide. PharmacyChecker also alleges that it is unique among its competitors (which include two of the alleged coconspirators) by providing information about reputable pharmacies worldwide, and the "shadow" regulation scheme of the coconspirators has deprived PharmacyChecker of its most essential competitive resource—its visibility to consumers seeking this information on the internet. *Id.* at 2-3; *see also id.* ¶¶ 20-26.

Before the Court is a motion to dismiss for failure to state a claim filed by one of the alleged coconspirators, which—because of issues relating to personal jurisdiction—is the only defendant in this case. The remaining alleged coconspirators are still defendants in the original

lawsuit brought by PharmacyChecker in federal court in New York, which is continuing. For the reasons explained below, the Court denies the pending motion to dismiss.

## STANDARDS

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). The court must draw all reasonable inferences from the factual allegations in favor of the plaintiff. *Newcal Indus. v. Ikon Off. Sol.*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The court need not, however, credit a plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "The plausibility standard is not akin to a

probability requirement, but it asks for more than a sheer possibility that a defendant has acted

unlawfully." *Mashiri v. Epsten Grinnell & Howell*, 845 F.3d 984, 988 (9th Cir. 2017) (quotation

marks omitted).

## PROCEDURAL BACKGROUND

PharmacyChecker alleges that LegitScript LLC (LegitScript) is part of a conspiracy to

restrain trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. As noted, this lawsuit is

closely related to an ongoing action in federal court in New York against the other four alleged

coconspirators. A more detailed procedural background than the Court typically provides may be

helpful.

In August 2019, PharmacyChecker filed an antitrust lawsuit in federal court in New York

against five defendants, alleging a violation of § 1 of the Sherman Act. In that action,

PharmacyChecker sued: (1) the National Association of Boards of Pharmacy (NABP); (2) the

Alliance for Safe Online Pharmacies (ASOP); (3) the Center for Safe Internet Pharmacies Ltd.

(CSIP); (4) the Partnership for Safe Medicines, Inc. (PSM); and (5) the defendant here,

LegitScript LLC (LegitScript).[1] Shortly after filing the New York Lawsuit, PharmacyChecker

moved for a preliminary injunction, which the district court denied. In October 2019,

PharmacyChecker filed an Amended Complaint.

In a joint motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure, all five of

the original defendants in the New York Lawsuit moved to dismiss. ASOP and PSM also filed

separate motions to dismiss under Rule 12(b)(6). In addition, LegitScript filed its own motion to

---

[1] That lawsuit is titled *PharmacyChecker.com LLP v. National Association of Boards of Pharmacy, et al.*, Case No. 7:19-cv-07577-KMK (S.D.N.Y.) (the New York Lawsuit). In that action, PharmacyChecker also alleges false advertising in violation of § 43 of the Lanham Act, 15 U.S.C. § 1125, against NABP. The Lanham Act claim is not relevant here.

dismiss, both under Rule 12(b)(2) and Rule 12(b)(6), arguing that the federal court in New York lacked personal jurisdiction over LegitScript, that PharmacyChecker failed to plead facts showing unlawful concerted action, and that the claim against LegitScript is barred by the Sherman Act's statute of limitations.

In March 2021, U.S. District Judge Kenneth M. Karas ruled on the motions before him. *See PharmacyChecker.com, LLC v. Nat'l Ass'n of Boards of Pharmacy*, 530 F. Supp. 3d 301 (S.D.N.Y. 2021). Judge Karas found that on the record presented, the court lacked personal jurisdiction over LegitScript and accordingly dismissed PharmacyChecker's claim against LegitScript without prejudice. Judge Karas gave PharmacyChecker 30 days to file a second amended complaint if it wished to do so. *Id*. at 327. Judge Karas also denied both the joint motion to dismiss and ASOP's separate motion to dismiss. Among other things, Judge Karas held that PharmacyChecker adequately alleged a conspiracy to restrain trade that included as coconspirators NABP, ASOP, CSIP, and PSM. *Id*. at 328-32. In addition, Judge Karas granted in part and denied in part PSM's motion to dismiss, largely denying PSM's motion except for finding that three specific allegations were protected under the *Noerr-Pennington* doctrine;[2] thus, although those allegations could not serve as a basis for imposing liability, they could be considered by a factfinder as evidence of conspiracy. *Id*. at 339-40. He also ruled that PharmacyChecker's claim under the Sherman Act against NABP, ASOP, CSIP, and PSM was not barred by the statute of limitations. *Id*. at 350.

---

[2] The *Noerr-Pennington* doctrine derives its name from two cases, *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc*., 365 U.S. 127 (1961), and *United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965). The Supreme Court expanded the doctrine in *California Motor Transportation Co. v. Trucking Unlimited*, 404 U.S. 508 (1972).

PharmacyChecker chose not to file a second amended complaint in the New York Lawsuit. Instead, PharmacyChecker moved to sever its claim against LegitScript and transfer that claim to the District of Oregon, which has general personal jurisdiction over LegitScript.[3] Under Rule 21 of the Federal Rules of Civil Procedure, a court may "sever any claim against a party." Federal law also provides:

> Whenever a civil action is filed in a court . . . and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action . . . to any other such court . . . in which the action . . . could have been brought at the time it was filed . . ., and the action . . . shall proceed as if it had been filed in . . . the court to which it is transferred on the date upon which it was actually filed in . . . the court from which it is transferred.

