# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

|  |  |
|---|---|
| **PHARMACYCHECKER.COM LLC**, | Case No. 3:22-cv-252-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **LEGITSCRIPT LLC**, | |
| Defendant. | |

Philip S. Van Der Weele, K&L GATES LLP, One SW Columbia Street, Suite 1900, Portland, OR 97204; Aaron R. Gott, BONA LAW PC, 331 Second Avenue South, Suite 420, Minneapolis, MN 55401; and James F. Lerner, BONA LAW PC, 41 Madison Avenue, Suite 2509, New York, NY 10010. Of Attorneys for Plaintiff PharmacyChecker.com LLC.

Richard P. Sybert, Hannah Brown, and Matthew Mejia, GORDON REES SCULLY MANSUKHANI LLP, 1300 SW Fifth Avenue, Suite 2000, Portland, OR 97201; John T. Mills, GORDON REES SCULLY MANSUKHANI LLP, One Battery Park Plaza, 28th Floor, New York, NY 10004; and Christopher Pallanch, TONKON TORP LLP, 888 SW Fifth Avenue, Suite 1600, Portland, OR 97204. Of Attorneys for Defendant LegitScript LLC.

**Michael H. Simon, District Judge.**

Plaintiff PharmacyChecker.com LLC (PharmacyChecker) brings this antitrust lawsuit under § 1 of the Sherman Act, 15 U.S.C. § 1, alleging that it is the victim of a conspiracy to restrain competition in the markets for online pharmacy verification services and comparative drug pricing information. As alleged by PharmacyChecker, the United States is in a prescription

drug crisis. The cost of prescription medicine in the United States is higher than anywhere in the world, and the effect on public health is disastrous. Millions of Americans each year do not fill needed prescriptions because of cost. As a result, many become sicker or even die. Others—about four million people annually—seek their medications from pharmacies abroad at lower cost. Yet prescription drug importation into the United States is generally forbidden by federal law.

PharmacyChecker launched PharmacyChecker.com in 2003. PharmacyChecker compares the prices of online pharmacies based inside and outside the United States. According to PharmacyChecker, it operates a rigorous accreditation program that informs visitors of online pharmacy websites whether those pharmacies have met certain safety standards and obtained certain credentials. It also provides drug price comparison information that allows visitors worldwide to find the lowest prices for their prescription medications, whether dispensed in the United States or abroad. In addition, it offers a prescription drug discount card that allows consumers to save as much as 90% at many U.S. pharmacies. PharmacyChecker also raises awareness about policy issues relating to prescription medication access and affordability in the United States. PharmacyChecker is not a pharmacy and does not itself buy, sell, import, dispense, process orders for, or distribute any drugs.

In August 2019, PharmacyChecker filed a federal lawsuit in the Southern District of New York (the New York Case). In that action, PharmacyChecker alleged violations of federal antitrust law, among other claims, and sued five alleged conspirators: (1) the National Association of Boards of Pharmacy (NABP); (2) the Alliance for Safe Online Pharmacies; (3) the Center for Safe Internet Pharmacies Ltd.; (4) the Partnership for Safe Medicines, Inc.; and

(5) the defendant here, LegitScript LLC (LegitScript).[1] The first four defendants (collectively, the New York Defendants) are business associations or organizations of pharmacy industry players. LegitScript is a for-profit, privately managed verification and monitoring service for online pharmacies. It is the only private service of that kind recognized by Defendant NABP. PharmacyChecker alleges that LegitScript directly competes with PharmacyChecker in the market for online pharmacy verification services.

Now before the Court is a motion for summary judgment filed by LegitScript. Because of issues relating to personal jurisdiction, LegitScript is the only defendant in this action in the District of Oregon. The other alleged conspirators, the New York Defendants, have since prevailed in the New York Case on their own motion for partial summary judgment against PharmacyChecker's antitrust claim. In the pending motion in this case, LegitScript argues that issue preclusion bars PharmacyChecker from continuing its antitrust claim in this Court. Alternatively, LegitScript moves for summary judgment on the same grounds that the New York Defendants argued in the New York Case, asserting that PharmacyChecker has not suffered any cognizable antitrust injury and therefore lacks standing. LegitScript contends that the main purpose of PharmacyChecker's business is to enable U.S. consumers illegally to import for personal use prescription drugs from foreign pharmacies.

PharmacyChecker responds that issue preclusion is not applicable because the partial summary judgment opinion in the New York Case is not a sufficiently final judgment to warrant preclusive effect. PharmacyChecker also argues that LegitScript fails to meet its burden of

---

[1] The Court's Opinion and Order denying LegitScript's motion to dismiss expands on the allegations against the defendants in the New York Case, their roles in the alleged conspiracy to restrain competition, and the relevant markets alleged by PharmacyChecker. *PharmacyChecker.com LLC v. LegitScript LLC*, 614 F. Supp. 3d 796, 803-08 (D. Or. 2022).

showing that issue preclusion applies because the issues in the two cases are not identical

because a different legal standard applies under Ninth Circuit law than was applied in the New

York Case. PharmacyChecker further argues that its business is entirely legal and that under

Supreme Court and Ninth Circuit precedent, none of PharmacyChecker's activities preclude

antitrust standing. For the reasons explained below, the Court denies LegitScript's motion for

summary judgment.

## STANDARDS

### A.  Summary Judgment

A party is entitled to summary judgment if the "movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine

dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A court must view

the evidence in the light most favorable to the non-movant and draw all reasonable inferences in

the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th

Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the

drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling

on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of

the plaintiff's position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255

(1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the

non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith

Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks omitted).

### B.  Antitrust Standing and Antitrust Injury

A private plaintiff may sue to enforce the Sherman Act under § 4 of the Clayton Act, 15

U.S.C. § 15(a). That statute provides that "any person who shall be injured in his business or

property by reason of anything forbidden in the antitrust laws may sue therefor . . . , and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a). A private plaintiff, however, must have "antitrust standing." *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987 (9th Cir. 2000). When deciding whether a plaintiff has antitrust standing, courts consider "(1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages." *Id.* (quoting *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal*., 190 F.3d 1051, 1054-55 (9th Cir. 1999)).

The first factor for antitrust standing—the "nature of the plaintiff's alleged injury"— requires a showing of what the law calls "antitrust injury," that is, "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.* (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)). A showing of antitrust injury is necessary, but not always sufficient, to establish standing under the antitrust laws. *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 n.5 (1986); *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 456 (9th Cir. 2021) (describing antitrust injury as "mandatory" for antitrust standing); *see also* William H. Page, *The Scope of Liability for Antitrust Violations*, 37 Stan. L. Rev. 1445, 1483-85 (1985) (distinguishing concepts of antitrust injury and antitrust standing).

Parsing the Supreme Court's definition from *Atlantic Richfield Co*., the Ninth Circuit has identified "four requirements for antitrust injury: (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Am. Ad Mgmt*, 190 F.3d at 1055.

# BACKGROUND[2]

## A. PharmacyChecker's Products and Revenues

PharmacyChecker provides information services to its website visitors without charge. Some of these visitors never click through to any pharmacy's website. These visitors simply use the information on PharmacyChecker's website as a comparative-price reference, for research, for use in policy advocacy, or as an educational tool. A Wall Street Journal op-ed recognized PharmacyChecker as one of just a handful of companies that provide patients and policymakers with a resource that gives transparency to prescription drug prices.[3] In addition,

---

[2] As noted, LegitScript's motion is based on two alternative arguments. One relies on issue preclusion, and the other is based on facts relating to PharmacyChecker's alleged antitrust injury. The parties did not provide evidence to this Court on the second issue, only briefing. LegitScript stated in its motion that it incorporated by reference the briefing and exhibits filed in the New York Case. At oral argument, LegitScript explained that it did not obtain discovery from PharmacyChecker because many exhibits in the New York Case were subject to a protective order. But this Court was unable to access the documents filed under seal in New York. Further, asking this Court to locate in the docket of the New York Case evidentiary support, whether under seal or not, for LegitScript's motion here is not an appropriate method of presenting evidence. LegitScript acknowledged that it "may have erred . . . simply to refer to the record in New York." The Court allowed the parties to submit supplemental briefing and evidence after oral argument. PharmacyChecker submitted several documents that had been filed in the New York Case: the declaration of its President and Co-founder Gabriel Levitt (ECF 282-1), and PharmacyChecker's statement of material facts submitted in the New York Case, which included the statement of material facts submitted by the New York Defendants (ECF 282-2). In response, and to "complete the record," LegitScript filed the reply to PharmacyChecker's statement of material facts filed by the New York Defendants (ECF 291). No party objected to these submissions, and the Court accepts them. The Court also construes LegitScript as having adopted the factual positions asserted by the New York Defendants. Further, the Court considers evidence submitted elsewhere in this Court's record, including the affidavits of PharmacyChecker's Chief Executive Officer and Co-founder, Tod Cooperman, MD (ECF 19, 56).

[3] Joe Grogan & Casey B. Mulligan, *In Defense of Pharmacy Benefit Managers*, Wall St. J. (July 11, 2022), https://www.wsj.com/articles/in-defense-of-pharmacy-benefit-managers-drugs-rebates-patient-costs-premiums-transparency-innovation-regulation-ftc-11657571932 ("Companies such as GoodRx, Pharmacy Checker, and SaveonMeds add transparency to the system and give patients the option to access affordable medication outside their pharmacy benefits.").

PharmacyChecker's online pharmacy verification and drug price comparison services are referenced in media sources, including AARP Magazine, the Wall Street Journal, NBC News, Yahoo Finance, the New York Times, Kaiser Health News, and others. Its drug price comparisons have been cited by the FDA and academic researchers. Organizations such as Medicines Sans Frontiers (Doctors Without Borders) have sought advice from PharmacyChecker on international pharmacy safety and drug pricing, and the World Health Organization has published reports citing PharmacyChecker. Its executives have testified before Congress regarding counterfeiting and other issues relating to prescription drugs. Further, a U.S. Senate staff report expressly relied on data from PharmacyChecker.[4]

Rather than charge visitors a fee for its information services, PharmacyChecker supports its website and programs with revenue obtained from several sources. For purposes of the pending motion, the parties agree that the bulk of PharmacyChecker's revenue from January 2015 to August 2021 derived from click-through fees (85%) and verification program fees (14%) (including fees for accreditation and listing) paid by online pharmacies. Its remaining revenue, about 1%, came from other sources, such as its prescription drug discount card, Medicare drug plans, advertising, and the sale of e-books.

Click-through fees are a common form of payment for traffic on the internet. Online pharmacies pay a fee for each click to their website routed through PharmacyChecker.com, regardless of the clicker's geographic origin or location. The parties agree that approximately 95% of PharmacyChecker's click-through revenue from January 2015 to August 2021 was paid by foreign pharmacies. The parties also agree that U.S.-based clicks

---

[4] U.S. Senate Homeland Sec. & Gov't Affs. Comm., Ranking Member's Office, *Manufactured Crisis* 4 (2018) ("Using PharmacyChecker.com, staff also reviewed price comparisons for specific brand-name drugs available through verified online pharmacies.").

generated only 69.4% of click-through revenue during that time. PharmacyChecker also provides other evidence that millions of users outside of the United States view and use its website.

PharmacyChecker agrees that between 94 to 96% of its total revenue came from foreign pharmacies. As noted above, however, not all PharmacyChecker's total revenue, which would include total revenue from foreign pharmacies, was from *click-through revenue*, let alone U.S.-based (or U.S. origin) click-through revenue. Mr. Levitt explains in his declaration that even applying the figures assumed by the New York Defendants' expert, at most only 56.7% of PharmacyChecker's total revenue came from clicks by U.S. users (or visitors) to foreign pharmacies. Mr. Levitt multiplied PharmacyChecker's total click-through revenue by the percentage of U.S. based consumers (69.4%), then multiplied that number by the percentage of click-through revenue from foreign pharmacies (rounding up from approximately 95% to 96%), then divided that number by PharmacyChecker's total revenue, to arrive at 56.7%.

LegitScript, however, focused on the fact that 96% of click-through revenue came from foreign pharmacies and 85% of total revenue came from all click-through revenue, in asserting the percentage of total revenue based on click-throughs to foreign pharmacies. This would equal 81.6% of total revenue. This calculation, however, does not distinguish *U.S.-based* clicks (agreed by the parties to be 69.4%). Reducing the total revenue attributable to foreign pharmacy click-through income to only U.S. based click-throughs (81.6% times 69.4% equals 56.63%), the parties would have almost identical percentages for PharmacyChecker's total revenue received from foreign pharmacies based on U.S. clicks (56.63% versus 56.7%).

As noted, about 14% of PharmacyChecker's revenue came from verification program fees paid by participating online pharmacies, including initial application and annual fees for verification, and monthly listing fees for being published in PharmacyChecker's online directory.

Only verified pharmacies may participate in PharmacyChecker's drug-listing comparison program. Mr. Levitt also calculates that 13.7% of PharmacyChecker's verification program revenue came from U.S.-based pharmacies. Although the parties dispute precise percentages, they agree that about 5% of PharmacyChecker's total revenue from January 2015 to August 2021 was from verification fees paid by U.S. online pharmacies and click-through fees paid by U.S. online pharmacies.

PharmacyChecker does not track visitor activity after visitors to its website click through to a pharmacy website and thus has no data connecting clicks to purchase transactions. It also does not receive that information from pharmacies that participate in its programs. PharmacyChecker earns revenue when visitors click through to pharmacies, but none of that revenue depends on whether a purchase transaction occurs (except for revenue associated with the U.S. prescription drug discount card). Mr. Levitt explains that according to one foreign pharmacy's estimate, only 3.47% of clicks received through PharmacyChecker.com led to a purchase transaction. In addition, LegitScript has provided evidence showing that in at least three instances PharmacyChecker assisted or offered to assist U.S. consumers who purchased prescriptions from foreign pharmacies for personal use deal with issues related to their orders.

## B. Purported Anticompetitive Conduct and Injury

PharmacyChecker alleges that the purported conspirators have engaged in targeted and coordinated misinformation and "scare" campaigns, group boycotts, and other exclusionary conduct, all with an objective of destroying PharmacyChecker's reputation, suppressing its presence in consumer-accessible channels of the internet, and interfering with its business relationships. PharmacyChecker also alleges that the actions of the alleged conspirators fall into five general categories: (1) "blacklisting" PharmacyChecker and having its website designated as "unsafe"; (2) manipulating search engine results; (3) gatekeeping over the ".pharmacy" domain

extension and trying to have the International Corporation for Assigned Named and Numbers require the removal of any pharmacy domain not approved by NAPB; (4) persuading pharmacies not to work with PharmacyChecker; and (5) spreading misinformation adverse to PharmacyChecker.[5]

As for injury, PharmacyChecker provides evidence that directly after the alleged anticompetitive conduct by LegitScript and the New York Defendants, PharmacyChecker's site traffic from organic search results dropped more than 78%. PharmacyChecker also provides evidence that its monthly click-through revenue dropped by more than 77% since March 2019. PharmacyChecker also offers evidence of reputational harms. Mr. Cooper and Mr. Levitt explain that fewer U.S. pharmacies have participated in PharmacyChecker's programs in recent years, allegedly because of the concerted efforts by LegitScript and the New York Defendants. PharmacyChecker contends that the alleged conspirators coerced or dissuaded U.S. pharmacies from participating in PharmacyChecker's verification and listing programs.

PharmacyChecker gives as an example HealthWarehouse.com, one of the largest U.S. online pharmacies, which left PharmacyChecker's verification program in 2017. Mr. Levitt describes an email he received from HealthWarehouse.com in January 2017, stating that it would have to leave the PharmacyChecker Verification Program or risk losing its Verified Internet Pharmacy Practice Sites (VIPPS) accreditation, which is run by New York Defendant NABP. Similarly, Mr. Cooper explains that LegitScript and the New York Defendants coordinated U.S.-targeted advertisements using "pharmacychecker" as a Google AdWord to dissuade both

---

[5] In its pending motion, LegitScript does not argue that there is insufficient evidence of these allegations to raise a genuine issue for trial on the merits of PharmacyChecker's antitrust claim, and the Court makes no finding either way. This discussion is provided solely for background purposes.

online pharmacies and consumers from associating with it or using its services. Mr. Levitt describes that from 2015 to the present, contemporaneous with the alleged conspiracy, the number of U.S. pharmacies participating in PharmacyChecker's verification program dropped from 36 to 8.

## C.  The New York Case

In March 2020, LegitScript moved to dismiss in the New York Case, arguing that the federal court in New York lacked personal jurisdiction over LegitScript, an Oregon company. U.S. District Judge Kenneth M. Karas found that the federal court in New York lacked personal jurisdiction over LegitScript and dismissed PharmacyChecker's claims against LegitScript without prejudice. *PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy* (*PharmacyChecker I*), 530 F. Supp. 3d 301, 320-27 (S.D.N.Y. 2021). Rather than filing an amended complaint in New York, PharmacyChecker moved to sever its claim against LegitScript. In February 2022, Judge Karas transferred PharmacyChecker's lawsuit against LegitScript to the District of Oregon. Shortly thereafter, LegitScript moved to dismiss under Rule 12(b)(6), which the Court denied in July 2022. *PharmacyChecker.com LLC v. LegitScript LLC* (*PharmacyChecker II*), 614 F. Supp. 3d 796 (D. Or. 2022). The Court also denied LegitScript's motion to stay discovery. *PharmacyChecker.com LLC v. LegitScript LLC*, 2022 WL 17496113 (D. Or. Dec. 8, 2022).

Meanwhile, in June 2022, the New York Defendants moved for partial summary judgment against PharmacyChecker's antitrust claim against them, arguing that PharmacyChecker lacked antitrust standing. The New York Defendants argued that PharmacyChecker could not show antitrust standing because the main purpose of its business is to facilitate illegal conduct by others, specifically, assisting consumers in the United States in purchasing and importing prescription drugs for their personal use from certified pharmacies

located in other countries. In March 2023, Judge Karas granted that motion.

*PharmacyChecker.com v. Nat'l Ass'n of Bds. of Pharmacy* (*PharmacyChecker III*), 2023

WL 2973038 (S.D.N.Y. Mar. 28, 2023). Judge Karas ruled that PharmacyChecker lacks antitrust

standing because its business is "completely or almost completely geared toward facilitating"

consumers' alleged illegal importation of non-controlled drugs for personal use with a

prescription. *Id*. at *30.

## DISCUSSION

### A.  Issue Preclusion

LegitScript first argues that the Court should grant summary judgment based on issue

preclusion[6] because Judge Karas already decided antitrust standing in favor of the New York

Defendants. PharmacyChecker responds that this argument should fail because there is no final

judgment in the New York Case or, in the alternative, because the issues are not the same.

### 1.  Standards for Issue Preclusion

"The preclusive effect of a judgment is defined by claim preclusion and issue preclusion,

which are collectively referred to as 'res judicata.'" *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008).

Claim preclusion occurs when "a final judgment forecloses successive litigation of the very same

claim, whether or not relitigation of the claim raises the same issues as the earlier suit." *Id.*

(quotation marks omitted). "Issue preclusion, in contrast, bars successive litigation of an issue of

fact or law actually litigated and resolved in a valid court determination essential to the prior

judgment, even if the issue recurs in the context of a different claim." *Id.* (quotation marks

omitted). "By precluding parties from contesting matters that they have had a full and fair

---

[6] Courts previously referred to the form of issue preclusion being sought by LegitScript as "offensive nonmutual collateral estoppel."

opportunity to litigate, these two doctrines protect against the expense and vexation attending multiple lawsuits, conserve judicial resources, and foster reliance on judicial action by minimizing the possibility of inconsistent decisions." *Id.* (cleaned up).

To establish issue preclusion, formerly known as collateral estoppel, "the party asserting issue preclusion" must show that: "(1) the issue at stake was identical in both proceedings; (2) the issue was actually litigated and decided in the prior proceedings; (3) there was a full and fair opportunity to litigate the issue; and (4) the issue was necessary to decide the merits." *Howard v. City of Coos Bay*, 871 F.3d 1032, 1040, 1041 (9th Cir. 2017) (quotation marks omitted); *see also Love v. Villacana*, 73 F.4th 751, 754 (9th Cir. 2023) (same). "A final judgment is afforded preclusive effect even if erroneous." *Love*, 73 F.4th at 754.

Courts typically evaluate the first prong—whether the issue is identical—using four factors:

> (1) is there a substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first?
>
> (2) does the new evidence or argument involve the application of the same rule of law as that involved in the prior proceeding?
>
> (3) could pretrial preparation and discovery related to the matter presented in the first action reasonably be expected to have embraced the matter sought to be presented in the second?
>
> (4) how closely related are the claims involved in the two proceedings?

*Howard*, 871 F.3d at 1041 (quoting *Resolution Tr. Corp. v. Keating*, 186 F.3d 1110, 1116 (9th Cir. 1999)). These factors, however, "are not applied mechanistically." *Id.*

### 2.  Analysis

#### a.  Finality of New York Case Decision

PharmacyChecker argues that the partial summary judgment decision by Judge Karas is not a final judgment for purposes of issue preclusion. In *Arizona v. California*, the Supreme Court stated the "general rule" that "issue preclusion attaches only '[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment.'" 530 U.S. 392, 414 (alteration in original) (quoting Restatement (Second) of Judgments § 27 (1982)), *supplemented*, 531 U.S. 1 (2000). In discussing the preclusive effect of a prior court decision for issue preclusion, courts generally reference a "judgment." *See Taylor*, 553 U.S. at 892 (stating that issue preclusion "bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment" (quotation marks omitted)); *Howard*, 871 F.3d at 1040-41 (quoting *Taylor*).[7]

"To be 'final' for collateral estoppel purposes, a decision need not possess 'finality' in the sense of 28 U.S.C. § 1291. A final judgment for purposes of collateral estoppel can be any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect." *Luben Indus., Inc. v. United States*, 707 F.2d 1037, 1040 (9th Cir. 1983) (quotation marks omitted). To determine whether a decision is "sufficiently firm," the Ninth Circuit adopted the factors from the Restatement (Second) of Judgments:

> [P]reclusion should be refused if the decision was avowedly tentative. On the other hand, that the parties were fully heard, that the court supported its decision with a reasoned opinion, *that the decision was subject to appeal or was in fact reviewed on appeal*,

---

[7] The Ninth Circuit has repeatedly stated the *Taylor* standard for issue preclusion. *See, e.g.*, *Mull v. Motion Picture Indus. Health Plan*, 41 F.4th 1120, 1140 (9th Cir. 2022); *Media Rts. Techs., Inc. v. Microsoft Corp.*, 922 F.3d 1014, 1020 (9th Cir. 2019); *Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 861 F.3d 944, 955 (9th Cir. 2017).

are factors supporting the conclusion that the decision is final for purpose of preclusion.

*Id.* (emphasis and alteration added in *Luben*). The Ninth Circuit has subsequently stated in discussing the requirements for issue preclusion that the decision must be appealed or appealable. *See Env't Prot. Info. Ctr., Inc. v. Pac. Lumber Co.*, 257 F.3d 1071, 1076 (9th Cir. 2001) ("As collateral estoppel does not apply to an unappealable determination, simply holding a ruling unappealable eliminates any prospect of preclusion."); *Dixon v. Wallowa County*, 336 F.3d 1013, 1020 (9th Cir. 2003) ("Issue preclusion does not apply to an issue that is not appealable.").

"[P]artial summary judgment is merely a pretrial adjudication that certain issues shall be deemed established for the trial of the case." Fed. R. Civ. P. 56(d) advisory committee's note to 1946 amendment, *quoted with approval in Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1202 n.9 (9th Cir. 2009). The 2010 amendment to Rule 56, among other things, specifically referenced "partial summary judgment" in Rule 56(a) and moved the court's authority to issue an order adjudicating undisputed facts and granting less than full relief on a motion to Rule 56(g) but reaffirmed that partial summary judgment is "disposition of less than the whole action, whether or not the order grants all the relief requested by the motion." Fed. R. Civ. P. 56(a) advisory committee's note to 2010 amendment. A decision granting partial summary judgment generally is not appealable. *See Solis v. Jasmine Hall Care Homes, Inc.*, 610 F.3d 541, 545-46 (9th Cir. 2010).

Applying Alaska law, the Ninth Circuit considered whether a decision granting partial summary judgment could be given preclusive effect. *St. Paul Fire & Marine Ins. Co. v. F.H.*, 55 F.3d 1420 (9th Cir. 1995). The Ninth Circuit concluded that the partial summary judgment decision was not "sufficiently firm" because the decision "could not have been appealed . . .

when it was entered," "was subject to reconsideration on proper motion" under Rule 54(b) of the Alaska Rules of Civil Procedure, and "[t]he court could, on its own initiative, revise the order at any time before judgment." *Id.* at 1425 (quotation marks omitted). This reasoning is equally applicable under federal law. Decisions adjudicating motions for partial summary judgment generally can be modified under Rule 54(b) of the Federal Rules of Civil Procedure by a court either on its own initiative or on a motion by the parties. *See, e.g.*, *Credit Suisse First Bos. Corp. v. Grunwald*, 400 F.3d 1119, 1124 (9th Cir. 2005) ("Federal Rule of Civil Procedure 54(b) states that a district court can modify an interlocutory order 'at any time' before entry of a final judgment, and we have long recognized the well-established rule that a district judge always has power to modify or to overturn an interlocutory order or decision while it remains interlocutory." (quotation marks omitted)); *Blackburn v. Sturgeon Servs. Int'l, Inc.*, 2014 WL 1275919, at *1 (E.D. Cal. Mar. 27, 2014) ("On its own motion, the Court here revises its prior order granting partial summary judgment."); *In re Galena Biopharma, Inc. Derivative Litig.*, 2014 WL 5494890 (D. Or. Oct. 30, 2014) (discussing the factors district courts in the Ninth Circuit consider in evaluating a motion for reconsideration filed under Rule 54(b)). Further, such decisions generally are not appealable until a final judgment has been entered, absent the grant of mandamus. *Solis*, 610 F.3d at 545-46.

Similarly, the Ninth Circuit in *Luben* affirmed the district court's conclusion that a non-tentative, reasoned interlocutory opinion was not entitled to collateral estoppel effect because it was not sufficiently firm. *Luben*, 707 F.2d at 1040. The Ninth Circuit agreed with the district court's explanation that the interlocutory opinion was "subject to free revision by the court on its own motion or on motion of any party at any time before judgment" and added that the opinion "could not have been the subject of an appeal at the time the instant case was decided

in the District Court." *Id.* The Ninth Circuit also refused to apply issue preclusion for a reason

not reached by the district court. The Ninth Circuit was "convinced that the Government did not

have a 'full and fair opportunity to litigate' its claim because it could not appeal the interlocutory

memorandum" at issue. *Id.* This again emphasizes the importance of the appealability

requirement.

Judge Karas's decision does not appear to be tentative, the parties were fully heard, and

Judge Karas issued a reasoned opinion. Nonetheless, like the opinions found lacking in *St. Paul*

and *Luben*, the partial summary judgment opinion issued by Judge Karas could not be appealed

at this time because Judge Karas declined to enter a Rule 54(b) partial judgment. Thus, his ruling

is subject to his revision at any time before final judgment is entered in the New York Case. *See*

Fed. R. Civ. P. 54(b). Thus, it is not entitled to preclusive effect.[8] *See St. Paul*, 55 F.3d at 1425;

*Luben*, 707 F.2d at 1040; *see also Kottom v. Walker*, 2015 WL 7301849, at *4 (N.D. Cal. Nov.

19, 2015) (declining to apply issue preclusion to an opinion granting partial summary judgment);

*Householder Grp., LLLP v. Van Mason*, 2010 WL 5093117, at *3 (D. Ariz. Dec. 8, 2010)

---

[8] LegitScript argues that a final judgment is not required and that *St. Paul* is distinguishable because it applied Alaska law. The three bases relied on by the Ninth Circuit in *St. Paul* for concluding that a partial summary judgment opinion is insufficiently firm for preclusive effect, however, are identical under federal law and Alaska law. Additionally, most of the cases cited by LegitScript involved a decision that was appealed or could have been appealed but was not. They are thus inapposite to this case, which involves an opinion that is generally not appealable and for which a Rule 54(b) partial judgment was requested but denied. LegitScript cites *Security People, Inc. v. Medeco Security Locks, Inc.*, 59 F. Supp. 2d 1040 (N.D. Cal. 1999), in which the district court stated that a disposition by summary judgment is a decision on the merits and given preclusive effect. *Id.* at 1045. That is not necessarily incorrect as a general proposition. A summary judgment decision resolving all issues in a case is appealable and not subject to the deficiencies critical to the analysis in *Luben* and *St. Paul*. It is unclear whether the summary judgment decision at issue in *Security People* was complete or partial. Regardless, *Security People* did not address the appealability issue emphasized in *Luben* and other Ninth Circuit cases. It was affirmed without any discussion by the Federal Circuit. The Court does not find *Security People* persuasive in the current context on the question now pending.

(declining to apply issue preclusion to partial summary judgment order, relying on *St. Paul* and stating that "[t]he Ninth Circuit's language [in *St. Paul*] concerning the non-preclusive effect of a partial summary judgment order is both forceful and general in nature, and strongly suggests that the opportunity to appeal and the finality of an order are important, if not the most important, considerations for a district court"); *id.* at *2 ("[T]he *St. Paul* decision, while stopping short of articulating a black and white rule, strongly suggests that partial summary judgment orders by their very nature are not sufficiently firm to have a preclusive effect on any future proceedings."); *DRK Photo v. McGraw-Hill Cos.*, 2014 WL 2584811, at *5 (D. Ariz. June 10, 2014) ("The holding in *St. Paul* calls into question the preclusive effect of the partial summary judgment order in *Wiley*. Accordingly, the Court finds that collateral estoppel does not apply to the standing issue."), *aff'd sub nom. DRK Photo v. McGraw-Hill Glob. Educ. Holdings, LLC*, 870 F.3d 978 (9th Cir. 2017); 10B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2737 (4th ed. 2023) (explaining that an adjudication of less than the entire action under Rule 56(g) of the Federal Rules of Civil Procedure is not appealable and "has no preclusive impact, since the trial court retains jurisdiction to modify the order at any time prior to the entry of a final judgment" (footnote omitted)); *cf. McMillan v. Lowe's Home Ctrs., LLC*, 2016 WL 232319, at *4 (E.D. Cal. Jan. 20, 2016) (relying primarily on *St. Paul* in declining to apply issue preclusion because the order "denying Lowe's' motion to dismiss is not currently appealable and is subject to free revision by the court on its own motion or on motion of any party at any time before judgment" and thus concluding that "the Illinois district court's order is not 'sufficiently firm' to constitute a final judgment for purposes of issue preclusion").

Further, even if the partial summary judgment opinion in the New York Case might qualify as "sufficiently firm" to warrant consideration for issue preclusion, LegitScript's

argument would still fail. As discussed next, LegitScript fails its burden to show the elements required for issue preclusion.

### b. Elements for Issue Preclusion

As noted, even if Judge Karas's partial summary judgment ruling is "sufficiently firm" to satisfy that requirement for preclusive effect, LegitScript still must meet its burden to show the other elements of issue preclusion. *Howard*, 871 F.3d at 1040. LegitScript fails to show both a full and fair opportunity to litigate the issues and identicality.

### i. Full and Fair Opportunity to Litigate

PharmacyChecker has not been able to appeal Judge Karas's interlocutory opinion. In such circumstances, the Ninth Circuit has concluded that a party does not have a full and fair opportunity to litigate an issue, precluding application of issue preclusion. *See, e.g.*, *Luben*, 707 F.2d at 1040 ("Moreover, we are convinced that the Government did not have a 'full and fair opportunity to litigate' its claim because it could not appeal the interlocutory memorandum in *Bristol*. Thus, we conclude that the District Court did not abuse its discretion in rejecting the application of the doctrine of collateral estoppel against the Government on the issue."). Thus, LegitScript fails to show the applicability of issue preclusion.

### ii. Identicality

LegitScript also must show that the issues are identical between the proceedings for issue prelusion to apply. *Howard*, 871 F.3d at 1041. *Howard* provides four factors for courts to consider when evaluating whether an issue is identical in both proceedings. *Id.* As noted, "these factors are not applied mechanistically." *Id.* The Court may prioritize some factors over others or omit some altogether. *See, e.g.*, *Syverson v. Int'l Bus. Machs. Corp.*, 472 F.3d 1072, 1080-81 (9th Cir. 2007) (mentioning only three of the four factors); *Cent. Delta Water Agency v. United*

*States*, 306 F.3d 938, 953 (9th Cir. 2002) (evaluating only factual overlap without discussing the remaining factors).

The second of these "identicality" factors is whether "the new evidence or argument involve the application of the same rule of law as that involved in the prior proceeding." *Howard*, 871 F.3d at 1041. Moreover, issue preclusion is unavailable when a different legal standard applies, even to the same facts. *Peterson v. Clark Leasing Corp.*, 451 F.2d 1291, 1292 (9th Cir. 1971) (per curiam) ("Issues are not identical if the second action involves the application of a different legal standard, even though the factual setting of both suits is the same."); *Sw. Pet Prods. v. Koch Indus.*, 32 F. App'x 213, 215 (9th Cir. 2002) (issues not identical where "different rule of law applies"). Thus, the Court should not grant preclusive effect to an issue decided under a legal standard inapplicable in this Circuit.

The Court agrees with LegitScript that the top-level issue is the same: whether PharmacyChecker lacks antitrust standing. The questions that Judge Karas decided, however, are whether PharmacyChecker's business is "completely or almost completely geared towards facilitating illegality" and, if so, whether that is a barrier to antitrust standing. Judge Karas derived this legal standard from his analysis of various cases.

LegitScript assumes that the same rule of law applies in the Ninth Circuit, but the standard described by Judge Karas is not the law in the Ninth Circuit. Thus, the issues are not identical if a different legal standard applies in this Court. *Peterson*, 451 F.2d at 1292. Indeed, Judge Karas noted that a decision from the Southern District of New York, or even from the

Second Circuit, is not binding in the District of Oregon in the Ninth Circuit.[9] Further, this Court previously reached the same conclusion.[10]

As discussed below, because Ninth Circuit precedent provides a different legal standard than the standard applied by Judge Karas, the issues are not identical. Thus, even if Judge Karas's decision was the type of opinion otherwise warranting preclusive effect, LegitScript fails to show two of the required elements of issue preclusion and the Court would not apply issue preclusion. Instead, the Court independently evaluates whether the relevant antitrust precedent dictates summary judgment be granted on LegitScript's argument that PharmacyChecker has not suffered antitrust injury and therefore does not have antitrust standing, considering the record facts in this case.

**B. Antitrust Standing and Illegality**

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. To establish a § 1 violation, a plaintiff must prove "(1) a contract, combination or

---

[9] *PharmacyChecker.com LLC v. Nat'l Ass'n of Bds. of Pharmacy*, 2023 WL 4492148, at *2 (S.D.N.Y. June 5, 2023) ("The Parties fail to explain how their 'belief' that additional finality in the form of a Second Circuit appeal of the purely legal, standing-related question would 'shape' the District of Oregon proceedings. . . . [PharmacyChecker] originally brought claims against LegitScript LLC, which were severed and transferred to the District of Oregon upon LegitScript's motion. However, a Second Circuit decision regarding antitrust standing in this case would be persuasive at best, and certainly not binding upon a district court in the Ninth Circuit. As such, judicial administrative interests are not served as suggested by the Parties—both cases will likely continue in parallel due to choices made by Defendants at the outset of this case." (citations to the record omitted)).

[10] *PharmacyChecker.com LLC v. LegitScript LLC*, 2022 WL 17496113, at *3 (D. Or. Dec. 8, 2022) (denying a motion to stay proceedings and explaining that "[e]ven if the Southern District of New York grants summary judgment, it is unclear whether Ninth Circuit precedent on this issue would yield the same result" and that "the Supreme Court has not yet resolved this question of law, and the law among the circuits may yield different conclusions").

conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition." *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012) (quoting *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008)). In addition to these three elements, a private plaintiff must also show a fourth— antitrust standing, which includes antitrust injury. *See id.*; *see also Am. Ad Mgmt.*, 190 F.3d at 1054-55. In its motion for summary judgment, LegitScript argues that PharmacyChecker fails to show antitrust standing. In its pending motion, PharmacyChecker does not dispute that PharmacyChecker can otherwise satisfy the first three elements (the three substantive elements) of its § 1 claim. For purposes of ruling on LegitScript's pending motion, the Court therefore assumes that PharmacyChecker can show that LegitScript and the New York Defendants violated § 1; the Court considers below only whether LegitScript has demonstrated that PharmacyChecker cannot establish antitrust injury.

### 1. Background

In evaluating the New York Defendants' Rule 12(b)(6) motion to dismiss in the New York Case, Judge Karas formulated a standard from a set of cases that addressed antitrust injury when a plaintiff's business involved illegality: "[W]here the plaintiff's enterprise is completely or almost completely illegal, or completely or almost completely geared towards facilitating illegality, that plaintiff cannot plead an antitrust injury." *PharmacyChecker I*, 530 F. Supp. 3d at 329-30. Judge Karas then applied that standard when ruling on the New York Defendants' motion for summary judgment and concluded that the New York Defendants "ha[d] met their burden to prove that [PharmacyChecker's] enterprise is 'completely or almost completely geared towards facilitating illegality.'" *PharmacyChecker III*, 2023 WL 2973038, at *30 (quoting *PharmacyChecker I*).

Invoking that standard, LegitScript now argues in its pending motion that PharmacyChecker is unable to suffer an antitrust injury as required for antitrust standing because, according to LegitScript, PharmacyChecker's business "is completely or almost completely geared towards facilitating illegality."[11] LegitScript further argues that PharmacyChecker's "facilitation" of the unlawful importation of prescription drugs makes PharmacyChecker's business *itself* illegal.  PharmacyChecker responds that the standard described by Judge Karas is inapplicable to the question of antitrust injury because Ninth Circuit precedent precludes it, and that in any event, PharmacyChecker's business is entirely legal.

---

[11] Legitscript states that it "is arguing that PharmacyChecker has no *standing*," which "is a threshold issue, and not merely an affirmative defense." ECF 278 at 17 (emphasis in original). The Ninth Circuit has identified antitrust injury as an element of proof required for an antitrust claim. *See, e.g.*, *Datagate, Inc. v. Hewlett-Packard Co.*, 941 F.2d 864, 868 (9th Cir. 1991) ("Datagate failed to demonstrate causal 'antitrust' injury and thus failed to meet its burden of establishing standing."). The Ninth Circuit also has held that a defense that negates an element of a plaintiff's claim is not an affirmative defense—at least for purposes of Rule 8(c) of the Federal Rules of Civil Procedure. *See Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002) ("Edison's attempt to prove that it provided a reasonable accommodation merely negates an element that Zivkovic was required to prove and therefore was not an affirmative defense required to be pled in Edison's answer.").

The Ninth Circuit, however, has indicated that a defendant's challenge based on the plaintiff's purported illegal activity should be brought as an affirmative defense or, depending on the circumstances, a counterclaim to offset damages. *See Memorex Corp. v. Int'l Bus. Machines Corp.*, 555 F.2d 1379, 1380 (9th Cir. 1977); *Calnetics Corp. v. Volkswagen of Am.*, 532 F.2d 674, 689 (9th Cir. 1976); *cf. Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1044 (9th Cir. 2017) (stating in analyzing a claim under the Telephone Consumer Protection Act that "certain elements of a plaintiff's claim may be shifted to defendants, when such elements can fairly be characterized as affirmative defenses or exemptions"). For purposes of LegitScript's pending motion, it is irrelevant whether showing PharmacyChecker's purported illegal activity is an affirmative defense or showing its legal activity is a part of the element of antitrust injury. Regardless of which party has the burden of proof, the Court's conclusion would be the same because the facts in the record and the binding caselaw leave no doubt that PharmacyChecker has suffered a cognizable antitrust injury.

2.  **Analysis**

   a.  **Illegality**

Based on the facts and law presented by the parties, the Court concludes that PharmacyChecker's business is legal. LegitScript has identified no federal or state law that *PharmacyChecker* has violated. Nor has LegitScript pointed to any instance of a federal or state law enforcement agency prosecuting or even threatening to prosecute PharmacyChecker, or any instance of a federal or state regulatory body taking or even threatening to take any action against PharmacyChecker (*e.g.*, by issuing a cease-and-desist order). Nor, for that matter, has LegitScript shown that visitors to PharmacyChecker's website—including those visitors who click on links to non-U.S. pharmacies—engage in illegal activity simply by using PharmacyChecker's website.

LegitScript, however, has produced evidence showing that some number of U.S. visitors to PharmacyChecker's website appear to have violated federal law through cross-border purchase and import of prescription drugs for personal use and that PharmacyChecker's website facilitates that illegal activity. PharmacyChecker asserts that it does not track visitor activity after visitors to its website click through to a pharmacy's website and that it has no data connecting clicks to transactions. PharmacyChecker acknowledges, however, that some clicks do, in fact, lead to transactions and does not dispute that some of those transactions involve U.S.-based website users who unlawfully import prescription drugs after clicking through to non-U.S. online pharmacies. The agreed-upon revenue numbers show that approximately 57% of PharmacyChecker's total revenue is received from foreign pharmacies based on U.S.-origin clicks to those pharmacies. It also is reasonable to infer that the non-U.S. pharmacies continue to pay click-through fees only because there has been sufficient purchasing activity from users of PharmacyChecker's website (whether those users are based in the U.S. or elsewhere) to justify those fees.

The question before the Court, therefore, is whether an antitrust plaintiff, which does not itself engage in illegal activity, lacks antitrust standing merely because that plaintiff's website facilitates illegal activity by others and the plaintiff receives revenue as an indirect result of that activity. No case from the United States Supreme Court or the Ninth Circuit directly addresses that question.[12] The Court therefore looks to the most factually analogous cases from the Supreme Court and the Ninth Circuit for guidance to see what sort of illegal activity or facilitation of illegal activity by a private antitrust plaintiff with an otherwise valid antitrust claim will negate antitrust standing.

### b.  Supreme Court Cases

The Court finds guidance in two Supreme Court cases, *Kiefer-Stewart* and *Perma Life*, which abolished traditional equitable defenses as applied to antitrust claims. *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211 (1951), *overruled on other grounds*, *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984); *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 140 (1968) (also overruled by *Copperweld*). The first of these defenses, abolished in *Kiefer-Stewart*, is "unclean hands," which "refers to the plaintiff's wrongdoing against a third party with respect to the subject matter of the suit." *Memorex Corp. v. Int'l Bus. Machines Corp.*, 555 F.2d 1379, 1382 (9th Cir. 1977). In *Kiefer-Stewart*, the plaintiff, a liquor wholesaler, alleged that the defendants, who sold liquor to wholesalers, had illegally conspired to sell liquor only to those wholesalers who would resell the liquor at specified maximum prices. *Kiefer-Stewart*, 340 U.S. at 212.

---

[12] The most factually analogous case is a non-binding decision from the Seventh Circuit, *Maltz v. Sax*, 134 F.2d 2 (7th Cir. 1943). As discussed below, however, the facts of that case still are distinguishable and that case has since been overruled, at least in part.

At trial, the defendants introduced evidence showing that the plaintiff had illegally conspired with other wholesalers to set *minimum* prices, but the district court instructed the jury that the plaintiff's participation in that separate conspiracy, even if proved, could not be raised as a defense. The Supreme Court agreed and explained:

> If [the plaintiff] and others were guilty of infractions of the antitrust laws, they could be held responsible in appropriate proceedings brought against them by the Government or by injured private persons. The alleged illegal conduct of [the plaintiff], however, could not legalize the unlawful combination by [the defendants] nor immunize them against liability to those they injured.

*Id.* at 214. Thus, although an antitrust plaintiff that engaged in illegal activity "may be vulnerable to prosecution or held liable by a party injured as a result" of that activity, "defendants cannot avoid liability to [the plaintiff] for their own antitrust conspiracy by alleging that [the plaintiff] is culpable for a distinct infraction." *Burlington Indus. v. Milliken & Co*., 690 F.2d 380, 388 (4th Cir. 1982); *see also Memorex*, 555 F.2d at 1381 ("'Unclean hands' has not been recognized as a defense to an antitrust action for many years." (citing *Kiefer-Stewart*)).

Similarly, the equitable defense of *in pari delicto* (of equal fault), which "refers to the plaintiff's participation in the same wrongdoing as the defendant," does not bar an otherwise valid antitrust claim. *Memorex*, 555 F.2d at 1382. In *Perma Life*, franchisee-operators of Midas Muffler Shops entered into sales agreements with Midas, Inc. (Midas) and later brought an antitrust suit against Midas challenging restrictions in those same agreements. *Perma Life*, 392 U.S. at 140. The court of appeals held that the plaintiffs' claim was barred by the doctrine of *in pari delicto* because the plaintiffs "had enthusiastically sought to acquire a Midas franchise with full knowledge" of the restrictive provisions in the agreements. *Id.* at 137-38. The Supreme Court disagreed, holding that "the doctrine of *in pari delicto* . . . is not to be recognized as a

defense to an antitrust action." *Id.* at 138. In a discussion later quoted by the Ninth Circuit in

several key antitrust cases, the Supreme Court explained:

> [T]he purposes of the antitrust laws are best served by [e]nsuring
> that the private action will be an ever-present threat to deter
> anyone contemplating business behavior in violation of the
> antitrust laws. The plaintiff who reaps the reward of treble
> damages may be no less morally reprehensible than the defendant,
> but the law encourages his suit to further the overriding public
> policy in favor of competition. A more fastidious regard for the
> relative moral worth of the parties would only result in seriously
> undermining the usefulness of the private action as a bulwark of
> antitrust enforcement.

*Id.* at 139.[13]

Echoing its decision in *Kiefer-Stewart*, the Supreme Court noted that "permitting the

plaintiff to recover a windfall gain does not encourage continued violations by those in his

position since they remain fully subject to civil and criminal penalties for their own illegal

conduct." *Id.* (citing *Kiefer-Stewart*);[14] *see also Javelin Corp. v. Uniroyal, Inc.*, 546

F.2d 276, 279 (9th Cir. 1976) (holding that, with a narrow exception, a founding member of an

antitrust conspiracy can bring an antitrust claim against co-conspirators); *Volvo N. Am. v. Men's*

*Int'l Pro. Tennis Council*, 857 F.2d 55, 68 (2d Cir. 1988) (holding that "a cartel member has

---

[13] The Supreme Court in *Perma Life* cited both *Kiefer-Stewart* and *Simpson v. Union Oil Co. of California*, 377 U.S. 13 (1964). In *Simpson*, the Supreme Court held that a lessee of a retail outlet who had signed an agreement making him "a participant in the illegal, competition-destroying scheme" could nonetheless bring suit under the antitrust laws. *See Perma Life*, 392 U.S. at 138-39 (construing *Simpson*).

[14] The Supreme Court in *Perma Life* did not foreclose the possibility that a plaintiff's "truly complete involvement in a monopolistic scheme could ever be a basis . . . for barring a plaintiff's cause of action," but clarified that such a bar would be "wholly apart from the idea of *in pari delicto*." *Perma Life*, 392 U.S. at 140. The Ninth Circuit has since held that a defendant may be able to defend itself from an antitrust claim by showing that the plaintiff was involved in the same anticompetitive conspiracy at issue, but only if "the degree of participation of the plaintiff" had been "equal to that of any defendant and a substantial factor in the formation of the conspiracy." *Javelin Corp. v. Uniroyal, Inc.*, 546 F.2d 276, 279 (9th Cir. 1976).

antitrust standing to challenge the cartel to which it belongs," provided that certain conditions are met (citing *Perma Life*, among other cases)). Although *Perma Life* addressed only illegality involving an antitrust plaintiff's "concurrent violation of the antitrust laws, it has been understood to have abolished the defense of illegality even when the plaintiff's wrongdoing is unrelated to antitrust policy." *Consol. Exp., Inc. v. N.Y. Shipping Ass'n*, 602 F.2d 494, 526 (3d Cir. 1979) (collecting cases), *vacated on other grounds sub nom. Int'l Longshoremen's Ass'n v. Consol. Exp., Inc.*, 448 U.S. 90 (1980).

### c.  Ninth Circuit Cases

As the Ninth Circuit has explained, the "common nucleus" of unclean hands and *in pari delicto* is "illegality on the part of the plaintiff." *Memorex*, 555 F.2d at 1381. In two key decisions, the Ninth Circuit, relying on the principles set forth in in *Kiefer-Stewart* and *Perma Life*, similarly rejected the defendants' attempts to use the plaintiffs' illegal conduct to immunize the defendants' liability.

### i.  *Calnetics*

In *Calnetics*, the plaintiff (a seller of automobile air-conditioners), alleged that the defendants (which included a Volkswagen subsidiary and an automobile distributor), engaged in a conspiracy that displaced Calnetics from the market. *Calnetics Corp. v. Volkswagen of Am., Inc.*, 532 F.2d 674, 679-80 (9th Cir. 1976). At trial, Calnetics sought to introduce evidence of actual sales of its products, which was necessary to show that the defendants' conspiracy diminished Calnetics' anticipated sales. The district court excluded that evidence on the ground that the sales had stemmed from an illegal agreement between Calnetics and an automobile distributor. *Id.* at 688. Without evidence of actual sales, Calnetics could not show that it had suffered damages, and the district court therefore granted summary judgment in favor of the defendants against Calnetics' antitrust claims. The Ninth Circuit reversed.

Citing *Perma Life* and *Kiefer-Stewart*, the Ninth Circuit explained that the defendants'

challenge to the evidence at issue was "in effect an *in pari delicto* or 'unclean hands' defense,

which is not a defense in an action for treble damages." *Id.* The court quoted at length *Perma*

*Life*'s discussion of the antitrust laws' purposes, including the need to ensure that a private cause

of action "will be an ever-present threat to deter anyone contemplating business behavior in

violation of the antitrust laws," irrespective of the "relative moral worth of the parties." *Id.*

(quoting *Perma Life*, 392 U.S. at 139.). Considering these purposes, the Ninth Circuit found "no

legitimate reason for distinguishing [the] defendants' 'illegal sales' argument from the *in pari*

*delicto* type of defense struck down in *Perma Life*." *Id.* at 689.

The question in *Calnetics* was whether the district court properly had excluded the

plaintiff's evidence of damages, and not whether the plaintiff had antitrust standing. But the

Ninth Circuit's emphasis on the policies effectuated by the antitrust laws and the court's

supporting analysis are relevant to whether a plaintiff's involvement in illegal activity—even

*direct* involvement, as was the case in *Calnetics*—should deprive that plaintiff of a private cause

of action under the antitrust laws. Notably, the Ninth Circuit in *Calnetics* approvingly cited a

then-recent district court decision in which that court rejected an asserted defense of illegality,

even though the plaintiff would not have had acquired an antitrust claim but for its own illegal

activity:

> From a practical point of view, Calnetics is in a position no
> different from that of the plaintiff in *Purex Corp. v. General Foods*
> *Corp.*, 318 F. Supp. 322 (C.D. Cal. 1970), who had acquired an
> antitrust cause of action by virtue of an acquisition which was
> itself illegal. Recognizing the asserted defense of illegality as a
> species of *in pari delicto*, the *Purex* court rejected it.

*Id.* at 689. The Ninth Circuit also approved of the Tenth Circuit's decision in *Semke v. Enid*

*Automobile Dealers Ass'n*, 456 F.2d 1361 (10th Cir 1972), in which that court concluded that the

plaintiff "was entitled to prove damages his business suffered, even though at the time of injury [he] may have been illegally engaged in the automobile retail business." *Id.* (construing *Semke*).[15]

Relying on the overarching policies of the antitrust laws, the Ninth Circuit concluded that "even though the market position from which Calnetics was displaced had been attained only through illegal conduct" and Calnetics was thereby subject to civil and criminal penalties, Calnetics was not required to lose its antitrust action. *Id.* As the court explained, "[t]o rule otherwise would effectively frustrate the important public policy underl[y]ing the antitrust laws: encouragement of private antitrust suits in order to deter the illegal exercise of market power."[16]

### ii. *Memorex*

In *Memorex*, the Ninth Circuit directly addressed whether a plaintiff's illegal activity meant that it could not show antitrust standing. *Memorex*, 555 F.2d at 1381-83. The defendant (IBM) argued that the plaintiff (Memorex) had acquired its presence in the market for disk storage devices—the same market that, according to Memorex, had been injured by IBM's allegedly anti-competitive acts—only because Memorex had stolen trade secrets from IBM. Asserting a so-called "unlawful market presence" defense, *id.* at 1381, IBM argued that

---

[15] In *Semke*, the Tenth Circuit concluded that the plaintiff had, in fact, violated a state statute that provided for criminal and civil penalties, although the court also concluded that there had been "a basis for the plaintiff to question whether the statute applie[d] to his activities." 456 F.2d at 1363, 1364 n.1, 1368.

[16] In support, the Ninth Circuit cited *Lanier Business Products v. Graymar Co.*, 355 F. Supp. 524 (D. Md. 1973), in which the court rejected an affirmative defense that was based on the unlawful antitrust activity of the plaintiff. As that court explained: "It would be intolerable to excuse the continuation of conduct detrimental to the common good because of the equally egregious actions of another." *Id.* at 526.

Memorex had no "business" of its own, as required to satisfy the Clayton Act's requirement that a plaintiff "be injured in his business." *See* 15 U.S.C. § 15(a).

The Ninth Circuit explained that IBM's defense of "unlawful market presence" and the traditional equitable defenses of unclean hands and *in pari delicto* shared a "common nucleus"— illegality. *Memorex*, 555 F.2d at 1381. In rejecting IBM's argument that Memorex did not suffer a cognizable injury because it had engaged in illegal activity, the Ninth Circuit found compelling the reasoning in *Calnetics*, and again cited *Purex* and *Semke*:

> Were it not for Calnetics' allegedly illegal conduct, it would not have suffered any injury because it would not have sold any products to Volkswagen distributors. All sales were the result of commercial bribery. In effect, Calnetics claimed only an "illegal market presence" much as IBM suggests Memorex does here. The "rights" of Calnetics were no greater than those of Memorex, even assuming Memorex stole the patents from which its products were made.

> *Memorex therefore had "rights" which could be injured by the wrongdoing of IBM. This is all that is required to maintain a private antitrust suit.* Memorex's own illegal conduct did not divest it of an antitrust action. *See also Semke v. Enid Automobile Dealers Association*, 456 F.2d 1361 (10[th] Cir. 1972) (rejecting defense that plaintiff's entire business was illegal because it was unlicensed); *Purex Corp. v. General Foods Corp.*, 318 F. Supp. 322 (C.D. Cal. 1970) (recognizing asserted defense of illegality as a species of *in pari delicto*).

*Id.* at 1381-82 (emphasis added; footnote omitted).[17] Rejecting IBM's argument that Memorex's illegal activity meant that it could not sustain an antitrust injury, the Court declared: "We continue to side with the goal of vigorous enforcement of our antitrust laws." *Id.* at 1383.

The holding of *Memorex* was confined to IBM's defense of "unlawful market presence," which was based on Memorex's alleged theft of trade secrets *from IBM*: the court held that

---

[17] In a footnote, the Ninth Circuit added that "Memorex, like Calnetics, was subject to civil action and even criminal penalties for its wrongdoing." *Memorex*, 555 F.2d at 1382 n.3.

"illegality is not to be recognized as a defense to an antitrust action when the illegal acts by the plaintiff are directed *against the defendant*."[18] *Id.* at 1382 (emphasis added). The court, however, recognized that in some instances a plaintiff's violation of the law may bar an antitrust action. *See id.* at 1382 n.5; *id* at 1383 (citing *Javelin*'s holding that a plaintiff will be barred from recovery when the illegal conspiracy of the defendants "would not have been formed but for the plaintiff's participation"). Nonetheless, the analysis and policies underlying the court's holding in *Memorex* apply here. As the Ninth Circuit has explained, the same principle underlies *Kiefer-Stewart*, *Perma Life*, *Calnetics*, and *Memorex*: "a plaintiff's illegal conduct cannot be raised as a complete bar to his antitrust action." *First Beverages, Inc. v. Royal Crown Cola Co.*, 612

---

[18] The fact that the alleged illegal activity at issue in *Memorex* involved a plaintiff's theft of *a defendant's* trade secrets may be why the Ninth Circuit referred to that activity as a "private wrong" even though Memorex would have been subject to criminal penalties for such wrongdoing. *See* 555 F.2d at 1382; *id.* at 1382 n.3. LegitScript argues that *Memorex* does not apply because the court held only that a "private wrong" does not eliminate antitrust injury, whereas "[PharmacyChecker's] illegal conduct is a public wrong." ECF 271 at 21 (emphasis in original). Assuming without deciding that the cross-border importation of prescription drugs engaged in by users of PharmacyChecker's website is a "public wrong," and setting aside the fact that LegitScript has not shown that PharmacyChecker's conduct itself is illegal, the Court finds no reason why the reasoning and principles in *Memorex* should apply only those defenses that are based on a plaintiff's "private" illegal acts but not to the illegality defense asserted here.

In *Memorex*, the Ninth Circuit relied on several decisions in which courts rejected illegality defenses, including *Kiefer-Stewart* and *Perma Life*, both of which involved asserted defenses that were based on the plaintiff's alleged *antitrust* violations. *See Kiefer-Stewart*, 340 U.S. at 214; *Perma Life*, 392 U.S. at 139-40; *see also Radovich v. Nat. Football League*, 352 U.S. 445, 454 n.10 (1956) (noting that violations of antitrust laws are regarded as "*a special form of public injury*" (emphasis in *Radovich*) (quoting *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 493 (1940)). In *Calnetics*, where the Ninth Circuit rejected the defendants' "illegal sales" argument as equivalent to "the *in pari delicto* type of defense struck down in *Perma Life*," the plaintiff's alleged illegality also involved an antitrust violation. *See Calnetics*, 532 F.2d at 688-89; *see also Purex*, 318 F. Supp. at 323-24 (rejecting affirmative defenses that were based on the plaintiff's alleged antitrust violation); *Semke*, 456 F.2d at 1367-70 (rejecting a defense based on the plaintiff's violation of a state licensing statute).

F.2d 1164, 1174 (9th Cir. 1980).[19] It is worth emphasizing that *Kiefer-Stewart*, *Perma Life*, *Calnetics*, and *Memorex*, along with *Purex* and *Semke*, all involved defenses based on illegal activity in which a plaintiff was alleged to have directly participated. PharmacyChecker itself, however, has broken no law; it is merely facilitating illegal activity by third parties, among other lawful activities.

### iii. Other Caselaw

LegitScript relies on several cases in which courts have concluded that a plaintiff that engaged in or sought to engage in illegal activity lacked antitrust standing. For the reasons discussed below, the Court finds those cases inapplicable, inconsistent with controlling law, or otherwise unpersuasive.

In several cases involving antitrust plaintiffs who had been involved in illegal activity, courts have concluded that the plaintiffs lacked injury because they failed to establish that their damages had been caused by anticompetitive acts. LegitScript relies on *Realnetworks*, in which the plaintiff, who sought to market a product (RealDVD) that would allow the copying of DVDs, asserted that the defendant movie production studios' refusal to license the copying of DVDs caused the plaintiff an antitrust injury. *Realnetworks, Inc. v. DVD Copy Control Ass'n*, 2010 WL 145098 at *1-2, 5 (N.D. Cal. Jan. 8, 2010). In that case, the defendants sought a temporary restraining order and then a preliminary injunction barring the plaintiff's manufacture and distribution of RealDVD. The court granted both, concluding they were "necessitated by [the plaintiff's] own possibly unlawful conduct." *Id.* at *5. The court in *Realnetworks* concluded that the plaintiff had failed to allege a plausible antitrust injury, not because the plaintiff had engaged

---

[19] As discussed, the Ninth Circuit in *Javelin* identified a narrow exception. The Court acknowledges that other exceptions may apply in factual circumstances not relevant here, such as when a plaintiff's *entire* business is illegal and that plaintiff is subject to criminal punishment.

in illegal activity but because the harm that the plaintiff suffered resulted from the court's injunctions. *Id.*; *see also id.* at *6 ("The Court does not here hold that Real is barred from maintaining an antitrust claim because it has engaged in illegal activity[.]"); *cf. Snake River Valley Elec. Ass'n v. PacificCorp*, 357 F.3d 1042, 1050 n.8 (9th Cir. 2004) ("Because the statute does not permit the transfer of customers by mere private action (i.e., PacificCorp could not yield customers [to the plaintiff], without state approval from the PUC, even if it wanted to do so), . . . the statute in question precludes the element of causal antitrust injury . . . even if PacificCorp acted anti-competitively . . . ." (citation omitted)).

Thus, *Realnetworks* did not address whether a plaintiff's own illegal activity or facilitation of illegal activity by others, without more, negates antitrust injury. Rather, the court found merely that effects that flowed from the plaintiff's intended (and likely illegal) activity— the resulting injunctions—were the actual cause of the asserted injury. Here, however, LegitScript has not shown evidence to support its argument that "[PharmacyChecker] would have suffered *the same injury* regardless of LegitScript's conduct due to enforcement by the FDA, Secretary of Health and Human Services, or enforcement agencies such as U.S. Customs Border Patrol." *See* ECF 278 at 19 (emphasis added). LegitScript has offered no evidence of any such enforcement activity or even threatened enforcement activity. *Realnetworks*, therefore, is inapposite.

LegitScript also relies on the Eighth Circuit's decision in *In re Canadian Import Antitrust Litigation*, 470 F.3d 785 (8th Cir. 2006). The plaintiffs in this class action were U.S.-based *consumers* who purchased prescription drugs from the defendant drug companies. The plaintiffs alleged that the defendants unlawfully conspired to suppress the importation of certain prescription drugs from Canadian pharmacies, thereby resulting in increased prices for

prescription drugs sold in the United States. *Id.* at 787-88. The district court "concluded that the plaintiffs lacked standing to pursue their federal antitrust claims because the allegedly anticompetitive behavior discouraged only unlawful importation of drugs and not lawful activity that the Sherman Act was designed to protect." *Id.* at 788. On appeal, the plaintiffs argued that the importation of the drugs at issue was not, in fact, illegal; in the alternative, they argued that even if such importation was illegal, they nonetheless could pursue an antitrust claim based on the defendants' anticompetitive conduct. *Id.* at 788, 791.

The Eighth Circuit concluded, first, that such importation would have violated federal law because the drugs at issue were not labeled in conformity with federal requirements. *Id.* at 788-91.[20] The court then addressed the plaintiffs' alternative argument that they could still maintain their antitrust claim. Notably, the Eighth Circuit did not conclude that the plaintiffs' antitrust claim was barred as a matter of law because the plaintiffs sought to achieve their goal (lower prescription drug prices in the United States) by furthering activity that was illegal (importation of drugs not labeled in conformity with federal law). Rather, the court concluded that the plaintiffs' claim was barred because the plaintiffs could not demonstrate any injury *caused* by the defendants' conduct. The court explained:

> Plaintiffs allege that they are injured by increased prices for prescription drugs in the United States, which they say result from their inability to import less expensive drugs distributed by Canadian pharmacies. As we have explained, however, the importation of drugs from Canada is prohibited by federal law. The absence of competition from Canadian sources in the domestic prescription drug market, therefore, is caused by the federal statutory and regulatory scheme adopted by the United States government, not by the conduct of the defendants. Consequently,

---

[20] LegitScript relies on *In re Canadian Import* in part for the Eighth Circuit's conclusion that importation of the drugs at issue in that case was illegal. *See* 470 F.3d at 789. PharmacyChecker, however, does not import drugs from non-U.S. pharmacies; nor has LegitScript shown that PharmacyChecker's business itself is otherwise illegal.

the alleged conduct of the defendants did not cause an injury of the type that the antitrust laws were designed to remedy. *See RSA Media, Inc. v. AK Media Group, Inc.*, 260 F.3d 10, 15 (1st Cir. 2001) (plaintiff lacked antitrust standing where it "was not excluded from the market for outdoor billboards because of [defendant's] threats," but rather "because of the Massachusetts regulatory scheme that prevents new billboards from being built"); *City of Pittsburgh v. West Penn Power Co.*,147 F.3d 256, 265 (3d Cir. 1998) (City suffered no antitrust injury and had no antitrust standing because "any injury suffered by the City did not flow from the defendants' conduct, but, rather, from the realities of the regulated environment in which all three were actors"); 2 P. Areeda & H. Hovenkamp, *Antitrust Law* § 338, at 320 (2d ed. 2000) (explaining that antitrust standing is lacking where "a force other than the antitrust violation fully accounts for the plaintiff's injury").

*In re Canadian Import*, 470 F.3d at 791-92 (alteration in original). *In re Canadian Import* does not apply here for the same reasons, discussed above, that *Realnetworks* is inapposite. *See Rebotix Repair, LLC v. Intuitive Surgical, Inc.*, 2022 WL 3272538, at *8 (M.D. Fla. Aug. 10, 2022) (concluding that cases such as *In re Canadian Import* "stand for the proposition that a regulatory or legislative bar can *factually* break the chain of causation between an antitrust defendant's challenged conduct and the plaintiff's injury" (emphasis in original)).

LegitScript's reliance on *Pearl Music Co.* is similarly unavailing. *See Pearl Music Co. v. Recording Indus. Ass'n of Am., Inc.*, 460 F. Supp. 1060 (C.D. Cal. 1978). The plaintiffs in that case were engaged in a tape piracy business that was "by its very nature, entirely illegal." *Id.* at 1068. The court concluded that that the "almost total magnitude" of the plaintiffs' illegal conduct made the plaintiffs' "miniscule conduct that *may* be legal, insignificant." *Id.* The court in *Pearl Music* therefore concluded that the plaintiffs "should not be able to assert or claim that they have rights protected by the antitrust laws."[21] *Id.*; *cf. Bubis v. Blanton*, 885 F.2d 317, 320

---

[21] The court in *Pearl Music* distinguished *Memorex* and *Calnetics* on the ground that neither of those cases "present a factual pattern as is present here that is, one in which the

(6th Cir. 1989) (affirming dismissal of antitrust claim for lack of standing because the plaintiff's interest in the allegedly harmed business was entirely illegal). Even if correctly decided, *Pearl Music* is distinguishable: the evidence in the record does not show that any aspect of PharmacyChecker's business is illegal—let alone "entirely illegal."[22]

The case with facts most analogous to those here is *Maltz v. Sax*, 134 F.2d 2 (7th Cir. 1943).[23] That case, however, is distinguishable and has been overruled at least in part. In *Maltz*, the court held that the plaintiff, whose business was "limited to making and selling gambling apparatus," could not bring an antitrust claim for two reasons. *Id.* at 4. First, the plaintiff "[came] into court with unclean hands." *Id.* at 5. Second, the plaintiff's business was limited to the making and selling of products usable only for activities that were unlawful or "consistently condemned . . . as against public policy," and he therefore had "no legal rights to protect." *Id.* at 4, 5.

---

plaintiff is engaged in a business which is, by its very nature, entirely illegal." 460 F. Supp. at 1068.

[22] Even if the Court agreed with LegitScript that the *facilitation* of illegal activity is *itself* illegal or otherwise equivalent to illegal activity, *Pearl Music* and similar cases would still be distinguishable. PharmacyChecker's facilitation of illegal activity only applies to actual drug purchases made by U.S. consumers at foreign pharmacies. The evidence in the record of such actual transactions includes LegitScript's evidence of PharmacyChecker assisting three consumers after problems occurred with their purchases and PharmarcyChecker's evidence that one pharmacy indicated that 3.47% of clicks from PharmacyChecker's website resulted in drug purchases. At summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Even accepting LegitScript's argument that facilitation of cross-border importation of drugs is itself illegal, the evidence does not show that only a "miniscule" or "insignificant" portion of PharmacyChecker's business is legal. *See Pearl Music*, 460 F. Supp. at 1068. To the contrary, the evidence shows no more than a "miniscule" or "insignificant" amount of the purportedly illegal activity.

[23] No circuit court has cited *Maltz* approvingly in more than 45 years, and the Seventh Circuit has not cited it in nearly 70 years. The most recent appellate case to cite *Maltz* approvingly was *Memorex*—for the limited proposition that some injury must occur before a plaintiff can recover. *Memorex*, 555 F.2d at 1383.

As discussed earlier, the equitable defense of unclean hands is no longer recognized as a defense to an antitrust action. *See Kiefer-Stewart*, 340 U.S. at 212; *Memorex*, 555 F.2d at 1381. As for the Seventh Circuit's conclusion that plaintiff had "no legal right in a business, the conduct of which was gambling," *Maltz*, 134 F.2d at 5, the facts in this case are distinguishable. PharmacyChecker *does* have a legal right in its business. Moreover, PharmacyChecker's business is not "limited to the making and selling" of products usable only for activities that are unlawful or that have been "consistently condemned . . . as against public policy."[24] *See id.* at 4.

### 3. Final Thoughts

Even when an antitrust plaintiff has *directly* engaged an illegal activity that unequivocally constitutes a public harm, the Supreme Court has held that such harm must be addressed, if at all, by means other than depriving the plaintiff of an otherwise valid antitrust cause of action or immunizing the antitrust defendants. *See Kiefer-Stewart*, 340 U.S. at 214 (holding that if the plaintiff had violated antitrust laws in an unrelated conspiracy, the plaintiff "could be held responsible in appropriate proceedings brought . . . by the Government or by injured private persons," but that such illegal conduct "could not legalize the unlawful combination of [the defendants] nor immunize them against liability to those they injured"); *Perma Life*, 392 U.S.

---

[24] Further, the Seventh Circuit's reliance on public policy considerations likely do not survive *Perma Life*, and *Maltz* may therefore have been overruled in another respect. *Compare Maltz*, 134 F.2d at 4 (discussing "against-public-policy businesses practices which include the use of gambling machines" and noting that "[f]ederal courts have consistently condemned [gambling] as against public policy"); and *id.* at 6 (concluding that a "construction of the Sherman Act" that would bar the plaintiff's claim was "[m]ore consistent with our general public policy"); *with Perma Life*, 392 U.S. at 139 (noting "the overriding public policy in favor of competition" and explaining that "a more fastidious regard for the relative moral worth of the parties would only result in seriously undermining the usefulness of the private action as a bulwark of antitrust enforcement"); *see also Consol. Exp.*, 602 F.2d at 526 n.21 ("The appellees also rely on *Maltz v. Sax*. We do not believe that holding survives *Perma Life*." (citation omitted)).

at 134 (similar); *cf. Memorex*, 555 F.2d at 1382 & n.3 (noting that the plaintiff was subject to

"civil action and even criminal penalties for its wrongdoing" but holding that "[a] wrongful act

committed against one who violates the antitrust laws must not become a shield in the violator's

hands against operation of the antitrust laws"). The Ninth Circuit has held that the same principle

applies, even when a plaintiff would not have acquired an antitrust cause of action but for the

plaintiff's illegal activity. *See Calnetics*, 532 F.2d at 689; *Memorex*, 555 F.2d at 1381-82.

Under Ninth Circuit law, even direct involvement by a plaintiff in illegal activity "cannot

be raised as a complete bar to his antitrust action." *First Beverages*, 612 F.2d at 1174 (construing

*Kiefer-Stewart*, *Perma Life*, *Calnetics*, and *Memorex*).[25] It would contravene Supreme Court and

Ninth Circuit precedent for this Court to fashion a new rule that deprives a plaintiff of an

antitrust cause of action and immunize an antitrust defendant when the plaintiff's business is

entirely *legal*. That is so even if the plaintiff's website is used for purposes of facilitating

unlawful activity by others and the plaintiff indirectly derives revenue (even a large portion of its

revenue) from that activity. *See Perma Life*, 392 U.S. at 139 (noting "the overriding public

policy in favor of competition" and admonishing that weighing the "relative moral worth of the

parties would only result in a seriously undermining the usefulness of the private action as a

bulwark of antitrust enforcement"); *cf. Radovitch v. Nat'l Football League*, 352 U.S. 445, 453

(1957) ("In the face of [the Congressional policy underlying the antitrust laws], this Court should

not add requirements to burden the private litigant beyond what is specifically set forth by

Congress in those laws."). Thus, at this stage of the lawsuit, LegitScript has not met its burden to

---

[25] Again, the Ninth Circuit in *Javelin* identified a narrow exception, and the Court acknowledges that other exceptions may apply, such as when a plaintiff's entire business is itself illegal.

PAGE 39 – OPINION AND ORDER

justify summary judgment based on its argument that PharmacyChecker lacks either antitrust injury or antitrust standing.

## CONCLUSION

The Court DENIES Defendant LegitScript's Motion for Summary Judgment. ECF 271. The Court also DENIES AS MOOT Defendant's Renewed Motion to Stay Discovery. ECF 269.

**IT IS SO ORDERED**.

DATED this 3rd day of January, 2024.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge