**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| PHARMACYCHECKER.COM LLC, | No. 24-2697 |
| *Plaintiff - Appellee*, | D.C. No. 3:22-cv-00252-SI |
| v. | |
| LEGITSCRIPT LLC, | OPINION |
| *Defendant - Appellant*. | |

Appeal from the United States District Court
for the District of Oregon
Michael H. Simon, District Judge, Presiding

Argued and Submitted February 3, 2025
Portland, Oregon

Filed May 23, 2025

Before: Carlos T. Bea, Lucy H. Koh, and Jennifer Sung,
Circuit Judges.

Opinion by Judge Bea

## **SUMMARY**[*]

### **Antitrust Standing**

The panel affirmed the district court's order denying defendant LegitScript LLC's motion for summary judgment based on lack of standing in an antitrust action brought by PharmacyChecker.com LLC.

PharmacyChecker alleged that its competitor LegitScript engaged in a group boycott in violation of antitrust laws. LegitScript moved for summary judgment, contending that PharmacyChecker lacked antitrust standing because its business facilitated the illegal importation of foreign drugs and, accordingly, it could not suffer any legally cognizable injury under Section 4 of the Clayton Act.

The panel held that LegitScript's argument was foreclosed by Supreme Court and Ninth Circuit precedent. Championing a public policy in favor of private antitrust enforcement, the Supreme Court in *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211 (1951), and *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134 (1968), held that, in general, neither the equitable defense of *in pari delicto* not that of unclean hands can act as a complete bar to lawsuits brought under Section 4 of the Clayton Act. In *Calnetics Corp. v. Volkswagen of America, Inc.*, 532 F.2d 674 (9th Cir. 1976), this court held that an injury to the fruits of a plaintiff's illegal conduct can confer antitrust standing. *Memorex Corp. v. IBM*, 555 F.2d 1379 (9th Cir. 1977), confirmed that a plaintiff can suffer a legally

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

cognizable injury when competing in a legitimate market, even if the injury is inflicted upon a business or property interest that has been obtained through the plaintiff's unlawful conduct. The panel concluded that here, based on the record at the summary judgment stage, the business interests that PharmacyChecker sought to protect were not meaningfully different from those of the plaintiffs in *Calnetics* and *Memorex*, even assuming that PharmacyChecker's alleged facilitation of unlawful foreign drug importation was itself illegal.

---

## COUNSEL

Aaron R. Gott (argued), Bona Law PC, Minneapolis, Minnesota; Philip S. Van Der Weele, K&L Gates LLP, Portland, Oregon; for Plaintiff-Appellee.

Richard P. Sybert (argued) and Holly L.K. Heffner, Gordon Rees Skully Mansukhani LLP, Portland, Oregon, for Defendant-Appellant.

## OPINION

BEA, Circuit Judge:

Two wrongs don't make a right.  Nor do they necessarily cancel each other out.  In this case, PharmacyChecker.com LLC ("PharmacyChecker") sued its competitor LegitScript LLC ("LegitScript") for engaging in a group boycott in violation of antitrust laws.  LegitScript moved for summary judgment, contending that PharmacyChecker lacked antitrust standing because PharmacyChecker's business facilitated illegal activities and, accordingly, it could not suffer any legally cognizable injury under Section 4 of the Clayton Act.  The district court denied LegitScript's motion and certified an interlocutory appeal under 28 U.S.C. § 1292(b).  We affirm.  Following the Supreme Court's teachings and the precedents in this Circuit, we must hold that, to further the public policy in favor of vigorous antitrust enforcement, a plaintiff may have antitrust standing under Section 4 of the Clayton Act to sue for injuries suffered by its business or property interest when competing in a legitimate market, even if such business or property interest has been attained by unlawful means.

### I.

### A.[1]

The Federal Food, Drug, and Cosmetic Act ("FFDCA") prohibits the "introduction or delivery for introduction into

---

[1] The parties here did not independently produce below any evidence regarding PharmacyChecker's antitrust standing; instead, they submitted and relied on certain filings from a related case before the U.S. District Court for the Southern District of New York.  The district court in this case accepted these filings, upon which we base the factual recitation

interstate commerce" of any drug that is adulterated, misbranded, or not approved by the Food and Drug Administration ("FDA").    21 U.S.C. §§ 331(a), 331(d), 355(a); *see also In re Canadian Imp. Antitrust Litig.*, 470 F.3d 785, 788–89 (8th Cir. 2006) (noting that personal importation of foreign drugs into the United States can violate the FFDCA either "because the drugs are not approved in accordance with 21 U.S.C. § 355, are not labeled as required by 21 U.S.C. § 352, or are dispensed without a valid prescription in contravention of 21 U.S.C. § 353(b)(1)").

It is illegal in "most circumstances" "for individuals to import drugs" into the United States "for personal use because these products purchased from other countries often have not been approved by the FDA for use and sale in" the United States.    *Personal Importation*, U.S. FOOD & DRUG ADMIN.,            https://www.fda.gov/industry/import-basics/personal-importation (last updated Oct. 8, 2024).    The FDA "may consider a more permissive decision" in "allowing the importation of medications for personal use" if, for instance, the drug "is not for treatment of a serious condition and there is no known significant health risk," or if the drug "is for a serious condition for which effective treatment may not be available domestically either through commercial or clinical means."    *Id.*    And foreign nationals who vacation, study, or work in the United States may also ship to themselves as much as a 90-day supply of drugs for personal use; if they stay in the United States for more than

---

here concerning PharmacyChecker.  We view the facts stated in these filings in the light most favorable to PharmacyChecker, the nonmovant.

90 days, they may have additional medications shipped to them.[2]  *Id.*

Against this backdrop, PharmacyChecker operates the PharmacyChecker.com website.   The website is not a pharmacy; it does not "buy, sell, distribute, dispense, or process orders for" any drugs.   Rather, it accredits online pharmacies across the globe for their safety standards, and it compares the prices of the drugs offered by those pharmacies for its website users from around the world.   According to PharmacyChecker, its "central objective has been to examine the qualifications (i.e., practice and safety standards) of online pharmacies wherever they might be to provide worldwide visitors with information to make good choices, to be safe, and to get medication most affordably."

PharmacyChecker's business model depends on charging online pharmacies verification fees and click-through fees.[3]  From January 2015 through August 2021 ("Relevant Period"), approximately 14% of PharmacyChecker's revenue came from verification fees, which were charged to online pharmacies for services that PharmacyChecker provided in accrediting those pharmacies and listing them on its website.   About 84% of the verification fees that PharmacyChecker collected were paid by foreign pharmacies.

---

[2] The parties dispute whether other exceptions may apply.  We need not address this dispute because our decision here does not rest on its resolution.

[3] PharmacyChecker also provides discount cards for U.S. consumers to purchase U.S. prescription drugs at U.S. pharmacies.  However, the record suggests that these discount cards accounted for only about 0.2% of PharmacyChecker's revenue.

In the Relevant Period, approximately 85% of PharmacyChecker's revenue came from click-through fees, which PharmacyChecker charged its accredited pharmacies whenever their hyperlinks on the PharmacyChecker.com website were clicked. About 95% of PharmacyChecker's click-through revenue in the Relevant Period came from online pharmacies located outside the United States; approximately 69% of that revenue resulted from clicks made by PharmacyChecker.com users located inside the United States. This means around 56% of PharmacyChecker's total revenue in the Relevant Period was generated from clicks made by PharmacyChecker.com users inside the United States on hyperlinks for online pharmacies outside the United States.

These click-through fees were charged to the pharmacies solely based on the clicks made by PharmacyChecker.com users. PharmacyChecker collected these fees irrespective of whether its users ended up purchasing any drugs. Accordingly, PharmacyChecker did not track its website users' activities after they clicked through to those pharmacies' websites and did not know how many of its U.S. users purchased drugs from foreign pharmacies and had them shipped into the United States. On this point, the record consists of one online pharmacy's deposition testimony that only about 3.47% of the clicks from PharmacyChecker.com resulted in a drug transaction.[4]

---

[4] LegitScript has proffered evidence that the "frequently asked questions" section on PharmacyChecker.com explained how its U.S. users could purchase medications from foreign pharmacies. PharmacyChecker responds that, in that section, it answered questions most frequently asked by its website users located worldwide. There is also evidence suggesting that PharmacyChecker assisted U.S. consumers with their purchases of drugs from its accredited foreign pharmacies.

B.

In August 2019, PharmacyChecker sued its competitor LegitScript and other industry organizations (excluding LegitScript, hereinafter "SDNY Defendants") in the U.S. District Court for the Southern District of New York ("New York court") for their alleged group boycott against PharmacyChecker in violation of the Sherman Act and for alleged false advertising by one of the SDNY Defendants in violation of the Lanham Act ("SDNY Action"). [5] Specifically, PharmacyChecker alleged, *inter alia*, that the SDNY Defendants (1) worked with LegitScript to have "published articles disparaging" PharmacyChecker; (2) colluded with LegitScript to have "created the '.pharmacy' [internet] domain to serve a gatekeeping function," a domain which PharmacyChecker is presumably ineligible to use; (3) added PharmacyChecker.com to their "Not Recommended Sites list" or the like; and (4) "ran targeted online ads against" PharmacyChecker. Further, according to PharmacyChecker, one of the SDNY Defendants caused Microsoft, a corporate member of that SDNY Defendant, to set up a warning box on its search engine which would appear whenever its users click on the

---

But PharmacyChecker received only about 20 inquiries per year for assistance with an issue involving its accredited pharmacies. By way of comparison, LegitScript's expert concluded that PharmacyChecker collected click-through fees "from approximately 7.5 million clicks" over the Relevant Period.

[5] LegitScript offers "verification and monitoring services for online pharmacies." It allegedly competes with PharmacyChecker "in the pharmacy accreditation market." SDNY Defendants include National Association of Boards of Pharmacy, Alliance for Safe Online Pharmacies, Partnership for Safe Medicines, and Center for Safe Internet Pharmacies Ltd.

search results for webpages from PharmacyChecker.com. Defendants' conduct allegedly prevented PharmacyChecker from competing effectively "in the global markets for online pharmacy verification and comparative drug price information."

In March 2021, the New York court found that it lacked personal jurisdiction over LegitScript, a limited liability company organized under the laws of Oregon. PharmacyChecker thus moved to sever its claim against LegitScript and to transfer that claim to the U.S. District Court for the District of Oregon ("Oregon Action"), and the New York court granted that motion. *PharmacyChecker.com LLC v. LegitScript LLC*, 614 F. Supp. 3d 796, 803 (D. Or. 2022).

Meanwhile, the New York court denied SDNY Defendants' joint motion to dismiss and formulated the following rule regarding antitrust injury: "[W]here the plaintiff's enterprise is completely or almost completely illegal, or completely or almost completely geared towards facilitating illegality, that plaintiff cannot plead an antitrust injury." Applying this rule, the New York court declined to dismiss PharmacyChecker's antitrust claim in the SDNY Action for want of antitrust standing because the pleadings did not establish PharmacyChecker's complete or almost complete involvement in illegal activities or the facilitation thereof.

The SDNY Action then moved forward. In March 2023, the New York court granted SDNY Defendants summary judgment as to PharmacyChecker's antitrust claim, holding that PharmacyChecker lacked antitrust standing. The New York court found it "clear" that PharmacyChecker directed "U.S. consumers to foreign pharmacies where they [could]

purchase prescription medication in violation of federal law," and that PharmacyChecker "described this facilitation as its mission 'to help consumers afford medication they need[ed].'"    As such, the court concluded that PharmacyChecker was "completely or almost completely geared towards facilitating illegality" and, accordingly, lacked a cognizable antitrust injury.  Pursuant to Federal Rule of Civil Procedure 54(b), the parties in the SDNY Action jointly requested that the New York court enter a partial final judgment on this decision so that PharmacyChecker could appeal it.  *PharmacyChecker.com LLC v. Nat'l Ass'n of Bds. of Pharmacy*, No. 19-CV-7577, 2023 WL 4492148, at \*1 (S.D.N.Y. June 5, 2023).  The New York court denied that request.  *Id.*  The SDNY Action thus proceeded to discovery on PharmacyChecker's non-antitrust claim.

In June 2023, LegitScript moved for summary judgment in the Oregon Action, contending that (1) issue preclusion barred PharmacyChecker's antitrust claim because the New York court had found PharmacyChecker lacked antitrust standing; and that, even absent issue preclusion, (2) PharmacyChecker lacked antitrust standing under Ninth Circuit law.[6]  In January 2024, Judge Michael H. Simon, presiding over the Oregon Action, denied LegitScript summary judgment.

Regarding issue preclusion, Judge Simon held that the New York court's decision did not bar PharmacyChecker's claim in the Oregon Action because (1) the New York court's decision was not sufficiently firm to have a

---

[6] PharmacyChecker did not assert a false advertising claim in the Oregon Action as it did in the SDNY Action.  *PharmacyChecker*, 614 F. Supp. 3d at 802 n.1.

preclusive effect; (2) the parties in the SDNY Action had not been given an opportunity to appeal; and (3) the Second and Ninth Circuits' precedents differ on the relevant legal question.  On appeal, LegitScript does not challenge this portion of Judge Simon's ruling.

As to PharmacyChecker's antitrust standing, Judge Simon—viewing the evidence in the light most favorable to PharmacyChecker—concluded that "PharmacyChecker's business [was] legal."  Judge Simon observed that "LegitScript ha[d] identified no federal or state law that *PharmacyChecker* ha[d] violated."  "Nor ha[d] LegitScript pointed to any instance of a federal or state law enforcement agency prosecuting or even threatening to prosecute PharmacyChecker, or any instance of a federal or state regulatory body taking or even threatening to take any action against PharmacyChecker (*e.g.*, by issuing a cease-and-desist order)."  "Nor, for that matter, ha[d] LegitScript shown that visitors to PharmacyChecker's website— including those visitors who click[ed] on links to non-U.S. pharmacies—engage[d] in illegal activity simply by using PharmacyChecker's website."  At most, found Judge Simon, LegitScript could be said to have proffered evidence establishing "that some number of U.S. visitors to PharmacyChecker's website appear[ed] to have violated federal law through cross-border purchase and import of prescription drugs for personal use and that PharmacyChecker's website facilitate[d] that illegal activity."

Accordingly, Judge Simon framed the controlling question for LegitScript's motion for summary judgment as follows: "[W]hether an antitrust plaintiff, which does not itself engage in illegal activity, lacks antitrust standing merely because that plaintiff's website facilitates illegal

activity by others and the plaintiff receives revenue as an indirect result of that activity." Judge Simon answered this question in the negative and denied LegitScript summary judgment.

LegitScript moved to certify Judge Simon's order for interlocutory appeal. Granting that motion, Judge Simon certified the following questions:

> (1) Might a plaintiff's facilitation of unlawful activity by others bar antitrust standing under some circumstances? (2) If so, is there a minimum threshold of facilitation of unlawful activity by others, measured in some appropriate fashion considering the plaintiff's entire range of business activities, for the bar to antitrust standing to be triggered?

LegitScript timely applied for this Court's permission to appeal, which application we granted.

II.

"Antitrust standing is a question of law reviewed de novo." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*, 190 F.3d 1051, 1054 (9th Cir. 1999). We also review de novo a district court's decision denying summary judgment. *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 606 (9th Cir. 2019). "[V]iewing the evidence in the light most favorable to the non-movant," we must determine "whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Soc. Techs. LLC v. Apple Inc.*, 4 F.4th 811, 816 (9th Cir. 2021) (citation omitted).

Before us is the district court's denial of summary judgment for LegitScript on two grounds: (1) PharmacyChecker's claim in this case is not precluded by the New York court's ruling that PharmacyChecker lacked antitrust standing; and (2) antitrust standing is not lacking under the laws of the Ninth Circuit. As the parties do not challenge Judge Simon's first ruling rejecting issue preclusion as a defense to PharmacyChecker's claim, we deal only with his second ruling concerning whether PharmacyChecker has antitrust standing.

### III.

Section 4 of the Clayton Act provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor" and "shall recover threefold the damages by him sustained." 15 U.S.C. § 15(a).  Congress has thereby created a group of "private attorneys general" to incentivize the enforcement of the U.S. antitrust laws. *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 746 (1977).

LegitScript argues that PharmacyChecker has no legal right in running a business that facilitates the illegal importation of foreign drugs and, accordingly, it did not suffer any legally cognizable injury under Section 4 of the Clayton Act. This argument fails, as it is foreclosed by this Circuit's binding precedents in *Calnetics Corp. v. Volkswagen of America, Inc*., 532 F.2d 674 (9th Cir. 1976) (per curiam), and *Memorex Corp. v. IBM*, 555 F.2d 1379 (9th Cir. 1977), which closely followed the Supreme Court's teachings in *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc*., 340 U.S. 211 (1951), and *Perma Life Mufflers,*

14    PHARMACYCHECKER.COM LLC v. LEGITSCRIPT LLC

*Inc. v. International Parts Corp*., 392 U.S. 134 (1968).[7]  We discuss these binding precedents below.

A.

Championing a public policy in favor of private antitrust enforcement, the Supreme Court in *Kiefer-Stewart* and *Perma Life* declared that, in general, neither the equitable defense of *in pari delicto* nor that of unclean hands can act as a complete bar to lawsuits brought under Section 4 of the Clayton Act:[8]

> [T]he purposes of the antitrust laws are best served by insuring that the private action will

---

[7] Both *Kiefer-Stewart* and *Perma Life* were partially overruled by *Copperweld Corp. v. Independence Tube Corp.*, when the Supreme Court held that a parent company is legally incapable of conspiring with its wholly owned subsidiary in violation of Section 1 of the Sherman Act. 467 U.S. 752, 758–59, 777 (1984). In *Copperweld*, the Court overruled its prior decisions, including *Kiefer-Stewart* and *Perma Life*, "to the extent" they had suggested otherwise. *Id.* at 777. *Kiefer-Stewart* and *Perma Life* were not overruled in their entirety because the determination that a parent company and its wholly owned subsidiary could conspire in violation of antitrust laws was not necessary to the disposition of either case. *Id.* at 764–66; *see also, e.g.*, *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 982 (9th Cir. 2023) (citing *Perma Life*); *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 426 (4th Cir. 2015) (citing *Kiefer-Stewart*).

[8] The defense of *in pari delicto* provides that a plaintiff who participates in a wrongdoing may not recover damages resulting from the same wrongdoing. *See Memorex*, 555 F.2d at 1382. The defense of unclean hands deals with a "plaintiff's wrongdoing against a third party with respect to the [same] subject matter of" the plaintiff's suit. *Id.* Notably, the doctrine of *in pari delicto* did not disappear from private antitrust actions altogether. Courts have applied this doctrine when a plaintiff and a defendant are equally at fault for the alleged antitrust conspiracy, such that "the illegal conspiracy would not have been formed but for the

> be an ever-present threat to deter anyone
> contemplating business behavior in violation
> of the antitrust laws.  The plaintiff who reaps
> the reward of treble damages may be no less
> morally reprehensible than the defendant, but
> the law encourages his suit to further the
> overriding public policy in favor of
> competition.  A more fastidious regard for the
> relative moral worth of the parties would only
> result in seriously undermining the
> usefulness of the private action as a bulwark
> of antitrust enforcement.  And permitting the
> plaintiff to recover a windfall gain does not
> encourage continued violations by those in
> his position since they remain fully subject to
> civil and criminal penalties for their own
> illegal conduct.

*Perma Life*, 392 U.S. at 139; *see also Kiefer-Stewart*, 340
U.S. at 214 ("If [the plaintiff] and others were guilty of
infractions of the antitrust laws, they could be held
responsible in appropriate proceedings brought against them
by the Government or by injured private persons.  The
alleged illegal conduct of [the plaintiff], however, could not
legalize the unlawful combination by [the defendants] nor
immunize them against liability to those they injured.").  Our
Circuit applied these teachings in *Calnetics*, 532 F.2d 674,
and *Memorex*, 555 F.2d 1379.

In *Calnetics*, plaintiff Calnetics Corporation
("Calnetics"), an independent manufacturer of automobile

---

plaintiff's participation." *Javelin Corp. v. Uniroyal, Inc.*, 546 F.2d 276,
279 (9th Cir. 1976).

air conditioning equipment, alleged that the acquisition by
Volkswagen of America, Inc. ("Volkswagen") of a
manufacturer of similar air conditioning equipment would
enable Volkswagen to "coerce both its wholly owned and
indirectly controlled distributors and dealers to satisfy their
demand for automobile air conditioning equipment from [the
acquiree's] supply, thus foreclosing sales opportunities of"
Calnetics and other independent manufacturers.  532 F.2d at
678–80.  Calnetics sued for both damages and equitable
relief.  *Id.* at 680.  To prove damages, Calnetics sought to
introduce evidence of its historical sales figures, but the
district court held this evidence was inadmissible because
those historical sales resulted from a kickback agreement
that allegedly constituted commercial bribery in violation of
federal antitrust laws and California state laws.  *Id.* at 680,
688.  As Calnetics could not prove damages without this
evidence, the district court granted summary judgment
against Calnetics as to its antitrust claim.  *Id.* at 688.

On appeal, the *Calnetics* panel disagreed and vacated the
summary judgment order.  *Id.* at 690.  The panel held that
Volkswagen's evidentiary challenge to Calnetics's historical
sales figures was "in effect an *in pari delicto* or 'unclean
hands' defense" and thus could not bar Calnetics's antitrust
suit.  *Id.* at 688; *see also id.* at 689 ("[D]efendants argue that
they are not challenging Calnetics'[s] right to bring an
antitrust action but merely its reliance on illegal sales for
proof of damages.  Labels, however, are not controlling, and
we find no legitimate reason for distinguishing defendants'
'illegal sales' argument from the *in pari delicto* type of
defense struck down in *Perma Life*." (footnotes and citation
omitted)).  According to the panel, Calnetics could maintain
its suit against Volkswagen "even though the market
position from which Calnetics was displaced had been

attained only through illegal conduct." *Id.* at 689. "To rule otherwise would effectively frustrate the important public policy underlining the antitrust laws: encouragement of private antitrust suits in order to deter the illegal exercise of market power." *Id.*

As such, *Calnetics* established that an injury to the fruits of a plaintiff's illegal conduct can confer antitrust standing under Section 4 of the Clayton Act. Granted, *Calnetics* involved only an evidentiary dispute and only discrete sales practices. But if there were any doubt about this principle of antitrust standing after *Calnetics*, we confirmed it in *Memorex* the following year.

In *Memorex*, plaintiffs Memorex Corporation and several affiliates ("Memorex"), originally in the business of selling magnetic recording tapes, tried to expand into the market for disk storage devices, in which market they had to compete with International Business Machines Corporation ("IBM"). 555 F.2d at 1380. Memorex sued IBM for perpetuating its purported monopoly in the disk storage device market in violation of the U.S. antitrust laws. *Id.* IBM asserted as an affirmative defense that Memorex owed its entire business presence in the disk storage device market to its unlawful misappropriation of IBM's intellectual property. *Id.* Memorex sought to strike this "unlawful market presence" defense, arguing that it was precluded by *Calnetics*. Br. of Appellees and Cross-Appellants at 12–16, *Memorex Corp. v. IBM*, 555 F.2d 1379 (9th Cir. 1977) (Nos. 76-1887, 76-1898).

IBM responded that *Calnetics* was inapposite because the "illegal conduct in *Calnetics* involved only selling practices" and, in contrast, "Memorex would not have been a competitor [to IBM] at all" but for its theft from IBM.

Reply Br. of Appellant on Antitrust Issues and Appellee's
Br. on Res Judicata Issues at 3, *Memorex Corp. v. IBM*, 555
F.2d 1379 (9th Cir. 1977) (Nos. 76-1887, 76-1898).  Like
LegitScript here, IBM attempted to distinguish *Calnetics* on
the ground that IBM's "unlawful market presence" defense
was different from the defenses of *in pari delicto* and
unclean hands.  *Id.*; Appellant's Br. at 10–12, *Memorex
Corp. v. IBM*, 555 F.2d 1379 (9th Cir. 1977) (Nos. 76-1887,
76-1898).  IBM argued that the plain text of Section 4 of the
Clayton Act barred Memorex from suing for injuries in a
business that was not "*HIS*" but was "*stolen from*" IBM.
Appellant's Br. at 9–10, 12, *Memorex Corp. v. IBM*, 555
F.2d 1379 (9th Cir. 1977) (Nos. 76-1887, 76-1898)
(emphases in original).

The *Memorex* panel disagreed with IBM's arguments
and instead found *Calnetics* "compelling."  *Id.* at 1381–83.
The panel observed IBM did not argue "that there was no
injury at all, but rather that the market position which
suffered injury was obtained through illegal means."  *Id.* at
1383.  Under *Calnetics*, such alleged illegality did not bar
Memorex's claim against IBM for its alleged antitrust
violations.  *Id.* at 1382–83 ("Memorex's own illegal conduct
did not divest it of an antitrust action. . . . The statutory
requirements for [its] suit are met.  That is all that is
necessary.").    The *Memorex* panel reasoned that, in
*Calnetics*, "[w]ere it not for Calnetics'[s] allegedly illegal
conduct, it would not have suffered *any* injury because it
would not have sold *any* products to Volkswagen
distributors."  *Id.* at 1381–82 (emphases added).  "All sales"
that were allegedly subject to injury resulted from
commercial bribery.  *Id.* at 1382.  "In effect," Calnetics built
"an 'illegal market presence' much as IBM suggest[ed]
Memorex d[id]."  *Id.*    Accordingly, "[t]he 'rights' of

Calnetics were no greater than those of Memorex, even assuming Memorex [had] stole[n] the patents from which its products were made." *Id.*

As such, *Memorex* confirmed that, under Section 4 of the Clayton Act, a plaintiff can suffer a legally cognizable injury when competing in a legitimate market, even if the injury is inflicted upon a business or property interest that has been obtained through the plaintiff's unlawful conduct.[9] After all, a plaintiff suing under Section 4 of the Clayton Act "is suing not only in its own behalf, but as a 'private attorney general' representing the public interest." *Javelin Corp. v. Uniroyal, Inc.*, 546 F.2d 276, 279–80 (9th Cir. 1976). "Congress established the private remedy to enlist the public as enforcers of the antitrust laws." *Id.* at 280. "The courts should encourage this function." *Id.*

Of course, a plaintiff who sues under Section 4 of the Clayton Act remains fully responsible for civil liabilities and, if applicable, can be subject to criminal penalties for its own illegal activities. *See Perma Life*, 392 U.S. at 139. But the plaintiff's illegality does not necessarily negate the defendant's liability to the plaintiff for antitrust violations. *Id.* Nor does it defeat the public benefits that the plaintiff's private enforcement of antitrust laws brings. *Id.* Permitting a perhaps imperfect plaintiff to sue under Section 4 of the Clayton Act serves the best interest of the public—both the plaintiff's and the defendant's wrongs can be accounted for,

---

[9] We express no view as to whether Section 4 of the Clayton Act may or may not recognize a plaintiff's injuries suffered while competing in an *illegitimate* market. This situation is present neither here nor in *Calnetics* or *Memorex*. Here, PharmacyChecker and LegitScript allegedly compete in the legitimate market of online pharmacy accreditation. And LegitScript does not claim the alleged market for providing comparative drug price information is illegal.

"instead of only one or neither." *First Beverages, Inc. of Las Vegas v. Royal Crown Cola Co.*, 612 F.2d 1164, 1175 (9th Cir. 1980).

In this case, based on the record at this summary judgment stage, the business interests that PharmacyChecker seeks to protect are not meaningfully different from those of the plaintiffs in *Calnetics* and *Memorex*, even assuming PharmacyChecker's alleged facilitation of unlawful foreign drug importation is itself illegal. Indeed, the PharmacyChecker's businesses that LegitScript claims to be illegal are proportionally less than those claimed to be illegal in *Calnetics* and *Memorex*. Here, the parties agree that only about 56% of PharmacyChecker's total revenue was generated from clicks made by website visitors located inside the United States on hyperlinks to pharmacies located outside the United States, from whom medications could presumably be purchased for shipment into the United States. Evidence tends to establish that only about 3.47% of these clicks resulted in actual drug transactions, which may or may not be unlawful depending on the actual circumstances underlying these transactions. For example, as mentioned *supra*, it would generally be lawful for a foreign national visiting the United States to ship himself a 90-day supply of medication for personal use. *See Personal Importation*, U.S. FOOD & DRUG ADMIN., https://www.fda.gov/industry/import-basics/personal-importation (last updated Oct. 8, 2024). LegitScript does not claim that the mere operation or the mere use of the PharmacyChecker.com website is illegal.

Based on this record, the teachings of the Supreme Court, and the binding precedents in our Circuit, we hold that PharmacyChecker is not denied antitrust standing under Section 4 of the Clayton Act simply because evidence

suggests PharmacyChecker facilitated possibly unlawful importation of foreign drugs by some number of its customers. We therefore affirm the district court's denial of LegitScript's motion for summary judgment.[10]

## B.

LegitScript attacks the application of *Memorex* in this case from three angles. *First*, it contends that *Memorex* does not apply where, as here, a plaintiff's illegal conduct is not directed against the defendant. It is true that the relevant holding in *Memorex* was narrow: "[W]e hold that illegality is not to be recognized as a defense to an antitrust action when the illegal acts by the plaintiff are directed against the defendant." 555 F.2d at 1382. But we are bound not just by the holding, but also the "reasoned consideration" "germane to the eventual resolution," of our precedents. *United States v. Johnson*, 256 F.3d 895, 914 (9th Cir. 2001) (en banc) (Kozinski, J., concurring). And, in *Memorex*, such "reasoned consideration" included the panel's discussion of why *Calnetics* was "compelling," *Memorex*, 555 F.2d at 1381–82, and how Memorex's private antitrust enforcement would benefit competition in the relevant market notwithstanding Memorex's prior conduct violative of other laws, *id.* at 1383.

To advance a narrow reading of *Memorex*, LegitScript also cites footnote five of that opinion, which stated that if "a plaintiff participates in an illegal conspiracy to restrain

---

[10] Because this appeal arises from a denial of summary judgment sought solely on the ground that PharmacyChecker lacked statutory antitrust standing, we have no occasion to decide whether PharmacyChecker may recover the damages suffered solely by the portion of its business interest that may later be proven illegal. *Cf. First Beverages*, 612 F.2d at 1174–75; *Memorex*, 555 F.2d at 1384 n.8; *Calnetics*, 532 F.2d at 689.

trade[,] an act not directed against the defendant[,] then his conduct must be evaluated under different standards." *Id.* at 1382 n.5. *Memorex* did not specify what those "different standards" might be or when illegality might serve as a defense. In our view, this footnote means that, when a plaintiff participates in an illegal conspiracy not against but alongside a defendant, the plaintiff may be divested of its antitrust standing if the conspiracy would not have been formed but for the plaintiff's participation. *Javelin Corp.*, 546 F.2d at 279 (discussed in *Memorex*, 555 F.2d at 1383). Properly read as such, this footnote does not change our conclusion here. To the extent LegitScript argues that this footnote implicitly bars private antitrust actions brought by plaintiffs who have committed wrongdoing against third parties, this argument fails in light of *Kiefer-Stewart*, 340 U.S. at 214, in which the plaintiff wholesaler allegedly conspired with other wholesalers to fix downstream prices— conduct not necessarily directed against the defendant manufacturers—but was not therefore barred from its antitrust action against the defendants. Br. for Resp'ts at 7– 8, *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211 (2006) (No. 297), 1950 WL 78636, at *7–8.

*Second*, LegitScript argues that *Memorex* does not apply where, as here, a plaintiff commits a public wrong. It is true that *Memorex* referred to the public wrong of IBM's antitrust violation and contrasted it with the private wrong of Memorex's alleged illegal conduct. 555 F.2d at 1382–83. But nothing in *Memorex* indicated that the panel was somehow limiting its holding as LegitScript suggests. Nor would such a limitation be consistent with the precedents upon which *Memorex* relied. In *Kiefer-Stewart*, for example, the plaintiff was alleged to have committed price-fixing antitrust violations similar in kind but separate from

those committed by the defendants. 340 U.S. at 212, 214 (describing how the defendants allegedly conspired to sell liquor only to wholesalers who would resell at prices below a fixed maximum, while the plaintiff wholesaler allegedly conspired with other wholesalers to resell liquor only at prices above a fixed minimum). The Supreme Court in that case did not weigh whose conduct was more reprehensible before concluding that the plaintiff's alleged illegal conduct did not bar its antitrust suit against the defendants. *Id.* at 214; *see also Perma Life*, 392 U.S. at 138–39 (also involving two public wrongs); *Calnetics*, 532 F.2d at 680 (same). As the Supreme Court has cautioned, a "fastidious regard for the relative moral worth of the parties would only result in seriously undermining the usefulness of the private action as a bulwark of antitrust enforcement." *Memorex*, 555 F.2d at 1383 (quoting *Perma Life*, 392 U.S. at 139).

*Finally*, LegitScript maintains that *Memorex* does not apply where, as here, a defendant cannot assert a counterclaim against a plaintiff's illegal conduct. Not true. The *Memorex* panel did not hinge its conclusion on the availability of a counterclaim. *See id.* at 1382 (noting that its conclusion was "particularly true when"—not true *only when*—"the defendant has other remedies available to him"); *id.* at 1382–83 (explaining that a counterclaim to offset damages and a challenge to Memorex's antitrust standing were distinct and different concepts). In fact, in *Memorex*, IBM did not—and probably could not—counterclaim against Memorex for the alleged misappropriation of intellectual property. *Id.* at 1383 & n.6 (observing that such a counterclaim might have been barred by res judicata due to IBM's previous litigation with Memorex).

IV.

Against the binding precedents of this Circuit, LegitScript relies on a Seventh Circuit decision, *Maltz v. Sax*, 134 F.2d 2 (7th Cir. 1943), and two district court decisions in the Ninth Circuit, *Modesto Irrigation Dist. v. Pac. Gas & Elec. Co.*, 309 F. Supp. 2d 1156 (N.D. Cal. 2004), *aff'd* 158 F. App'x 807 (9th Cir. 2005) (unpublished); *Pearl Music Co. v. Recording Indus. Ass'n of Am., Inc.*, 460 F. Supp. 1060 (C.D. Cal. 1978). None of them bind us, nor are they persuasive. We discuss them below.

A.

LegitScript first turns to the Seventh Circuit's 82-year old opinion in *Maltz*, 134 F.2d 2, which predated *Kiefer-Stewart* and the attendant trend against the use of unclean hands and *in pari delicto* defenses in antitrust cases, *see Calnetics*, 532 F.2d at 689 n.23.[11]   In *Maltz*, Benjamin

---

[11] *Maltz* has never been recognized by our Circuit as a persuasive authority on the dispositive issue here. It was cited by this Court only once pre-*Kiefer-Stewart* for the proposition that a treble-damage suit under Section 4 of the Clayton Act "merely redresses the private injury" rather than the "public interest," which proposition, as discussed *supra*, has been rejected by the Supreme Court in *Kiefer-Stewart* and *Perma Life*. *Burnham Chem. Co. v. Borax Consol.*, 170 F.2d 569, 578 & n.17 (9th Cir. 1948). Post-*Kiefer-Stewart*, *Maltz* was cited only three times by this Circuit. In two of those instances, we cited *Maltz* for the proposition that the right of a private party to recover damages under the Clayton Act "was intended to provoke greater respect for the Act," a proposition in line with *Kiefer-Stewart* but not dispositive of this case. *Karseal Corp. v. Richfield Oil Corp.*, 221 F.2d 358, 365 (9th Cir. 1955); *see also Flintkote Co. v. Lysfjord*, 246 F.2d 368, 398 n.40 (9th Cir. 1957). The last instance in which we cited *Maltz* was in *Memorex*, where we cited *Maltz* for "the simple proposition that some injury must have occurred before the plaintiff can recover." 555 F.2d at 1383. In fact, the Seventh Circuit itself has not cited *Maltz* since 1954. The only post-

Maltz, a manufacturer of certain gambling devices, sued his competitors for antitrust violations. 134 F.2d at 3. The defendants successfully moved to dismiss the case on the ground that the plaintiff's "sole business [was] the manufacture and sale of gambling devices, the use and sale of which [were] against public policy and unlawful." *Id.* In affirming the dismissal, the Seventh Circuit found that Maltz's "business was the making and selling of goods which could only be used by purchasers in furtherance of the business of gambling." *Id.* at 5. The court thus held that Maltz had "no legal right in a business" "for which he may obtain protection either in an action at law, or by a suit in equity." *Id.* "He had no legal rights to protect," so "defendants could not invade them."**12** *Id.*

LegitScript also resorts to *Pearl Music*, 460 F. Supp. 1060, a case decided by the U.S. District Court for the Central District of California in 1978, one year after *Memorex*. The *Pearl Music* court distinguished *Memorex* and *Calnetics* because the plaintiffs in *Pearl Music*, who sold pirated tapes, "engaged in a business which [was], by its very nature, entirely illegal." *Id.* at 1067, 1068; *see also id.* at 1068 ("The almost total magnitude of this illegal conduct by plaintiffs makes their miniscule conduct that may be legal, insignificant, and, in any event, none of such miniscule and

---

*Kiefer-Stewart* instance in which the Seventh Circuit cited *Maltz* was for the statement that private antitrust actions were authorized by the Clayton Act to further the enforcement of the U.S. antitrust laws. *Sun Theatre Corp. v. RKO Radio Pictures*, 213 F.2d 284, 289, 293 (7th Cir. 1954), *abrogated by Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321 (1971).

12 The Seventh Circuit also held that Maltz's claim was barred because he came to the court with unclean hands. *Maltz*, 134 F.2d at 5. This holding probably did not survive *Kiefer-Stewart*, 340 U.S. at 214.

possibly legal conduct rises to the level of the legitimate activities of *Memorex* and *Calnetics*."). The court thus held that, because the plaintiffs in *Pearl Music* "engaged in wholly illegal enterprises which [were] directed against the public in violation of clear federal and state statutory criminal prohibitions," they "should not be able to assert or claim that they ha[d] rights protected by the anti-trust laws." *Id.* at 1068.

Relying on *Maltz* and *Pearl Music*, LegitScript argues that a plaintiff that engages in an entirely or almost entirely illegal business does not have antitrust standing under Section 4 of the Clayton Act. But neither case is factually apt. LegitScript fails to proffer any evidence suggesting that PharmacyChecker was not legally registered, that PharmacyChecker itself illegally imported any foreign drugs, or that PharmacyChecker's business exclusively or almost exclusively involved facilitating the illegal importation of foreign drugs. In fact, LegitScript does not dispute that PharmacyChecker engaged in legitimate businesses in many instances, acknowledging, for example, that approximately 30% of the click-through fees collected by PharmacyChecker were generated by customers outside the United States. Hence, LegitScript's reliance on *Maltz* and *Pearl Music* is misplaced.

More fundamentally, *Maltz* and *Pearl Music* are at odds with *Calnetics*. In *Calnetics*, 532 F.2d at 689, we endorsed the reasoning of *Semke v. Enid Automobile Dealers Association*, 456 F.2d 1361 (10th Cir. 1972). In *Semke*, the Tenth Circuit allowed the plaintiff L.G. Semke, doing business as Semke Auto Mart, an unlicensed dealer in new cars, to maintain his antitrust suit, even though the defendants argued that Semke's "whole business operation" violated state licensing statutes, which served an important

public interest in weeding out "unscrupulous automobile dealers." *Calnetics*, 532 F.2d at 689. More severe than Maltz, Semke did not just facilitate illegal activities; he himself engaged in a business that, like *Pearl Music* plaintiffs', was entirely illegal. Yet the Tenth Circuit recognized Semke's antitrust standing, and we relied on *Semke* in deciding *Calnetics* to encourage private antitrust enforcement.[13] *Id.*; *see also Memorex*, 555 F.2d at 1382 (citing *Semke* with approval). As such, *Maltz* and *Pearl Music* are not persuasive.

B.

LegitScript also cites *Modesto*, a case decided by the U.S. District Court for the Northern District of California, 309 F. Supp. 2d 1156, and later affirmed by us in an unpublished memorandum disposition, 158 F. App'x 807. In that case, the plaintiff Modesto Irrigation District ("Modesto") attempted to expand its electricity services into Pittsburg, California—an area serviced by Pacific Gas and Electric Company ("PG&E")—without governmental approval, believing such approval was unnecessary. *Modesto*, 309 F. Supp. 2d at 1159–62. Modesto alleged that PG&E engaged in anticompetitive conduct to forestall its expansion into Pittsburg, and PG&E moved for summary judgment on one of its affirmative defenses: that Modesto lacked antitrust injury. *Id.* at 1161–62.

The district court found that governmental approval was required for Modesto's expansion into Pittsburg. *Id.* at 1163–69. Then, the district court reasoned that, because Modesto "possessed neither the legal right nor the necessary

---

[13] Notably, while Semke's business, as he carried it out, was illegal, he competed in a legitimate market.

[governmental approval] to expand its services into Pittsburg," PG&E's alleged conduct trying to exclude Modesto from servicing Pittsburg "could not inflict a[] cognizable antitrust injury." *Id.* at 1170. On appeal, the *Modesto* panel affirmed, holding that because Modesto did not receive the necessary governmental approval, it was "not a lawful competitor of" PG&E in Pittsburg and thus "could not have suffered an antitrust injury at the hands of PG&E" there. *Modesto Irrigation Dist. v. Pac. Gas & Elec. Co.*, 158 F. App'x 807, at \*1 (9th Cir. 2005) (unpublished).

*Modesto* stands for the unremarkable proposition that a private plaintiff does not suffer an *antitrust* injury if it would suffer the same injury in the absence of the alleged anticompetitive conduct. Simply put, antitrust standing is lacking where "a force other than the antitrust violation fully accounts for the plaintiff's injury." 2 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* § 338, at 320 (2d ed. 2000). In *Modesto*, even absent PG&E's alleged anticompetitive conduct, Modesto would not have been able to service Pittsburg because it lacked the necessary governmental approval. Here, however, PharmacyChecker is allegedly foreclosed from the relevant markets solely on account of LegitScript's alleged anticompetitive conduct. LegitScript has identified no other forces that could fully explain PharmacyChecker's alleged injury, such as any government enforcement actions or the threat thereof to enjoin the operation of the PharmacyChecker.com website. *Modesto* is thus distinguishable.[14]

---

[14] Likewise distinguishable are other cases cited by LegitScript that are similar to *Modesto*. *See Snake River Valley Elec. Ass'n v. PacifiCorp*, 357 F.3d 1042, 1051 (9th Cir. 2004) (holding that the defendant's "refusal to give some of its current or former customers to [the plaintiff]

V.

Following this Circuit's binding precedents in *Calnetics*, 532 F.2d 674, and *Memorex*, 555 F.2d 1379, we "continue to side with the goal of vigorous enforcement of our antitrust laws," *id.* at 1383, "the Magna Carta" for "the preservation of [our] economic freedom and [] free-enterprise system," *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972).

**AFFIRMED.**

---

was required by statute, [thus] shielding [the defendant]'s action from antitrust liability"); *Vinci v. Waste Mgmt., Inc.*, 80 F.3d 1372, 1375–77 (9th Cir. 1996) (holding that the plaintiff, neither a competitor nor a consumer in the relevant market, did not have antitrust standing as a dismissed employee to challenge the alleged anticompetitive conduct on the ground that his refusal to participate in that conduct caused his employment termination); *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 418 (3d Cir. 1997) (holding that the plaintiff lacked antitrust standing because both law and contract prevented the plaintiff from competing with the defendant). The same is true for *In re Canadian Import Antitrust Litigation*, 470 F.3d 785 (8th Cir. 2006), and *Realnetworks, Inc. v. DVD Copy Control Association, Inc.*, No. C 08-4548 MHP, 2010 WL 145098 (N.D. Cal. Jan. 8, 2010), both of which Judge Simon properly distinguished. *In re Canadian Imp. Antitrust Litig.*, 470 F.3d at 791 ("The absence of competition from Canadian sources in the domestic prescription drug market, therefore, is caused by the federal statutory and regulatory scheme adopted by the United States government, not by the conduct of the defendants."); *Realnetworks*, 2010 WL 145098, at *5, *6 (the court did "not hold that [the plaintiff] [was] barred from maintaining an antitrust claim because it [had] engaged in illegal activity"; rather, the court held that whatever injury the plaintiff might have suffered stemmed not from the defendant's alleged anticompetitive conduct, but from injunctions issued by the court).