28 U.S.C. § 1631. In January 2022, Judge Karas severed PharmacyChecker's claim against LegitScript and transferred that claim to this Court. ECF 219.

In March 2022, LegitScript filed its motion to dismiss this case under Rule 12(b)(6). LegitScript argues that PharmacyChecker's claim against LegitScript should be dismissed for either of two reasons. ECF 238. LegitScript first argues that PharmacyChecker has failed to plead enough facts to show LegitScript's participation in the alleged unlawful conspiracy. Second, LegitScript contends that PharmacyChecker's claim against LegitScript is barred by the Sherman Act's statute of limitations. PharmacyChecker responded on the merits. ECF 239.[4] LegitScript replied. ECF 240. In June 2022, the Court heard oral argument.

---

[3] LegitScript is a limited liability company organized under the laws of the State of Oregon with its principal place of business in Oregon.

[4] As noted, Judge Karas concluded that PharmacyChecker adequately alleged a conspiracy to restrain trade that included NABP, ASOP, CSIP, and PSM among the conspirators and that PharmacyChecker's claim under the antitrust laws against these defendants was not barred by the statute of limitations. On these issues, Judge Karas ruled only regarding these four defendants. After concluding that the federal court in New York lacked personal jurisdiction over

## FACTUAL BACKGROUND[5]

### A. The Markets and the Players

As alleged by PharmacyChecker, there are two relevant product markets at issue in this lawsuit. The first is the market for online pharmacy verification services. AC ¶ 103. The second is the market for comparative drug price and pharmacy information. *Id.* According to PharmacyChecker, the relevant geographic market is worldwide. AC ¶¶ 61, 106-107. Both LegitScript and NABP are direct competitors of PharmacyChecker in the first market, the market for online pharmacy verification services. *Id.* ¶¶ 7, 104. A member of ASOP is GoodRx, which is a competitor of PharmacyChecker in the second market, the market for comparative drug price and pharmacy information. *Id.* ¶ 7. NABP also competes with PharmacyChecker in the second market. *Id.* ¶ 6. LegitScript also is a founding member of both ASOP and CSIP. *Id.* ¶¶ 7, 8, 68.

Plaintiff PharmacyChecker was founded in 2002 to promote and protect consumer health by evaluating the practices of online pharmacies based inside and outside the United States. It operates a rigorous accreditation program designed to inform consumers of legitimate pharmacies that observe safe pharmacy practices and are licensed in their home jurisdictions. It provides drug price comparison information that allows consumers worldwide to find the lowest prices for their prescription medications, whether dispensed in the United States or abroad. It offers a prescription drug discount card that allows consumers to save as much as 90 percent from many U.S. pharmacies. It provides information about prescription assistance programs and

---

LegitScript, Judge Karas did not rule—one way or the other—on those questions regarding LegitScript. *See PharmacyChecker.com*, 530 F. Supp. 3d at 345 n.20.

[5] These facts come from PharmacyChecker's Amended Complaint (ECF 82). At this stage of the lawsuit, the Court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the light most favorable to the plaintiff.

other information about pharmacies and prescription medicine that allows consumers to make informed purchasing decisions; it also raises awareness about policy issues surrounding prescription medication in the United States. *Id.* ¶ 5.

Defendant LegitScript is a for-profit, privately managed verification and monitoring service for online pharmacies. It is the only private service of that kind recognized by NABP. As noted, LegitScript is a direct competitor of PharmacyChecker in the market for online pharmacy verification, and LegitScript currently has contracts with companies such as Google to provide verification for and monitoring of Google's advertising platform. *Id.* ¶ 9. Also as noted, LegitScript is a cofounder of both ASOP and CSIP. *Id.* ¶¶ 7, 8, 68.

Non-party NABP[6] is an association of boards of pharmacies, mostly in the United States, which typically are quasi-private organizations that are comprised of, and controlled by, private pharmacists and pharmacies, despite their nominal designations as state agencies. Through its Verified Internet Pharmacy Practice Sites (VIPPS) program, as well as its ".pharmacy" Verified Websites program, and its Internet Drug Outlet Identification program, NABP is a direct competitor of PharmacyChecker in the market for online pharmacy accreditation and information. NABP has arrangements with companies, including Google and Bing, to provide verification of online pharmacies for advertising eligibility. *Id.* ¶ 6.

Non-party ASOP[7] has among its founders LegitScript, the American Pharmacists Association, the pharmaceutical company Eli Lilly and Company (Eli Lilly), and the National Association of Chain Drug Stores. A new member of ASOP is GoodRx, the leading provider of U.S.-only comparative drug price information. Thus, GoodRx is a direct competitor of

---

[6] NABP remains a defendant in the New York Lawsuit.

[7] ASOP remains a defendant in the New York Lawsuit.

PharmacyChecker in the market for comparative drug price information. NABP regularly

participates in ASOP meetings and initiatives. ASOP funds the ASOP Global Foundation, the

chair of which also is the senior manager for the ".pharmacy" Verified Websites program run by

the NABP. In addition, the Secretary of ASOP's Board of Directors works for Eli Lilly and is on

the executive board of NABP's ".pharmacy" Verified Websites program. A representative of Eli

Lilly said in an email: "ASOP is the manner in which Lilly (and PhRMA as an observer) is

working with other key stakeholders to compile data and collaborate to address the problem of

online drug sellers/counterfeits, as we cannot do this as one company, or as PhRMA alone."

*Id.* ¶ 7.[8]

Non-party CSIP[9] is an organization whose members include internet commerce

gatekeepers such as Google, Microsoft, Facebook, Mastercard, and UPS. Both LegitScript and

ASOP also are cofounders and co-organizers of CSIP. LegitScipt currently is an ex-officio

member of CSIP, and it regularly participates in CSIP meetings and initiatives. A main purpose

of CSIP is to provide a platform through which the other alleged coconspirators (on behalf of the

industry interests behind them) can obtain consensus from these gatekeepers to create new

barriers to internet commerce that would otherwise allow for open competition in the markets

relating to prescription drugs, including the two relevant product markets alleged in this lawsuit.

*Id.* ¶ 8.

Non-party PSM[10] is a business league organization. From 2007 until 2015, the Executive

Director of PSM was a person who was concurrently a deputy vice president at PhRMA. PSM

---

[8] PhRMA refers to "Pharmaceutical Researchers and Manufacturers of America." AC ¶ 7.

[9] CSIP remains a defendant in the New York Lawsuit.

[10] PSM remains a defendant in the New York Lawsuit.

has been characterized by Kaiser Health News as: "A nonprofit organization that has orchestrated a wide-reaching campaign against foreign drug imports" and that "has deep ties to the Pharmaceutical Research and Manufacturers of America, or PhRMA, the powerhouse lobbying group that includes Eli Lilly, Pfizer and Bayer." PSM has repeatedly published or presented alleged falsehoods and other misinformation about personal drug importation and PharmacyChecker. PSM is a listed observer to ASOP and has funded research of at least one member of the ASOP Academic Advisory Panel. *Id.* ¶ 10.

**B.  Alleged Conduct Targeting PharmacyChecker**

According to PharmacyChecker, it is one of the targets of the alleged conspiracy because PharmacyChecker provides patients with: (1) a way reliably to identify online pharmacies that operate safely worldwide; and (2) direct access to comparative drug price information not limited to U.S. pharmacies (or pharmacies of any particular jurisdiction). PharmacyChecker's existence is antagonistic to the alleged coconspirators' desired outcome of maintaining a captive U.S. drug market. With PharmacyChecker out of the way, the alleged coconspirators, and the interests they support and who support them, will dominate the market for information about accredited pharmacies and drug prices. *Id.* ¶ 27.

PharmacyChecker contends that the alleged coconspirators have engaged in targeted misinformation and scare campaigns, group boycotts, and other exclusionary conduct with a goal of destroying PharmacyChecker's reputation, suppressing its presence in consumer-accessible channels of the internet, and interfering with its business relationships. As noted, two members of the alleged cartel—LegitScript and NABP—are direct competitors of PharmacyChecker, as private accrediting bodies, hoping to close off accreditation for safe international pharmacies that sell to markets that the alleged coconspirators want to remain captive—most importantly (but not exclusively), the U.S. market. *Id.* ¶ 28.

PharmacyChecker alleges that the actions of the alleged coconspirators fall into five general categories: (1) "blacklisting" PharmacyChecker; (2) manipulating search engine results; (3) gatekeeping over the ".pharmacy" domain extension; (4) persuading pharmacies not to work with PharmacyChecker; and (5) spreading misinformation adverse to PharmacyChecker.

### 1. Blacklisting

By April 2010, NABP added PharmacyChecker to its "Not Recommended Sites" list of "Internet Drug Outlets." *Id.* ¶ 79. According to NABP, the sites included on that list should be avoided because they put "those who purchase from these sites in danger of purchasing drugs that could cause patients serious harm or even death." *Id.* NABP wrote on its website that "the sites on our Not Recommended list are those with serious and blatant violations posing a significant danger to patient health." *Id.* PharmacyChecker contested this designation, and NABP removed it from the list in February 2011. *Id.*

In December 2018, however, NABP again added PharmacyChecker to its "Not Recommended Sites" list. *Id.* ¶ 87. PharmacyChecker refers to NABP's "Not Recommended Sites" list as a "blacklist" and alleges that it is published for use by consumers and internet gatekeepers. *Id.* ¶ 79. PharmacyChecker also alleges that NABP added PharmacyChecker's blog, www.pharmacycheckerblog.com, to the Not Recommended Sites list, even though the blog merely provides news, commentary, and analysis on issues relating to drug prices and online pharmacies and does not link to online pharmacies. *Id.* ¶ 90.

### 2. Manipulating Search Engines

In 2006, search engines Google, Bing, and Yahoo! began using PharmacyChecker as a third-party verification company for advertising eligibility. *Id.* ¶ 48. Pharmacies wanting to advertise on one of those search engines needed to participate in and be accredited by PharmacyChecker's verification program. *Id.* PharmacyChecker alleges that, in 2008, NABP

approached Google, Bing, and Yahoo! "to persuade them to terminate their contracts with

PharmacyChecker.com in favor of either NABP or LegitScript." *Id.* ¶ 78.

After NABP updated its list of "Not Recommended Sites" to include PharmacyChecker

in December 2018, search engines began incorporating that "blacklist" into their algorithms for

determining how to present search results. *Id.* ¶ 110. PharmacyChecker alleges that Google

issued an "update" that incorporated NABP's blacklisting, thereby reducing PharmacyChecker's

traffic by 78 percent. *Id.* ¶¶ 109-111. Additionally, beginning in July 2019, when Bing users tried

to click on a PharmacyChecker search result, the following warning would appear: "Warning.

The National Association of Boards of Pharmacy (NABP) includes this site on its Not

Recommended list. We recommend that you learn more and verify your pharmacy before

making online health purchases." *Id.* ¶ 95. PharmacyChecker alleges that, based on this warning,

it lost 76 percent of its traffic from Bing. *Id.*; *see also id.* ¶ 112.

### 3.  Gatekeeping the ".pharmacy" Domain Extension

In 2010, ASOP issued a press release, stating its intention to "stop enabling rogue

Internet drug outlets" by, among other things, using domain name registrars and persuading the

major search engines to amend their policies to restrict advertising to internet pharmacies with

NABP's VIPPS accreditation. *Id.* ¶ 70. NABP hosted a meeting with CSIP to discuss preventing

advertising by websites that promote online international pharmacy sales. *Id.* ¶ 71. In 2012,

NABP and ASOP hosted a meeting called, "Task Force on Internet Pharmacy Practice," during

which they discussed these issues and developed a concrete plan to rely on, among other things,

domain name registrars to control online pharmacy activity. *Id.* ¶¶ 72-73.

PharmacyChecker alleges that from 2013 to 2014, NABP, ASOP, CSIP, and LegitScript

worked with other pharmaceutical stakeholders, including Pfizer, Eli Lilly, and Merck, jointly to

develop a proposal to create a global domain name system administered directly by NABP to

serve a gatekeeping function. *Id.* ¶ 80; *see also id.* ¶ 96. The proposal led to the creation of a new

generic top-level domain, ".pharmacy," which required websites to meet certain eligibility

requirements. *Id.* ¶ 80. The group worked with CSIP to implement these restrictions and prevent

websites that did not have the ".pharmacy" domain from advertising and receiving merchant

payments. *Id.* PharmacyChecker alleges that the domain extension is "used to lend a sense of

legitimacy and officiality to members of the cartel by giving them '.pharmacy domains'" and

that PharmacyChecker is excluded from using this domain because it does not meet the

established criteria, including VIPPS certification. *Id.* ¶ 99.

### 4.  Persuading Pharmacies Not to Work with PharmacyChecker

PharmacyChecker contends that the alleged coconspirators "[c]oerced pharmacies not to

do business with PharmacyChecker.com." *Id.* ¶ 82. For example, in January 2017,

Healthwarehouse.com, an online pharmacy with both VIPPS and PharmacyChecker

accreditation, informed PharmacyChecker that it would have to leave the PharmacyChecker

verification program or risk losing its VIPPS accreditation. *Id.* In March 2018, PharmacyChecker

was having a discussion with Healthwarehouse.com about listing its drug prices on

PharmacyChecker's drug price comparison tool. *Id.* ¶ 83. Healthwarehouse.com told

PharmacyChecker that NABP warned Healthwarehhouse.com that "PharmacyChecker.com is

out of compliance with VIPPS and dot pharmacy standards. . . . They violate US Law. Their site

promotes importation." *Id.* PharmacyChecker alleges that, based on these statements,

Healthwarehouse.com decided not to participate in PharmacyChecker's drug price comparison

program. *Id.*

Besides reaching out to specific pharmacies to persuade them not to use

PharmacyChecker's services, PharmacyChecker asserts that the alleged coconspirators

"persuaded *vendors* that maintain and categorize databases of websites and/or otherwise enable

network filtering to categorize PharmacyChecker.com and its accredited pharmacy websites as
'not safe,' 'malicious,' or 'pornography.'" *Id.* ¶ 84 (emphasis added). PharmacyChecker alleges
that one vendor told PharmacyChecker that PharmacyChecker had been so classified "by a
contracted verification service who [the vendor] would not name." *Id.* PharmacyChecker alleges,
on information and belief, that the "contracted verification service" was either NABP or
LegitScript. *Id.*

### 5. Disseminating Misinformation

PharmacyChecker alleges that the alleged coconspirators engage in coordinated
misinformation campaigns designed to spread false information about PharmacyChecker.
*Id.* ¶ 85. For example, on August 18, 2015, LegitScript and ASOP *jointly* issued a paid news
release "wrongly linking PharmacyChecker and PharmacyChecker-accredited online pharmacies
to an indictment related to illegal wholesale drug importation." *Id.* ¶ 85(a). The wire service that
published the release later retracted it, agreeing with PharmacyChecker that it was false. *Id.*
PharmacyChecker alleges that NABP, CSIP, and PSM published the same false and misleading
information. *Id.* ¶¶85(b)-(d), (f). PharmacyChecker alleges that ASOP dedicated an entire
section of its "Frequently Asked Questions" (FAQ) webpage to "disparaging
PharmacyChecker.com," which, among other things, repeated the false information contained in
the retracted news release. *Id.* ¶ 85(g). PharmacyChecker also alleges that in June and July 2019,
CSIP ran targeted online ads against PharmacyChecker that appeared when a user searched for
PharmacyChecker (and the ads appeared *above* the "organic" PharmacyChecker search results).
*Id*. ¶ 93. These ads urged users to "Choose a Safe Pharmacy" and warned that "It's not worth the
risk." *Id*.

**DISCUSSION**

In its pending motion to dismiss, LegitScript argues that even if PharmacyChecker

adequately stated a claim against NABP, ASOP, CSIP, and PSM alleging an unlawful conspiracy

to restrain trade, as Judge Karas found in denying the joint motion to dismiss the New York

Lawsuit, PharmacyChecker nevertheless failed to allege enough facts plausibly linking

*LegitScript* with the alleged conspiracy. LegitScript also argues that PharmacyChecker's claim is

barred by the statute of limitations. The Court considers each argument in turn.

**A.  Whether PharmacyChecker Adequately Alleges LegitScript's Involvement**

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust

or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with

foreign nations." 15 U.S.C. § 1. To state a claim under § 1, a plaintiff must plead:

> (1) a contract, combination or conspiracy among two or more
> persons or distinct business entities; (2) which is intended to
> restrain or harm trade; (3) which actually injures competition; and
> (4) harm to the plaintiff from the anticompetitive conduct.

*SmileDirectClub*, 31 F.4th at 1118 (cleaned up). In *SmileDirect*, the Ninth Circuit rejected the

lower court's requirement that the plaintiff plead facts inconsistent with the Dental Board's

regulatory purpose. As the Ninth Circuit explained,

> the district court applied a standard more appropriate at the
> summary judgment stage, where § 1 plaintiffs must offer "evidence
> that tends to exclude the possibility" of lawful independent
> conduct. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752,
> 764 (1984). Rule 12(b)(6) does not require this heightened
> showing. *See Erie Cnty. v. Morton Salt, Inc.*, 702 F. 3d 860, 869
> (6th. Cir. 2012) (explaining that, at the motion to dismiss stage, a
> § 1 "plaintiff need not allege a fact pattern that 'tends to exclude
> the possibility' of lawful, independent conduct"). We apply the
> standard that applies to all § 1 complaints: a plaintiff must
> plausibly allege an agreement that is unreasonable "per se" or
> under the "rule of reason."

*Id*. at 1118.

The essence of LegitScript's argument here is that PharmacyChecker has not plausibly alleged that LegitScript had any part in the alleged conspiracy. Thus, the Court construes LegitScript's argument as directed only at the first element of a § 1 claim: "a contract, combination or conspiracy among two or more persons or distinct business entities." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008).[11] An antitrust plaintiff bringing a claim under § 1 must allege "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. "Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.*

In the context of § 1, an agreement is "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (cleaned up). An actual agreement may be either express or inferred.[12] It

---

[11] LegitScript does not argue here any of the other bases for dismissal presented to Judge Karas in the joint motion to dismiss. In that motion, the defendants in the New York Lawsuit argued that PharmacyChecker failed adequately to allege antitrust injury, failed to show that the per se standard should apply versus the rule of reason, failed to correctly define the relevant market or markets, and failed adequately to allege harm to competition. Judge Karas's thorough and well-reasoned opinion addressed and rejected those issues at the pleading stage. LegitScript has not raised these issues in its motion that is now before the Court.

[12] As the Ninth Circuit explained:

> A knowing wink can mean more than words. Let us suppose five competitors meet on several occasions, discuss their problems, and one finally states— 'I won't fix prices with any of you, but here is what I am going to do— put the price of my gidget at X dollars; now you all do what you want.' He then leaves the meeting. Competitor number two says— 'I don't care whether number one does what he says he's going to do or not; nor do I care what the rest of you do, but I am going to price my gidget at X dollars.' Number three makes a similar statement— 'My price is X dollars.' Number four says not one word. All leave and fix 'their' prices at 'X' dollars.

also may be proven with either direct[13] or circumstantial evidence.[14] For example, competitors may expressly agree with each other to raise prices, and that satisfies the agreement-prong under § 1. On the other hand, competitors, especially in a concentrated, or oligopolistic, industry may see each other publicly raise prices and later independently, even if also interdependently, do the same. Such interdependent yet independent conduct without an actual agreement does not satisfy § 1. Thus, to infer an agreement, a factfinder may "consider whether sufficient 'traditional' conspiracy evidence exists from which a reasonabl[e] jury could infer that an agreement existed." *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 362 (3d Cir. 2004).

Further, merely finding parallel conduct is an insufficient basis to infer an agreement. As the Ninth Circuit explained in another § 1 case, also from earlier this year, "in the antitrust context, allegations of conspiracy often arise from parallel conduct among business competitors 'that could just as well be [lawful] independent action.'" *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 47 (9th Cir. 2022) (alteration in original) (quoting *Twombly*, 550 U.S. at 557). Thus, *when* a plaintiff in a § 1 case relies on allegations of parallel conduct to allege a § 1 claim, that plaintiff faces additional burdens when defending against a Rule 12(b)(6) motion. As the Ninth Circuit explained in *DRAM*:

> Generally, when a plaintiff alleges facts consistent with both the
> plaintiff's and the defendant's explanation, and both explanations

---

*Esco Corp. v. United States*, 340 F.2d 1000, 1007 (9th Cir. 1965).

[13] "Direct evidence of a conspiracy is evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011) (quotation marks omitted). Direct evidence may consist of written documents, audio or video recordings, or eyewitness testimony about what was said.

[14] "But antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case. Thus, . . . conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

PAGE 18 – OPINION AND ORDER

are plausible, the plaintiff survives a motion to dismiss under Rule 12(b)(6). *See Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). However, in the antitrust context, allegations of conspiracy often arise from parallel conduct among business competitors "that could just as well be [lawful] independent action." *Twombly*, 550 U.S. at 557. Therefore, to state a plausible Section 1 claim, plaintiffs must include additional factual allegations that place that parallel conduct in a context suggesting a preceding agreement. *Id*. In other words, plaintiffs must allege something more than conduct merely consistent with agreement in order to "nudge[ ] their claims across the line from conceivable to plausible." *Id*. at 570. This higher standard is warranted by practical considerations in antitrust cases, where proceeding to discovery "frequently causes substantial expenditures and gives the plaintiff the opportunity to extort large settlements even where he does not have much of a case." *Kendall*, 518 F.3d at 1047.

*DRAM*, 28 F.4th at 47 (alterations in original). As the Ninth Circuit clarified, "[i]n the absence of direct evidence of an agreement, certain *plus factors* may elevate allegations of parallel conduct to plausibly suggest the existence of a conspiracy." *Id*. (emphasis added). The Ninth Circuit also has held that "membership in an association does not render an association's members automatically liable for antitrust violations committed by the association." *Kendall*, 518 F.3d at 1048 (citing *Kline v. Coldwell Banker & Co.*, 508 F.2d 226, 232 (9th Cir. 1974)). Rather, "in order for a member of a trade association to become guilty . . . he must have knowingly, intentionally and actively participated in an individual capacity in the scheme." *Kline*, 508 F.2d at 232 (cleaned up).

LegitScript argues that PharmacyChecker alleges only "unilateral conduct, lawful coordination, and independent or parallel action." ECF 238, at 12. In its opposition memorandum, PharmacyChecker stated that "plus factors" abound in this case. ECF 239, at 15. Further complicating the analysis, however, PharmacyChecker asserted at oral argument that this is *not* a parallel conduct case because PharmacyChecker has alleged that LegitScript engaged in "joint action" with one or more of the alleged coconspirators.

The Court finds that the Amended Complaint alleges both express joint action and parallel conduct with plus factors (and alleges both direct and circumstantial evidence).[15] The most obvious allegation of express joint conduct is the allegation that LegitScript and ASOP "jointly issued a false and misleading paid news release on August 18, 2015, wrongly linking PharmacyChecker and PharmacyChecker-accredited online pharmacies to an indictment related to illegal wholesale drug importation." AC ¶ 85(a). Other allegations of express joint conduct are that LegitScript cofounded both ASOP and CSIP. *Id.* ¶¶ 7-8, 68. Relatedly, the Ninth Circuit in *SmileDirectClub* discussed when the actions of a membership entity can be imputed to its members. In that case, as discussed earlier, the plaintiff, SmileDirect, was a direct-to-consumer seller of teeth-aligning products and services, and the defendants were members or employees of the Dental Board of California (the Board). *SmileDirectClub*, 31 F.4th at 1116. SmileDirect alleged that "certain members of the Board, motivated by their private desires to stifle competition, mounted an aggressive, anti-competitive campaign of harassment and intimidation designed to drive [SmileDirect] out of the market." *Id.* SmileDirect did not, however, name the Board itself as a defendant; rather, it named only individual Board members and employees. *Id.* The Ninth Circuit held that SmileDirect adequately alleged that some of the defendants had engaged in anticompetitive activities sufficient to state a conspiracy claim under § 1. *Id.* at 1119.

The Ninth Circuit explained that, for the defendants who were both members of the Board and themselves practicing dentists, "[t]heir governance role is sufficient, when coupled

---

[15] As the facts develop, this case also may present some similarities with "hub and spoke" antitrust conspiracies based on the blurring of horizontal and vertical restraints. *See generally In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 (9th Cir. 2015) (noting that "the line between horizontal and vertical restraints can blur" and adding that although the Third and Seventh Circuits have recognized "hub and spoke" antitrust conspiracies, the Ninth Circuit has not yet done so).

with the congruence between the Board's actions and their own self-interest, to allow a plausible inference of active participation." *Id.* The Ninth Circuit recognized that membership alone is not enough to allege that an organization's members participate in an antitrust conspiracy, but the Court noted that SmileDirect's allegations were sufficient in that case to state a claim that the individual defendants had been involved in the unlawful conspiracy. *Id.* The Ninth Circuit observed that SmileDirect's "business model poses a competitive threat to the dentist Board members' 'dental practices'; that several Board members belong to powerful trade groups; and that they collectively have 'an economic incentive' to drive SmileDirect out of the market." *Id.* These allegations, however, applied "only to the dentists and orthodontists who allegedly view SmileDirect as competition," and, thus, the Ninth Circuit dismissed SmileDirect's claims against several individual defendants who were not direct competitors of the plaintiff. *Id.* at 1119.

PharmacyChecker's allegations against LegitScript are similar to the allegations made by SmileDirect against the dentist and orthodontist defendants in *SmileDirectClub* who competed with SmileDirect. PharmacyChecker plausibly alleges that LegitScript worked in concert with the membership organizations to which LegitScript belonged to protect LegitScript from competition by PharmacyChecker. Among other things, PharmacyChecker alleges that ASOP and LegitScript put out a joint news release that spread false information about PharmacyChecker. AC ¶ 85(a). PharmacyChecker also alleges that both LegitScript and NABP are direct competitors of PharmacyChecker. *Id.* ¶ 28. PharmacyChecker further alleges not only that LegitScript was a member of some organizations alleged to have conspired against PharmacyChecker, but also that LegitScript cofounded two of those organizations and remains in a position of governance in at least one of them. *Id.* ¶¶ 7-8, 10, 68; *see SmileDirectClub*, 31 F.4th at 1119 (holding that the dentist Board members' "governance role is sufficient, when coupled

with the congruence between the Board's actions and their own self-interest, to allow a plausible inference of active participation").

PharmacyChecker also alleges that these organizations were established "to restrain online pharmacies and wholly exclude international online pharmacy competition." AC ¶ 62. PharmacyChecker adds that LegitScript worked with internet gatekeepers to "accomplish the pharmaceutical and pharmacy interests' goal of restraining competition from international online pharmacies." *Id.* ¶ 66. PharmacyChecker also alleges facts suggesting that NABP, CSIP, and ASOP acted in furtherance of the conspiracy that were specifically in LegitScript's interest. *See, e.g.*, *id.* ¶ 73(b) (alleging that NABP and ASOP sought to "deprive all but LegitScript- and NABP- approved pharmacies of both paid search engine advertising and organic search results, payment processing accounts, website domains, and shipping companies"). That NABP would want to improve its own position against a competitor like PharmacyChecker could be attributable to individual and independent self-interest. But the allegation that NABP helped another competitor, LegitScript, try to injure PharmacyChecker, provides at least some factual support to PharmacyChecker's allegations of an agreement between LegitScript, NABP, and ASOP.

These allegations, especially when taken together, raise a suggestion of a preceding agreement sufficient to survive a motion to dismiss. In summary, PharmacyChecker alleges that LegitScript, a direct competitor, founded both ASOP and CSIP to restrain competition from international online pharmacies and that ASOP, CSIP, and NABP—another direct competitor— worked in concert to promote an anticompetitive strategy that injured PharmacyChecker. PharmacyChecker also alleges that LegitScript and ASOP jointly published a paid news release on August 18, 2015, that spread harmful misinformation about PharmacyChecker. *Id.* ¶ 85(a). At

the pleading stage, the Court finds that PharmacyChecker adequately alleges LegitScript's involvement in the purported conspiracy based on LegitScript's role in founding several the alleged coconspirators, its continuing membership and governance roles in those organizations, the congruence between those organizations' actions and LegitScript's self-interest, as well as the joint publishing with ASOP of a paid news release harmful to PharmacyChecker.[16]

## B.  Whether PharmacyChecker's Claim Is Barred by the Statute of Limitations

A claim under the Sherman Act must be commenced "within four years after the cause of action accrued." 15 U.S.C. § 15b. In the context of an alleged antitrust conspiracy, the Sherman Act's statute of limitations has been "understood to mean that each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971).

Although the operative date for determining when the statute of limitations has run is the date of the commission of the act that results in a plaintiff's injury, "[e]vidence of events or transactions which cannot be the subject of a suit by virtue of a statute of limitations bar may be introduced to show the nature and character of transactions under scrutiny or to establish a course of conduct." *Whittaker Corp. v. Execuair Corp.*, 736 F.2d 1341, 1347 (9th Cir. 1984). Further, to allege a continuing violation of the antitrust laws, "a plaintiff must allege that a

---

[16] That PharmacyChecker has *not* alleged specific activities linking LegitScript and PSM is insufficient for the Court to dismiss PharmacyChecker's antitrust claim against LegitScript. As noted, there is more than enough evidence, at least at the pleading stage, to state a conspiracy claim involving LegitScript, NABP, ASOP, and CSIP. Further, Judge Karas in the New York Lawsuit found that PharmacyChecker adequately stated a conspiracy claim involving ASOP, CSIP, NABP, and PSM. Collectively, this is sufficient for the Court here to allow PharmacyChecker to proceed in the pending action against LegitScript, alleging a conspiracy among LegitScript, NABP, ASOP, CSIP, and PSM.

defendant completed an overt act during the limitations period that meets two criteria: 1) It must be a new and independent act that is not merely a reaffirmation of a previous act; and 2) it must inflict new and accumulating injury on the plaintiff." *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1202 (9th Cir. 2014) (cleaned up). This requirement is "to differentiate those cases where a continuing violation is ongoing—and an antitrust suit can therefore be maintained—from those where *all of the harm* occurred at the time of the initial violation." *Id.* (emphasis added).

PharmacyChecker filed its original complaint on August 13, 2019. ECF 1. Under 28 U.S.C. § 1631, this is the operative filing date, even though the case was later transferred to this district. LegitScript argues that PharmacyChecker's allegations concern conduct that took place "in 2013-2014 and on August [18], 2015," citing AC ¶¶ 80 and 85(a).[17] ECF 238, at 16. As described above, the Court also is not persuaded by LegitScript's characterization of the operative pleading as failing to allege LegitScript's involvement in the purported conspiracy. Based on the Court's finding that PharmacyChecker adequately alleges LegitScript's participation in a conspiracy involving NABP, ASOP, and CSIP, the relevant question now is whether PharmacyChecker brought suit within four years of suffering injury caused by the conspiracy.

LegitScript also argues that its joint paid news release with ASOP, issued on August 18, 2015, is merely a "reaffirmation of a previous act" and thus cannot restart the statute of

---

[17] At oral argument, the Court noted that LegitScript appeared to make a typographical error in its motion. LegitScript stated in its motion that the date of the allegedly false paid news release jointly published by LegitScript and ASOP was August 13, 2015. ECF 238, at 16. At oral argument, LegitScript agreed that this was an error on its part and that the Amended Complaint in fact alleged that the joint news release was issued on August 18, 2015. AC ¶ 85(a). This act is within four years of the filing of the original complaint and allegedly caused harm to PharmacyChecker.

limitations for acts that occurred before August 13, 2015. The Court is not persuaded that the

paid news release jointly issued by LegitScript and ASOP on August 18, 2015, is a "mere

reaffirmation" of a previous act by LegitScript.

PharmacyChecker alleges:

> These misinformation campaigns have been sustained by
> defendants for extensive periods of time—many of the above
> examples still come up in search results—and include clearly false
> statements that are: (1) material to consumers considering which
> firms to trust; and (2) likely to induce reasonable reliance on the
> part of consumers who lack appreciable knowledge of the subject
> matter. Moreover, these statements are not readily susceptible to
> neutralization or offset by PharmacyChecker.com because of their
> wide dissemination.

AC ¶ 86. This allegation shows the August 18, 2015 joint news release goes beyond a "mere

reaffirmation" because it inflicted new harm independent from any prior conduct. Also, nothing

in the Amended Complaint (or even referred to in LegitScript's motion to dismiss) indicates that

the jointly issued news release of August 18, 2015, was merely a reissuance of the same news

release that had previously been issued or that LegitScript had engaged in that conduct before.

LegitScript also urges the Court not to consider any allegations before August 13, 2015.

A court, however, may consider evidence that "cannot be the subject of a suit by virtue of a

statute of limitations bar" to "show the nature and character of transactions under scrutiny or to

establish a course of conduct." *Whittaker*, 736 F.2d at 1347. Thus, the Court need not disregard

allegations of conduct pre-dating August 13, 2015.

Finally, many actions taken by the alleged coconspirators occurred after August 18, 2015.

These include: (1) NABP adding PharmacyChecker to its "Not Recommended Sites" list in

December 2018, AC ¶ 87; (2) CSIP reducing PharmacyChecker's search results in June and

July 2019, *id.* ¶¶ 93-95; (3) LegitScript and ASOP's jointly publishing a paid news release on

August 18, 2015, *id.* ¶ 85(a); and (4) PSM publishing a false and misleading article in 2018, *id.*

¶ 85(f). Even though not all these allegations expressly identify LegitScript as a directly

participating actor, that is not dispositive on the question of the statute of limitations. Actions

taken in furtherance of a conspiracy are imputed to all coconspirators. *United States v. Inryco,

Inc.*, 642 F.2d 290, 293 (9th Cir. 1981); *see also Arandell Corp. v. Centerpoint Energy Servs.*,

900 F.3d 623, 634 (9th Cir. 2018). Because the Court finds that PharmacyChecker has

adequately alleged that LegitScript conspired with the four defendants remaining in the New

York Lawsuit, the actions taken by any of them in furtherance of the alleged conspiracy may be

imputed to LegitScript when considering the statute of limitations. PharmacyChecker thus

adequately alleges that at least some of the participants in the alleged conspiracy took actions in

furtherance of the alleged conspiracy after August 13, 2015, including expressly LegitScript, that

caused injury to PharmacyChecker within the limitations period. Thus, PharmacyChecker's

claim is not barred by the Sherman Act's statute of limitations.

**CONCLUSION**

The Court DENIES Defendant LegitScript's Motion to Dismiss (ECF 238).

**IT IS SO ORDERED**.

DATED this 11th day of July, 2022.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge