**Richard P. Sybert**, OSB No. 833714
  Email: rsybert@grsm.com
  Direct Dial: (619) 230-7768
**Hannah Brown** (Pro Hac Vice)
  hbrown@grsm.com
GORDON REES SCULLY MANSUKHANI, LLP
1300 SW Fifth Avenue, Suite 2000
Portland, OR  97201
Tel: (503) 222-1075
Fax: (503) 616-3600

**Christopher J. Pallanch**, OSB No. 075864
  Direct: 503.802.2104
  Email: christopher.pallanch@tonkon.com
**Sadie Y. Concepción**, OSB No. 185015
  Direct: 503.802.5773
  Email: sadie.concepcion@tonkon.com
**Paul M. Balmer**, OSB No. 203429
  Direct: 503.802.5745
  Email: paul.balmer@tonkon.com
TONKON TORP LLP
1300 SW Fifth Avenue, Suite 2400
Portland, OR 97201
  Facsimile: 503.274.8779

    *Attorneys for Defendant LegitScript LLC*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

(PORTLAND DIVISION)

| | |
|---|---|
| PHARMACYCHECKER.COM LLC,<br><br>              Plaintiff,<br><br>    v.<br><br>LEGITSCRIPT LLC,<br><br>              Defendant. | Civil No. 3:22-cv-00252-SI<br><br>**LEGITSCRIPT'S RESPONSE TO PHARMACYCHECKER'S MOTION TO DISMISS COUNTERCLAIMS** |

LEGITSCRIPT'S RESPONSE TO PHARMACYCHECKER'S MOTION TO DISMISS
COUNTERCLAIMS

## TABLE OF CONTENTS

I.    LEGAL STANDARDS ...................................................................................................2

    A.    Rule 12(b)(6) Motion to Dismiss.................................................................................2

    B.    Rule 12(c) Motion for Judgment on the Pleadings ....................................................3

II.   PHARMACYCHECKER'S MOTION IS UNTIMELY OR PREMATURE. ...................4

    A.    PharmacyChecker's Rule 12(b)(6) motion is untimely. ............................................4

    B.    A Rule 12(c) motion is premature. .............................................................................6

III.  LEGITSCRIPT HAS ALLEGED A VIABLE RICO CLAIM AGAINST
    PHARMACYCHECKER'S FRAUDULENT CONDUCT. ............................................6

    A.    LegitScript has alleged harm recoverable under RICO, so the Motion fails. ..........8

        1.    LegitScript's costs in mitigating the harm from the illicit market
            PharmacyChecker created and facilitates is actionable. .............................9

        2.    PharmacyChecker's harm to LegitScript's business reputation and
            goodwill is actionable under Oregon law. .................................................12

        3.    LegitScript's lost sales and business opportunities are recoverable
            under RICO. ...............................................................................................13

    B.    PharmacyChecker proximately caused LegitScript's harm. ...................................14
        1.    The Court should consider the foreseeability of the harm to ....................14
            LegitScript and the creation of the black market when assessing ............14
            proximate cause. .......................................................................................14

        2.    LegitScript's alleged causal chain is sufficiently direct. ..........................16

    C.    PharmacyChecker's "False Marketing Enterprise" is a RICO enterprise
        under 18 U.S.C. § 1961(4). ......................................................................................19

         1.    The False Marketing Enterprise has a common purpose. ..........................20

         2.    The False Marketing Enterprise has structure and is not a rimless
            hub-and-spoke. ..........................................................................................21

    D.    LegitScript alleged PharmacyChecker's racketeering activity because the
        False and Deceptive Statements constitute predicate acts under 18 U.S.C.
        § 1961(1). .................................................................................................................22

IV.   LEGITSCRIPT ALLEGED A VIABLE LANHAM ACT CLAIM AGAINST
    PHARMACYCHECKER'S FRAUDULENT STATEMENTS .......................................24

A.    Legal framework of the Lanham Act......................................................................25

B.    LegitScript's allegations regarding PharmacyChecker's false advertising and the resulting harm to LegitScript.................................................................25

C.    The dismissed NABP claim in the S.D.N.Y. case alleges different harm from that alleged here. ..............................................................................................26

D.    LegitScript has pleaded proximate causation of commercial injury as a result of PharmacyChecker's false advertising......................................................27

E.    PharmacyChecker's false statements are actionable under the Lanham Act.........29

    1.    PharmacyChecker's statements about the safety of the pharmacies it accredits are verifiably false. ................................................................29

    2.    PharmacyChecker's statements about the legality of foreign drug importation are contrary to unambiguous FDA regulations. .....................31

V.    ANY DEFECTS IN LEGITSCRIPT'S COUNTERCLAIMS CAN BE CURED BY AMENDMENT ......................................................................................................33

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ahanchian v. Xenon Pictures, Inc.*,
624 F.3d 1253 (9th Cir. 2010) ........................................................................5

*Alaska v. Express Scripts, Inc.*,
774 F. Supp. 3d 1150 (D. Alaska 2025) ...................................... *passim*

*Anza v. Ideal Steel Supply Corp.*,
547 U.S. 451 (2006)........................................................................14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..........................................................................3

*Boyle v. United States*,
556 U.S. 938 (2009)....................................................................19, 21

*Bridge v. Phoenix Bond & Indem. Co.*,
553 U.S. 639 (2008)................................................................14, 15, 16

*Canyon Cnty. v. Syngenta Seeds, Inc.*,
519 F.3d 969 (9th Cir. 2008) ...........................................................10

*CDx Diagnostics Inc. v. Histologics LLC*,
2014 WL 3347525 (C.D. Cal. July 7, 2014).............................................6

*Cedar Swamp Holdings, Inc. v. Zaman*,
487 F. Supp. 2d 444 (S.D.N.Y. 2007)................................................21, 22

*City & Cnty. of S. F. v. Purdue Pharma L.P.*,
491 F. Supp. 3d 610 (N.D. Cal. 2020) ...............................................10, 11

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*,
173 F.3d 725 (9th Cir. 1999) ..........................................................31, 32

*Coleman v. The Quaker Oats Co.*,
232 F.3d 1271 (9th Cir. 2000) ............................................................3

*Columbia Sportswear N. Am., Inc. v. Seirus Innovative Accessories, Inc.*,
428 F. Supp. 3d 354 (D. Or. 2019) .....................................................15

*Com. Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.*,
271 F.3d 374 (2d Cir. 2001)...............................................................13

*Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv., Inc.*,
  911 F.2d 242 (9th Cir. 1990) ....................................................................24

*County of Marin v. Deloitte Consulting LLP*,
  836 F. Supp. 2d 1030 (N.D. Cal. 2011) ..............................................23, 24

*Dial A Car, Inc. v. Transp., Inc.*,
  82 F.3d 484 (D.C. Cir. 1996) ....................................................................32

*Doe v. United Sates*,
  419 F.3d 1058 (9th Cir. 2005) .................................................................3, 6

*Eclectic Properties East, LLC v. Marcus & Millichap Co.*,
  751 F.3d 990 (9th Cir. 2014) ....................................................................23

*Edwards v. Marin Park, Inc.*,
  356 F.3d 1058 (9th Cir. 2004) ....................................................................3

*Friedman v. 24 Hour Fitness USA, Inc.*,
  580 F. Supp. 2d 985 (C.D. Cal. 2008) .......................................................20

*Glob. Master Int'l Grp., Inc. v. Esmond Nat., Inc.*,
  76 F.4th 1266 (9th Cir. 2023) ...............................................................8, 13

*H.J. Inc. v. Nw. Bell Tel. Co.*,
  492 U.S. 229 (1989)...........................................................................23, 25

*Harmoni Int'l Spice, Inc. v. Hume*,
  914 F.3d 648 (9th Cir. 2019) .......................................................13, 17, 34

*Harris v. Amgen, Inc.*,
  573 F.3d 728 (9th Cir. 2009) ......................................................................3

*Hemi Grp., LLC v. City of N.Y.*,
  559 U.S. 1 (2010)...........................................................................15, 16

*Holloway v. Clackamas River Water*,
  No. 3:13–cv–01787–AC, 2016 WL 5429659 (D. Or. July 5, 2016).....................12

*In re HomeAdvisor, Inc. Litig.*,
  491 F. Supp. 3d 879 (D. Colo. 2020).....................................................21

*HomeLight, Inc. v. Shkipin*,
  694 F. Supp. 3d 1242 (N.D. Cal. 2023) ...............................................34

*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010)............................................................21, 22

*In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*,
  497 F. Supp. 3d 552 (N.D. Cal. 2020) ....................................................................11

*Leslie Salt Co. v. United States*,
  55 F.3d 1388 (9th Cir. 1995) ................................................................................33

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014)........................................................................................28, 29

*Mashiri v. Epsten Grinnell & Howell*,
  845 F.3d 984 (9th Cir. 2017) ..................................................................................3

*Med-Systems, Inc. v. Masterson Mktg., Inc.*,
  2011 WL 4715170 (S.D. Cal. Oct. 7, 2011) ...........................................................6

*In re Nat. W. Life Ins. Deferred Annuities Litig.*,
  635 F. Supp. 2d 1170 (S.D. Cal. 2009)..................................................................20

*In re Nat'l Prescription Opiate Litig.*,
  No. 1:17-MD-2804, 2018 WL 6628898 (N.D. Ohio Dec. 19, 2018) ............9, 10, 11

*In re Nat'l Prescription Opiate Litig.*,
  No. 19-OP-45853, 2024 WL 4912429 (N.D. Ohio Aug. 22, 2024) .........................10

*In re Neurontin Mktg. and Sales Pracs. Litig.*,
  712 F.3d (1st Cir. 2013)........................................................................................15

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
  513 F.3d 1038 (9th Cir. 2008) ..................................................................14, 24, 31

*Odom v. Microsoft Corp.*,
  486 F.3d 541 (9th Cir. 2007) (en banc) ..............................................................7, 20

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015)..............................................................................................24

*Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms.
  Co. Ltd.*,
  943 F.3d 1243 (9th Cir. 2019) ..................................................................3, 15, 16

*Palantir Techs., Inc. v. Abramowitz*,
  No. 19-CV-06879-BLF, 2020 WL 9553151 (N.D. Cal. July 13, 2020).............11, 13

*PharmacyChecker.com LLC v. LegitScript LLC*,
  No. 24-2697, Dkt. 29.1 (9th Cir. May 23, 2025) ....................................................33

*PharmacyChecker.com LLC v. Nat'l Assoc. of Bds. of Pharmacy*,
  7:19-cv-07577, Dkt. 309 (S.D.N.Y. Sept. 20, 2022) ..............................................27

*Pincay v. Andres*,
   389 F.3d 853 (9th Cir. 2004) ..........................................................................6

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*,
   507 U.S. 380 (1993)........................................................................................5

*Samuelson v. Jewell Sch. Dist. 8*,
   725 F. Supp. 3d 1195 (D. Or. 2024) .............................................................23

*Sandoz Pharms. Corp. v. Richardson-Vicks, Inc.*,
   902 F.2d 222 (3rd Cir. 1990) ...................................................................32, 33

*Sedima, S.P.R.L. v. Imrex Co., Inc.*,
   473 U.S. 479 (1985)......................................................................................22

*Shaw v. Nissan N. Am., Inc.*,
   220 F. Supp. 3d 1046 (C.D. Cal. 2016) ........................................................20

*Sheet Metal Workers Loc. No. 20 Welfare & Benefit Fund v. CVS Pharmacy, Inc.*,
   305 F. Supp. 3d 337 (D.R.I. 2018).................................................................21

*Shroyer v. New Cingular Wireless Servs., Inc.*,
   622 F.3d 1035 (9th Cir. 2010) .........................................................................2

*Skydive Arizona, Inc. v. Quattrocchi*,
   673 F.3d 1105 (9th Cir. 2012) .......................................................................25

*Southland Sod Farms v. Stover Seed Co.*,
   108 F.3d 1134 (9th Cir. 1997) .......................................................................30

*Speed's Auto Servs. Grp., Inc. v. City of Portland, Or.*,
   No. 3:12-CV-738-AC, 2014 WL 2809825 (D. Or. June 20, 2014) .........................12

*Sterling Drug, Inc. v. FTC*,
   741 F.2d 1146 (9th Cir. 1984) .......................................................................23

*Sun Sav. And Loan Ass'n v. Dierdorff*,
   825 F.2d 187 (9th Cir. 1987) .........................................................................22

*TrafficSchool.com, Inc. v. Edriver Inc.*,
   653 F.3d 820 (9th Cir. 2011) ....................................................................25, 28

*United States v. Feldman*,
   853 F.2d 648 (9th Cir. 1988) .........................................................................20

*United States v. Turkette*,
   452 U.S. 576 (1981)......................................................................................19

iv  TABLE OF AUTHORITIES

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.,*
349 F. Supp. 3d 881 (N.D. Cal. 2018) ...................................................................................9

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.,*
No. 3:16-CV-02086-CRB, 2019 WL 6749534 (N.D. Cal. Dec. 6, 2019), aff'd,
842 F. App'x 112 (9th Cir. 2021) ......................................................................................13

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.,*
No. MDL 2672 CRB (JSC), 2017 WL 4890594 (N.D. Cal. Oct. 30, 2017).....................9, 17

*Wedges/Ledges of Cal., Inc. v. City of Phoenix,*
24 F.3d 56 (9th Cir. 1994) ................................................................................................12

**Statutes**

15 U.S.C.A. § 1125 ................................................................................................................25

18 U.S.C. §§ 1341, 1343 ........................................................................................................22

18 U.S.C. § 1961(1) ...............................................................................................................22

18 U.S.C. § 1961(4) ...............................................................................................................19

18 U.S.C. § 1962(c) .................................................................................................................6

21 U.S.C. § 331(a), (d) ..........................................................................................................32

21 U.S.C. § 352 .....................................................................................................................32

21 U.S.C. § 353(b)(1) ............................................................................................................32

21 U.S.C. § 355 .....................................................................................................................32

Food, Drug, and Cosmetics Act (FDCA).....................................................................28, 32, 33

Lanham Act Section 43(a) ................................................................................................25, 28

**Other Authorities**

21 C.F.R. § 210.3(b)(7)..........................................................................................................32

Fed. R. Civ. P. 9(b) .................................................................................................................3

Fed. R. Civ. P. 6(b)(1)(B) ........................................................................................................5

Fed. R. Civ. P. 12(a)(1)(B) .......................................................................................................4

Fed. R. Civ. P 12(b)(6).................................................................................................. *passim*

Fed. R. Civ. P. 12(c) ....................................................................................................2, 3, 4, 6

Fed. R. Civ. P. 15 ..................................................................................................................3, 34

Fed. R. Civ. P. 56 ..................................................................................................................6

vi  TABLE OF AUTHORITIES

## INTRODUCTION

This case is about the black market for unsafe, dangerous, and illegally imported pharmaceuticals that Plaintiff PharmacyChecker.com LLC ("PharmacyChecker") has painstakingly created and facilitated. It is apparently Defendant LegitScript LLC's ("LegitScript") response to that black market—in the normal course of LegitScript's work and operations and at the behest of LegitScript's customers—that fuels PharmacyChecker's allegations of anticompetitive conduct. This black market for personally imported foreign pharmaceuticals, created through a series of false and misleading statements by PharmacyChecker, has harmed and continues to harm LegitScript, who is hired by lawful participants in the (legal) online pharmaceutical market to help ensure that the drugs that reach the end U.S. consumer are legal, safe, and as-advertised. LegitScript does so by certifying pharmacies and related supply chain businesses as compliant with rigorous safety certification standards—in a word, legitimate.

This Court is well aware of PharmacyChecker's role in creating that black market. In its decision in January 2024, the Court repeatedly cited evidence that U.S. consumers used PharmacyChecker's website and "violated federal law through cross-border purchase and import of prescription drugs for personal use and that PharmacyChecker's website facilitates that illegal activity." [ECF No. 292 at 24.] The Court also noted that PharmacyChecker derived significant revenue from that illegal activity. *Id.* The Court concluded that operating a website through which foreign pharmacies market, sell, and then deliver foreign prescription drugs to U.S. consumers in violation of federal law amounted to "facilitating illegal activity by third parties." *Id.* at 33. But PharmacyChecker does not just "facilitate" such illegal activity: it directly encourages and then profits from it, and indeed likely would not exist as a company but for the U.S. consumers who illegally import drugs through PharmacyChecker's website and (more importantly) the foreign sellers who pay PharmacyChecker handsomely to reach those U.S. consumers.

Of course, the Court's January 2024 ruling that facilitating such illegal conduct did not, itself, deprive PharmacyChecker of antitrust standing has no bearing on the questions now before the Court. Rather, this Court's inquiry on PharmacyChecker's Motion to Dismiss LegitScript's Counterclaims (the "Motion" [ECF No. 314]) is two-part: (1) has LegitScript alleged that PharmacyChecker's false and deceptive advertising statements, with the help of a network of foreign and rogue pharmacies and drug sellers, created a black market for illegally imported drugs? and (2) has LegitScript alleged that the existence of this black market caused it to lose sales and business goodwill, and incur significant mitigation expenses explaining the serious consequences of unlawful drug importation to consumers and other customers that believed PharmacyChecker's misrepresentations, all of which constitute damages that are recoverable under RICO and the Lanham Act? The answer to both questions is yes.

PharmacyChecker's Motion misses the mark. As explained below, the Court should deny the Motion for the following reasons: (1) it is untimely under Rule 12(b)(6) and premature under Rule 12(c); (2) PharmacyChecker's facilitation of illegal activity and LegitScript's injuries are redressable under RICO; (3) PharmacyChecker's facilitation of illegal activity and LegitScript's injuries are redressable under the Lanham Act; and (4) alternatively, even if the Counterclaims are deficient for some reason, amendment would not be futile, so the Court should allow LegitScript the opportunity to re-plead the Counterclaims. This Response is supported by the points and authorities below and the pleadings and papers on file with the Court.

## ARGUMENT

## I.    Legal Standards

### A.    Rule 12(b)(6) Motion to Dismiss

A motion to dismiss for failure to state a claim may be granted "only where there is no cognizable legal theory" to support the claim or when the complaint lacks "sufficient factual [allegations] to state a facially plausible claim for relief." *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Mashiri v. Epsten Grinnell & Howell*, 845 F.3d 984, 988 (9th Cir. 2017) (quotation marks omitted).

Dismissal of a civil RICO complaint for failure to state a claim is proper "only if it appears beyond doubt that [the claimant] can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co. Ltd.*, 943 F.3d 1243, 1248 (9th Cir. 2019) (cleaned up). "To avoid dismissal for inadequacy under Rule 9(b), [RICO plaintiff's] complaint would need to state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004) (citation omitted).

To the extent the Court finds the plaintiff has not stated sufficient facts to survive dismissal, leave to amend should be freely granted. *See Coleman v. The Quaker Oats Co.*, 232 F.3d 1271, 1294 (9th Cir. 2000) ("Federal Rule of Civil Procedure 15(a) liberally allows for amendments to pleadings"). Dismissal without leave to amend is inappropriate unless it is beyond doubt that the Complaint could not be saved by an amendment under Fed. R. Civ. P. 15. *See Harris v. Amgen, Inc.*, 573 F.3d 728, 737 (9th Cir. 2009).

**B.    Rule 12(c) Motion for Judgment on the Pleadings**

Federal Rule of Civil Procedure 12(c) permits a party's motion for judgment on the pleadings "*[a]fter the pleadings are closed*—but early enough not to delay trial." Fed. R. Civ. P. 12(c) (emphasis added). Pleadings are closed only when a complaint and answer have been filed and once any counter or cross claims have been answered. *Doe v. United Sates*, 419 F.3d 1058, 1061 (9th Cir. 2005) (stating that pleadings are closed only once the complaint and answer have been filed "assuming . . . that no counterclaim or cross-claim is made."). When responding to a counterclaim, including through a motion to dismiss, the responding party must file their answer

or responsive motion within 21 days unless otherwise extended by the court. *See* Fed. R. Civ. P. 12(a)(1)(B).

In deciding a Rule 12(c) motion for judgment on the pleadings, the court applies the same standards applicable to a Rule 12(b)(6) motion. *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054, n. 4 (9th Cir. 2011).

## II.     PharmacyChecker's Motion Is Untimely or Premature.

Parties are responsible for marshalling their own claims and defenses. Ensuring pleadings are timely filed is no exception. Despite PharmacyChecker's assertion that its tardy filing was the result of an "oversight by both parties," (Motion at 10 [ECF No. 314 at 17]), PharmacyChecker alone bore the burden to respond to LegitScript's counterclaims but neglected the counterclaims for over a year and a half. PharmacyChecker's refusal to respond matters for two reasons: First, PharmacyChecker's Motion is untimely under Rule 12(b)(6) because PharmacyChecker failed to respond within its deadline, even taking the judicial stay into account. Second, there has been no answer to the Counterclaims, so the Motion would be premature under Rule 12(c).

### A.     PharmacyChecker's Rule 12(b)(6) motion is untimely.

PharmacyChecker had ample time to address LegitScript's counterclaims, by motion practice or otherwise. LegitScript filed its Counterclaims on February 23, 2024 [ECF No. 299], making PharmacyChecker's response initially due March 15, 2024. On an unopposed motion, this Court allowed PharmacyChecker time to file a response on or before March 25, 2025 [ECF No. 301]—a total time of thirty days from the date of filing. However, the Court stayed all proceedings in its order certifying the interlocutory appeal on March 7, 2024 [ECF No. 302 at 14]. PharmacyChecker therefore had 13 days before the stay and 442 days during the appeal to consider LegitScript's counterclaims. While those 442 days are not counted against PharmacyChecker for purposes of timeliness, they bear consideration. After the Ninth Circuit's decision on May 23, 2025 [ECF No. 305], the formal mandate returning this case to this Court

was entered on June 16, 2025 [ECF No. 306]. PharmacyChecker then left LegitScript's counterclaims unaddressed for an additional 91 days before filing its Motion.

Under the rules, PharmacyChecker would have—at most—30 days to respond (assuming the Court allows the full response time from spring 2024) from when this Court's proceedings resumed on June 16, 2025. Even with such a lenient application of the Court's order, PharmacyChecker is still 61 days late. It is true (as PharmacyChecker notes) that the Court's case management schedule did not list a post-appeal deadline for PharmacyChecker's response to the Counterclaims. [ECF No. 309]. But no action of the Court permitted PharmacyChecker to wait until September 15, 2025, to respond to the Counterclaims.

Further, PharmacyChecker's neglect is inexcusable. *Cf.* Fed. R. Civ. P. 6(b)(1)(B); *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993). To determine whether a party's neglect is excusable, courts weigh four factors: (1) the danger of prejudice to the opposing party; (2) the length of delay and potential impact on judicial proceedings; (3) the reason for delay, and whether the delay was within the reasonable control of the moving party; and (4) whether the moving party's conduct was in good faith. *Ahanchian v. Xenon Pictures, Inc.*, 624 F.3d 1253, 1261 (9th Cir. 2010) (citing *Pioneer Inv. Serv. Co.*, 507 U.S. at 395).

Taking each of the four *Pioneer* factors in turn, the balance weighs in LegitScript's favor. Even with an extension of time to respond to the Motion, LegitScript has had significantly less time to consider PharmacyChecker's Motion than PharmacyChecker had to consider the Counterclaims. This imbalance puts LegitScript at a disadvantage and thereby prejudices LegitScript. The delay is also significant. PharmacyChecker left LegitScript's claims to languish for a total of 104 days, the total time that proceedings were not stayed. PharmacyChecker has unjustifiably delayed a case with a "lengthy history," (Motion at 10 [ECF No. 314 at 17]), drawing out the dispute and avoiding a speedy resolution. Further, there is no justifiable reason for the delay; PharmacyChecker simply failed to respond timely to the Counterclaims. *See Pincay v. Andres*, 389 F.3d 853, 858 (9th Cir. 2004) (a lawyer's mistaken belief he had 60 days

to file a notice of appeal rather than 30 days "was egregious" and his failure to read the rule was "one of the least compelling excuses that can be offered."). Although PharmacyChecker's neglect may have been in good faith, this is insufficient to outweigh the three other factors. Accordingly, the Court should deny the Motion as untimely.

> **B.    A Rule 12(c) motion is premature.**

PharmacyChecker suggests that if the Court finds the Motion untimely under Rule 12(b)(6), the Court can simply consider it as a Rule 12(c) motion for judgment on the pleadings. Not so. A Rule 12(c) motion is proper only "[a]fter the pleadings have closed," and the pleadings here have not closed. PharmacyChecker identifies no legal authority for the Court to overlook the plain language of Rule 12(c) and consider judgment on the pleadings despite PharmacyChecker's missing answer. *Doe*, 419 F.3d at 1061 (pleadings are closed only once an answer is filed "assuming . . . that no counterclaim or cross-claim is made."); *Med-Systems, Inc. v. Masterson Mktg., Inc.*, 2011 WL 4715170, at *2 (S.D. Cal. Oct. 7, 2011) (denying defendant's Rule 12(c) motion because it was filed before plaintiffs had responded to defendant's counterclaims); *CDx Diagnostics Inc. v. Histologics LLC*, 2014 WL 3347525, at *2 (C.D. Cal. July 7, 2014) (plaintiffs' Rule 12(c) motion against counterclaims not procedurally proper because plaintiffs had not yet answered counterclaims, so the court "must determine whether this motion is properly a Rule 12(b)(6) motion or a motion for summary judgment under Rule 56"). Accordingly, the Court should deny the motion.

**III.    LegitScript Has Alleged a Viable RICO Claim Against PharmacyChecker's Fraudulent Conduct.**

Even if the Court considers PharmacyChecker's motion, the Court should deny it. Under RICO, it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). "To state a claim under § 1962(c), a plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering

activity." *Odom v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir. 2007) (en banc) (citation omitted).

LegitScript's Counterclaims allege each element of a RICO claim. Specifically, LegitScript alleges that PharmacyChecker has created and directs a "False Marketing Enterprise" through PharmacyChecker's website to convince U.S. consumers (as well as banks, advertisers, e-commerce websites, payment processors, social media platforms, and search engines) that personal importation of drugs from foreign pharmacies is safe and legal, and fraudulently induce U.S. consumers into buying foreign drugs for personal use in violation of federal law. (Counterclaims ¶¶ 192, 202(a)–(c), 205 [ECF No. 299 at 36, 39–40].)

The False Marketing Enterprise works like this: PharmacyChecker, despite its full knowledge to the contrary, makes and publicizes numerous false and misleading statements on its website to create the perception that foreign drug importation is safe and legal. For example, PharmacyChecker answers the question "Is it legal to order prescription drugs online?" by stating "There is no law against ordering medication online", and then several sentences later conceding that importation of foreign drugs is "technically" prohibited in the United States. (*See* Counterclaims ¶¶ 168, 184–185 (the "False and Deceptive Statements").) PharmacyChecker then creates a list comparing U.S. prices for certain prescription drug to Canadian and international prices, shows the percentage savings available for those drugs, and includes direct links to online pharmacy pages where the consumer can order drugs, shipped from outside the United States from foreign countries. (Counterclaims ¶ 161 [ECF No. 299 at 26–27].) Critically, the pages linked from that price comparison list (including pages selling foreign drugs to U.S. consumers) are to companies that pay PharmacyChecker to be "accredited," be listed on the website, and in some cases pay to be listed higher up on PharmacyChecker's website. (Counterclaims ¶¶ 163–165 [ECF No. 299 at 27–28].) Those companies then pay PharmacyChecker fees for each consumer click-through from PharmacyChecker's website. (Counterclaims ¶ 165 [ECF No. 299 at 28].) From January 2015 to August 2021, the majority of PharmacyChecker's revenue was

from "foreign pharmacies based on U.S.-origin clicks to those pharmacies." (Court's January 3, 2024, Opinion and Order on Summary Judgment [ECF No. 292] at 24.)

The False Marketing Enterprise therefore creates a black market for foreign imported prescription drugs in the United States, the existence of which directly undermines one of LegitScript's core functions: Ensuring that prescription drugs advertised and sold online to U.S. consumers are safe, legal, as-advertised, and that the stream of commerce complies with applicable laws and regulations. (Counterclaims ¶¶ 193–97 [ECF No. 299 at 36–38].) As a result of the black market created and facilitated by PharmacyChecker's False and Deceptive Statements and operated through the False Marketing Enterprise, U.S. consumers—as well as banks, internet platforms, and other companies in the stream of commerce—are misled into believing that foreign drug importation is safe and legal. This PharmacyChecker-created black market and false belief harms LegitScript by requiring LegitScript to mitigate the black market impacts through monitoring, enforcement, and education, damaging LegitScript's business goodwill and reputation, and causing LegitScript to lose sales.

As explained below, the alleged conduct and LegitScript's injuries are redressable under RICO, and the Counterclaims have sufficiently articulated a claim for relief. PharmacyChecker's Motion does not bother to deny the False and Deceptive Statements or the existence of a black market (and indeed attempts to portray its intentional and blatant encouragement of illegal drug importation as mere "puffery"), but instead offers a reductive argument that misses the forest for the trees.

### A.    LegitScript has alleged harm recoverable under RICO, so the Motion fails.

At the outset, the Ninth Circuit has stressed that "[o]ur caselaw has established a low threshold for plaintiffs to show a concrete RICO injury." *Glob. Master Int'l Grp., Inc. v. Esmond Nat., Inc.*, 76 F.4th 1266, 1274 (9th Cir. 2023). Importantly, "[a]n out-of-pocket loss satisfies this requirement. . . [but] [a]n out-of-pocket loss is not required, however, for a financial loss to be tangible or concrete. In fact, the Ninth Circuit has allowed much more abstract losses to move beyond the pleading stage." *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods.*

*Liab. Litig.*, No. MDL 2672 CRB (JSC), 2017 WL 4890594, at *5 (N.D. Cal. Oct. 30, 2017). Indeed, RICO "[p]laintiffs do not need to identify the amount of damage so long as the fact of damage is based on a plausible theory." *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 349 F. Supp. 3d 881, 905 (N.D. Cal. 2018) (citation omitted). And "complex questions about the amount of the plaintiffs' damages were best addressed after the pleading stage." *Id.* at 896 (citing *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1171 (9th Cir. 2002)).

PharmacyChecker has harmed LegitScript in at least three ways, each of which is a cognizable RICO injury and establishes Article III standing on its own. **First**, PharmacyChecker's False and Deceptive Statements have created, facilitated, and funneled consumers, manufacturers, and sellers, and other market participants into a black market for unsafe and illegal imported drugs, forcing LegitScript—as a stamp of safety and approval and a market actor in the market for *legal* online pharmaceutical advertising and sales—to shoulder the costs of mitigating the black market. LegitScript expends significant resources investigating, flagging, and reporting unsafe and illegal online drug sales and sellers, and has had to spend money educating banks, advertisers, e-commerce websites, payment processors, social media platforms, and search engines about the illegality and danger of personal drug importation. **Second**, PharmacyChecker's creation of that black market through the False and Deceptive Statements has damaged LegitScript's business goodwill and reputation. **Third**, the False and Deceptive Statements and the existence of the illicit market have caused LegitScript to lose sales, customers, and revenue.

### 1.    LegitScript's costs in mitigating the harm from the illicit market PharmacyChecker created and facilitates is actionable.

Where a RICO enterprise creates an illicit market, which then requires market participants and gatekeepers in the legitimate market to mitigate the harmful effects, those mitigation costs are recoverable under RICO. *See In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2018 WL 6628898, at *6–10 (N.D. Ohio Dec. 19, 2018) ("*Summit County*"). In the national opioid litigation, numerous courts—including Judge Polster's MDL court in *Summit*

*County*[1]—allowed RICO claims to proceed on the theory that the defendant opioid manufacturers made deceptive claims and knowingly facilitated a flood of excess opioids into an illicit black market that wreaked havoc on communities. The plaintiffs (primarily local governments and public entities) were then forced to spend significant resources to combat black markets and mitigate the effects. Especially at the motion to dismiss stage, injuries in the form of unplanned budgetary expense, costs associated with "attempts to stop the flow of [illicit drugs]" and prevent the black market "from spreading and worsening," such as policing, education, and lost tax revenue due to lower market participation, were sufficient to state a RICO claim. *See Summit County,* 2018 WL 6628898 at \*8–10; *In re Nat'l Prescription Opiate Litig.*, No. 19-OP-45853, 2024 WL 4912429 at \*11–14 (N.D. Ohio Aug. 22, 2024) (reaffirming *Summit County*'s reasoning regarding RICO injury after remand); *City & Cnty. of S. F. v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 653 (N.D. Cal. 2020) ("opioid-related clean-up expenses and lost revenue" incurred by city parking lot and advertising businesses could be cognizable RICO injuries)[2]; *Alaska v. Express Scripts, Inc.*, 774 F. Supp. 3d 1150, 1171–72 (D. Alaska 2025) (following *Summit County* and denying motion to dismiss RICO claim where plaintiff sufficiently alleged harm in the form of required purchases of naloxone to combat the opioid epidemic—"novel consumer expenditures the State has alleged were necessitated by [defendant's] conduct and intended to combat the effects thereof."). And in a similar case in this circuit, Judge Orrick ruled that public entity plaintiffs in the Juul litigation had sufficiently alleged RICO injuries that

---

[1] Courts treat *Summit County* as "highly persuasive" to cases with similar facts or theories. *See City & Cnty. of S.F.*, 491 F. Supp. 3d at 630 (the court "will rely on the MDL's rulings as highly persuasive authority to the extent that these decisions are consistent with California and Ninth Circuit authority.")

[2] In *San Francisco*, Judge Breyer disagreed with *Summit County*'s conclusion that certain types of black market-mitigation expenditures were actionable under RICO, holding instead that "governmental entities *cannot* assert a RICO claim based on expenditures or services provided in their sovereign or quasi-sovereign capacities" after the Ninth Circuit's decision in *Canyon Cnty. v. Syngenta Seeds, Inc.*, 519 F.3d 969 (9th Cir. 2008). *San Francisco*, 491 F. Supp. 3d at 650 (emphasis original). Judge Breyer's skepticism is of no concern here because LegitScript is a private entity.

included, among other categories of harm, "the costs of hiring and training staff to address e-cigarette use, development of programs and materials to address e-cigarette use, costs of tutoring and other services for students who were disciplined for e-cigarette use," costs the plaintiffs would not have incurred but for defendants' false and misleading advertising. *In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*, 497 F. Supp. 3d 552, 621 (N.D. Cal. 2020).

　　Just as the manufacturers, prescribers, and suppliers of opiates in the opioid litigation created an illicit black market for recreational opiates that required significant mitigation and expense by local governments and public entities, so too have PharmacyChecker and the PharmacyChecker-Accredited Pharmacies created an illicit black market for personally imported foreign pharmaceuticals, requiring LegitScript to incur significant mitigation costs. Those are RICO injuries. LegitScript alleged the significant costs of the False and Deceptive Statements and black-market facilitation, such as deceiving consumers and LegitScript's customers about the safety of foreign drug importation, (Counterclaims ¶ 202(a)-(c) [ECF No. 299 at 39–40]), which requires LegitScript to incur education costs, *see in re JUUL Labs*, 497 F. Supp. 3d at 621, as well as unplanned expenditures. *See Alaska*, 74 F. Supp. 3d at 1171. LegitScript has also alleged lost revenue to its business. (Counterclaims ¶ 202(c), 203) [ECF No. 299 at 39–40]; *see City & Cnty. of S.F.*, 491 F. Supp. 3d at 653 (lost revenue to city advertising business is cognizable under RICO). And although not specifically alleged as an injury,[3] LegitScript's described work in monitoring and flagging unsafe transactions are efforts "to stop the flow of [illicit drugs]" and prevent the black market "from spreading and worsening" that can be actionable under RICO. *See Summit County*, 2018 WL 6628898 at *9 (citation omitted); *see also Palantir Techs., Inc. v. Abramowitz*, No. 19-CV-06879-BLF, 2020 WL 9553151, at *6 (N.D. Cal. July 13, 2020) ("costs incurred investigating and prosecuting alleged wrongful conduct may be sufficient to plead a RICO injury if such costs are directly and proximately caused by a

---

[3] If the Court finds the Counterclaims lacking of the required detail of such injuries, it is nevertheless plausible to allege facts showing this theory of harm.

PAGE - 11 LEGITSCRIPT'S RESPONSE TO PHARMACYCHECKER'S MOTION TO DISMISS COUNTERCLAIMS

defendant's alleged predicate acts").

Because at least some of LegitScript's alleged harms as a result of its necessary black-market mitigation are RICO injuries, the Court should deny the Motion.

### 2. PharmacyChecker's harm to LegitScript's business reputation and goodwill is actionable under Oregon law.

PharmacyChecker is wrong that injury to business, reputation, or goodwill is foreclosed by RICO precedents.[4] Because business reputation and goodwill are protectable property interests under Oregon law, they are recoverable interests under RICO. Courts in this district have squarely held "business goodwill" is a property interest. *Speed's Auto Servs. Grp., Inc. v. City of Portland, Or.*, No. 3:12-CV-738-AC, 2014 WL 2809825, at *9 (D. Or. June 20, 2014), aff'd sub nom. *Speed's Auto Servs. Grp., Inc. v. City of Portland, Oregon*, 685 F. App'x 629 (9th Cir. 2017) ("under Oregon law, a value exists over and above the value of a businesses [sic] assets, which is referred to as 'goodwill' value, and that Oregon courts have generally defined such goodwill as the: 'favor or advantage in the way of custom that a business has acquired beyond the mere value of what it sells whether due to the personality of those conducting it, the nature of its location, its reputation for skill or promptitude or any other circumstance incidental to the business and tending to make it permanent'") (quoting *In re Marriage of McDuffy*, 184 Or. App. 359, 365 (2002)). And federal courts "look to state law to determine if business goodwill is properly characterized a property interest." *Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56, 65 (9th Cir. 1994).

Therefore, the alleged damages to LegitScript's business goodwill and reputation, (Counterclaims at ¶¶ 202(d), 203, 214 [ECF No. 299 at 40, 43]), is injury to a protectable property interest under Oregon law, which is recoverable under RICO. *See Glob. Master*, 76

---

[4] PharmacyChecker cites just one Oregon case to support this argument, but that case considered the alleged harm to the individual reputation of an elected official, not the reputation or goodwill of a business that is at issue here. *Holloway v. Clackamas River Water*, No. 3:13–cv–01787–AC, 2016 WL 5429659, at *8 (D. Or. July 5, 2016), report and recommendation adopted, 2016 WL 5477548 (D. Or. Sept. 25, 2016), aff'd in part, rev'd in part on other grounds, 739 App'x 868 (9th Cir. 2018) (unpublished).

PAGE - 12 LEGITSCRIPT'S RESPONSE TO PHARMACYCHECKER'S MOTION TO
          DISMISS COUNTERCLAIMS

F.4th at 1274 (RICO plaintiffs must demonstrate "harm to a specific property interest cognizable under state law"); *see also Harmoni Int'l Spice, Inc. v. Hume*, 914 F.3d 648, 653–54 (9th Cir. 2019) (allowing plaintiff to replead to allege how reliance on defendant's false information caused "harm to [Plaintiff's] business reputation (assuming such harm is compensable under RICO)."

### 3. LegitScript's lost sales and business opportunities are recoverable under RICO.

Finally, PharmacyChecker is also wrong that lost sales, customers, and business opportunities cannot be cognizable RICO injuries. *Harmoni*, 914 F.3d at 654 (plaintiff could allege "the circumstances under which its customers learned of the defendants' false accusations and, in reliance on that false information, canceled purchases they were otherwise planning to make" and state a RICO claim); *Palantir*, 2020 WL 9553151, at *6 ("A loss of business opportunity may constitute a RICO injury if the plaintiff alleges a concrete financial loss based on that loss of business opportunity"); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, No. 3:16-CV-02086-CRB, 2019 WL 6749534, at *4 (N.D. Cal. Dec. 6, 2019), aff'd, 842 F. App'x 112 (9th Cir. 2021) ("damages from the loss of 'specific business opportunities and contracts' are recoverable under RICO") (citing *Xcentric Ventures, LLC v. Borodkin*, 798 F.3d 1201, 1203 (9th Cir. 2015)). Further, lost profits caused by the market-distorting illegal conduct of a purported competitor is a cognizable harm. *See Com. Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.*, 271 F.3d 374, 381–83 (2d Cir. 2001) (company had standing to assert RICO claims for lost profits against its direct competitor whose hiring of undocumented individuals allowed it to submit lower bids).

LegitScript alleged specific PharmacyChecker conduct that misled consumers and others and ultimately caused LegitScript to lose sales and business opportunities. (Counterclaims at ¶¶ 184–86; 202–03 [ECF No. 299 at 33–35, 39–40].) That is sufficient to state a RICO injury, so the Motion fails.

/ / /

B.     **PharmacyChecker proximately caused LegitScript's harm.**

The Court should also reject PharmacyChecker's argument that it is not the proximate cause of LegitScript's alleged harm. "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp*., 547 U.S. 451, 461 (2006). Importantly, proximate cause "is a flexible concept that does not lend itself to 'a black-letter rule that will dictate the result in every case.'" *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008) (quoting *Holmes v. Secs. Inv. Prot. Corp.*, 503 U.S. 258 at 272 n. 20 (1992)). Courts in this circuit have declined to dismiss RICO claims based on proximate cause at the pleadings stage, especially where "the proximate cause inquiry scrutinizes the relationship between those injuries and the defendants' conduct[.]" *Alaska*, 774 F. Supp. 3d at 1172; *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1055 (9th Cir. 2008) (proximate cause inquiry raised "factual questions, which we cannot resolve on a Rule 12(b)(6) motion in this case").

1.     **The Court should consider the foreseeability of the harm to LegitScript and the creation of the black market when assessing proximate cause.**

The Supreme Court considers the foreseeability of harm in the RICO proximate cause inquiry even where the harm is caused by a misrepresentation to a non-party. For example, in *Bridge*, a group of losing auction bidders sufficiently showed proximate cause by demonstrating that their injury—the loss of property liens—was the direct result of the defendant bidders' fraudulent misrepresentations to the county. 553 U.S. at 658. The defendants allegedly engaged in a scheme in which they submitted false statements to the county's office that enabled them to obtain more liens in auctions than would otherwise be permitted under the county's auction rules. *Id.* at 643–44. Importantly, the Supreme Court rejected the argument that "the proximate-cause analysis under RICO must precisely track the proximate-cause analysis of a common-law fraud claim," reasoning that although the fraudulent misrepresentation to the county did not *immediately* cause plaintiff's harm, the plaintiff's harm was nevertheless "a foreseeable result of result of *someone's* reliance on the misrepresentation." *Id.* at 656 (emphasis in original).

PAGE - 14 LEGITSCRIPT'S RESPONSE TO PHARMACYCHECKER'S MOTION TO DISMISS COUNTERCLAIMS

Therefore, "[i]t was a foreseeable and natural consequence of petitioners' scheme. . . that other bidders would obtain fewer liens" because the scheme directly removed property liens from compliant bidders, and there were no independent factors that could account for the plaintiffs' injury, satisfying proximate cause. *Id.* at 658.

PharmacyChecker's relegation of *Bridge* to a footnote and reliance on *Hemi Grp., LLC v. City of N.Y.*, 559 U.S. 1 (2010) is misplaced. In *Hemi*, the plaintiff City of New York alleged that the defendant out-of-state tobacco company had failed to file required customer information with the state (predicate mail and wire fraud), so the City could not then determine the proper local taxes to assess the defendant, costing the City millions of dollars in lost tax revenue. *Id.* at 5–6. The main opinion in *Hemi* reasoned that it was a non-party's independent acts—the failure to pay taxes—that more directly caused the City's specific harm. *Id.* at 11. The opinion also rejected the argument that proximate cause could turn on the foreseeability of the harm the defendants' conduct allegedly caused, and not just the directness of the causal link. *Id.* at 12.

But *Hemi* does not prevent this Court from considering the foreseeability of LegitScript's alleged damages in assessing proximate cause. *See Columbia Sportswear N. Am., Inc. v. Seirus Innovative Accessories, Inc.*, 428 F. Supp. 3d 354, 370 (D. Or. 2019), on reconsideration, 454 F. Supp. 3d 1040 (D. Or. 2020) (considering foreseeability). First, *Hemi* was a "4-1-3 decision with no majority on the proximate cause question." *In re Neurontin Mktg. and Sales Pracs. Litig.*, 712 F.3d at 38 n.12 (1st Cir. 2013) (upholding finding that drug manufacturer's fraudulent marketing proximately caused injury to third-party payor). Second, the Ninth Circuit more recently explained in *Painters*, 943 F.3d 1243, that foreseeability could be a part of the RICO proximate cause analysis. In *Painters*, a group of patients sued a drug manufacturer, alleging a false marketing campaign that misled non-party physicians about the drug. Even though the harm relied on the non-party prescribing physicians' independent actions to prescribe the drug, "it was perfectly foreseeable that physicians who prescribed [the drug] would play a causative role in Defendants' alleged fraudulent scheme to increase [the drug's] revenues." *Id.* at 1257. Significantly, the Ninth Circuit warned that the opposite holding—"that prescribing physicians'

PAGE - 15 LEGITSCRIPT'S RESPONSE TO PHARMACYCHECKER'S MOTION TO
DISMISS COUNTERCLAIMS

and pharmacy benefit managers' decisions constitute an intervening cause to sever the chain of proximate cause"—would insulate the defendants from liability for fraudulent marketing schemes, which is "not the purpose the requirement of proximate cause is intended to serve." *Id.* at 1257–58.

Accordingly, binding precedent directs this Court to consider the foreseeability of LegitScript's harm as part of the proximate cause analysis.

### 2. LegitScript's alleged causal chain is sufficiently direct.

This case is more like *Bridge* and *Painters* than *Hemi*. First, it was foreseeable that PharmacyChecker's False and Deceptive Statements would result in the alleged harm to LegitScript, even if the harm requires some U.S. consumers and other market participants to be deceived into believing that foreign drug importation is legal and safe, and reducing the number of *lawful* sales from LegitScript's certified entities. *See Bridge*, 553 U.S. at 658. Second, it was "perfectly foreseeable" that U.S. consumers who purchased foreign drugs through PharmacyChecker's website and affiliates and other supply chain actors who facilitated that purchase "would play a causative role in [the Fraudulent Marketing Enterprise's] alleged fraudulent scheme to increase" sales to U.S. consumers. *See Painters*, 943 F.3d at 1257. Third, allowing either (1) U.S. consumers' decisions to import drugs through PharmacyChecker's website and affiliates and/or (2) U.S. consumers' and banks', advertisers', and internet companies' fraudulently formed beliefs about foreign drug importation to "constitute an intervening cause to sever the chain of proximate cause" would allow PharmacyChecker and its affiliates to "be insulated from liability for their fraudulently marketing schemes, as they could continuously hide behind" the U.S. consumers. *See id.* This Court should not allow that outcome.

Courts confronting similar circumstances have found proximate cause can be satisfied. In *City of Everett v. Purdue Pharma L.P.*, the plaintiff had sufficiently alleged proximate cause in a RICO case where the defendants were aware that their drugs were being funneled into an illicit market. No. C17-209RSM, 2017 WL 4236062, at *6 (W.D. Wash. Sept. 25, 2017) ("Although not as direct as a car accident or slip-and-fall case, this causal chain is still a 'direct sequence,'

and it is facially plausible that the involvement of third parties, even criminals, was reasonably foreseeable given the extensive facts of Purdue's knowledge in the pleadings."). And in *In re Juul Labs, Inc., Mktg. Sales Pracs. & Prods. Liab. Litig.*, the court reiterated that allegations of "general market support" of the harmful product market and fraudulent advertising "generally directed to the market," was sufficient at the pleading stage to allege proximate cause of non-consumer plaintiffs' injuries to their businesses and by diversion of resources. No. 19-MD-02913-WHO, 2022 WL 1955678, at *6 (N.D. Cal. Jan. 28, 2022); *see also Harmoni*, 914 F.3d at 653 (if plaintiff alleged "circumstances under which its customers learned of the defendants' false accusations and, in reliance on that false information, canceled purchases they were otherwise planning to make," that would satisfy the proximate cause element of its RICO claim). By contrast, *Rote v. Silicon Valley Bank, Inc.* is inapposite and PharmacyChecker's reliance is misplaced. No. 3:16-CV-00471-SI, 2016 WL 4565776, at *6 (D. Or. Sept. 1, 2016). The alleged harm there was harm to shareholders of the non-party. RICO law generally forecloses shareholder harm, and the losses to the non-party had already been adjudicated. This is not such a derivative claim.

PharmacyChecker's suggested seven-step causal chain misreads the allegations in the Counterclaims and defies any logical understanding of a stream of commerce. (*See* Motion at 7–8.) Even charitably, Step 2 (consumer relies on misstatements), Step 3 (consumer does not rely on LegitScript's statements and certification), and Step 6 (merchants, banks, advertisers, and e-commerce supply chain participants do not rely on LegitScript's certification) are all simultaneous. Similarly, Step 4 (consumer purchases through PharmacyChecker website) and Step 5 (consumer does not purchase from merchant with LegitScript certification) also occur simultaneously. PharmacyChecker's seven steps are therefore just two or three steps, so the Court should reject this blatant attempt to stretch the alleged chain of causation.

Instead, a more accurate step-by-step causal chain goes this:

1. PharmacyChecker, supported by the click-through and listing revenue received from its affiliated pharmacies, makes False and Misleading Statements to U.S. consumers,

PAGE - 17 LEGITSCRIPT'S RESPONSE TO PHARMACYCHECKER'S MOTION TO
       DISMISS COUNTERCLAIMS

merchants, banks, advertisers, e-commerce websites, payment processers, social media platforms, search engines, and any other participant in the e-commerce supply chain that suggest, imply, and encourage that foreign drug importation is safe and legal. (Counterclaims ¶¶ 168, 184–185 [ECF No. 299 at 28–29, 33–35].) PharmacyChecker knows that the False and Misleading Statements are false and misleading, and yet intends to use the statements to facilitate U.S. consumer purchases of foreign drugs (and thereby generate revenue). (Counterclaims ¶¶ 179–183, 187–192 [ECF No. 299 at 32–33, 35–37].)

2.  U.S. consumers, merchants, banks, advertisers, e-commerce websites, payment processers, social media platforms, search engines, and other participants in the e-commerce supply chain rely on the False and Misleading Statements and (falsely) believe there to be a legal and safe market for foreign drug importation into the United States, and conversely believe that therefore LegitScritpt's role and reputation as a signifier of safety and compliance with applicable laws and regulations is unnecessary, thereby harming LegitScript's business and reputation. (Counterclaims ¶¶ 202 (a)-(c), 203, 214 [ECF No. 299 at 39–40, 43].)

3.  LegitScript loses sales and business to some merchants and other participants as a result of their mistaken belief as to the safety and legality of foreign drug importation, and at the same time LegitScript is forced to incur significant costs mitigating the fallout from PharmacyChecker's black market: monitoring and flagging unlawful and unsafe sales and properly educating consumers and merchants, banks, advertisers, e-commerce websites, payment processers, social media platforms, search engines, and other participants in the e-commerce supply chain about legality and risks of foreign drug importation, such as federal enforcement and potentially massive monetary penalties. (Counterclaims ¶¶ 181, 202(c)–(d), 203, 214 [ECF No. 299 at 32, 39–40, 43].)

This causal chain satisfies RICO's proximate cause requirement.

Importantly, the parties have not yet begun discovery into the allegations in the Counterclaims, which will further demonstrate the causal links between the False and Deceptive Statements, the creation of the black market, and the harm to LegitScript. Specifically, LegitScript will seek discovery into PharmacyChecker's communications with the accredited pharmacies, especially the foreign accredited pharmacies, regarding the False and Deceptive Statements. LegitScript will also seek discovery into other PharmacyChecker communications to and from both U.S. consumers and other market participants (merchants, banks, advertisers, e-commerce websites, payment processers, social media platforms, search engines) regarding the safety and legality of foreign drug importation, which likely constitute additional racketeering conduct. Finally, LegitScript will seek discovery into communications and documents that will show PharmacyChecker's intent to harm LegitScript through causing it lost sales and damaged business goodwill, and forcing LegitScript to incur mitigation and education costs.

### C.    PharmacyChecker's "False Marketing Enterprise" is a RICO enterprise under 18 U.S.C. § 1961(4).

RICO defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981). The Supreme Court has explained that "[t]his enumeration of included enterprises is obviously broad, . . . [t]he term 'any' ensures that the definition has a wide reach, and the very concept of an association in fact is expansive." *Boyle v. United States*, 556 U.S. 938, 944 (2009); *Odom*, 486 F.3d at 551 ("an associated-in-fact enterprise under RICO does not require any particular organizational structure, separate or otherwise.")

The Counterclaims' description of the False Marketing Enterprise clears this low bar for two reasons: (1) the False Marketing Enterprise shares the common purpose of convincing U.S. consumers (and others) that foreign drug importation is safe and legal and to purchase such drugs, and no amount of competition among the members defeats that purpose; and (2) the False

Marketing Enterprise has sufficient structure because there is coordination between the affiliated pharmacies and through their listing on PharmacyChecker's website.

1.      The False Marketing Enterprise has a common purpose.

PharmacyChecker is wrong that there can be no "common purpose" because the affiliated pharmacies compete, are pursuing their own business relationships with PharmacyChecker, and therefore lack the common purpose inducing sales to U.S. consumers through misstatements.

First, there is no rule in this circuit that economic competitors cannot share a common purpose in a RICO enterprise. *In re Nat. W. Life Ins. Deferred Annuities Litig.*, 635 F. Supp. 2d 1170, 1177–78 (S.D. Cal. 2009) (collecting cases) ("The competition among NMOs and among agents is not a barrier to finding that those same NMOs and agents share a common purpose with Defendant" and allowing RICO claim to proceed); *Alaska*, 774 F. Supp 3d at 1174 (neither competing among each other nor "a profit motive negate[s] a common purpose" of a RICO enterprise, especially where members of the enterprise collectively profited).

Nor is there a clear rule that the enterprise's common purpose must be "fraudulent" or something other than an ordinary contractual relationship. *Shaw v. Nissan N. Am., Inc.*, 220 F. Supp. 3d 1046, 1054 (C.D. Cal. 2016) (collecting cases); *Friedman v. 24 Hour Fitness USA, Inc.*, 580 F. Supp. 2d 985 (C.D. Cal. 2008) (permitting a RICO claim to proceed where the common purpose was the benign goal of "simply[ ]effectuat[ing] EFT payments"); *United States v. Feldman*, 853 F.2d 648, 657–59 (9th Cir. 1988) (no *mens rea* requirement for members of RICO enterprise).

Here, LegitScript alleges a common purpose ("deceiving U.S. consumers into purchasing drugs from foreign pharmacies in violation of U.S. law," Counterclaims ¶ 206,) that is fraudulent, but also necessarily relies on the joint pursuit of individual profits. Further, the fact that PharmacyChecker's website links to multiple and competing rogue international pharmacies only serves the common purpose: If PharmacyChecker linked to only one foreign pharmacy selling drugs to U.S. consumers, consumers might be skeptical (as they should be) that the process was legal (it's not). For effectuating the common purpose of inducing sales to U.S.

consumers and "loosening restrictions on the . . . dispensing of prescription [pharmaceuticals] and *collectively* profiting as a result," there is strength in numbers. *See Alaska*, 774 F. Supp. 3d at 1174.

<blockquote>

**2.      The False Marketing Enterprise has structure and is not a rimless hub-and-spoke.**

</blockquote>

It is clear that the False Marketing Enterprise "need not have a hierarchical structure or a 'chain of command.'" *Boyle*, 556 U.S. at 948. Indeed, courts have held that even so-called "hub-and-spoke" enterprises are viable under RICO when there is coordination among the spokes. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 375–79 (3d Cir. 2010); *Sheet Metal Workers Loc. No. 20 Welfare & Benefit Fund v. CVS Pharmacy, Inc.*, 305 F. Supp. 3d 337, 347–49 (D.R.I. 2018) (collecting cases); *Cedar Swamp Holdings, Inc. v. Zaman*, 487 F. Supp. 2d 444, 451 (S.D.N.Y. 2007) (hub-and-spoke structure may constitute a RICO enterprise when "a plaintiff . . . allege[s] that the defendants operated symbiotically and played necessary roles in the achievement of a common purpose"); *In re HomeAdvisor, Inc. Litig.*, 491 F. Supp. 3d 879, 891 (D. Colo. 2020) (plaintiff would state a RICO claim if they alleged "Venture defendants communicated with, collaborated with, or otherwise had contact with the other enterprise defendants so as to demonstrate that the Venture defendants worked with the other enterprise members as a unit").

Here, LegitScript has alleged that the False Marketing Enterprise has sufficient structure and coordinates in various ways. First, the non-PharmacyChecker members of the False Marketing Enterprise all list prices and links and sell drugs through PharmacyChecker's website. (Counterclaims ¶¶ 161–64 [ECF No. 299 at 26–28].) Indeed, just as the insurers in the *Brokerage Antitrust Litigation* submission of fraudulent bids to the "hub" broker to drive up prices "evince[d] an expectation of reciprocity and cooperation among the insurers," the affiliated pharmacies bid against one another for space on the PharmacyChecker website, bids that fraudulently imply (together with the False and Deceptive Statements) that U.S. consumers can safely and legally purchase those drugs. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 375–76. Second, that U.S. consumers were deceived and ultimately purchased foreign imported

drugs through PharmacyChecker's website, requires the False Marketing Enterprise members "operated symbiotically and played necessary roles in the achievement of a common purpose." *See Cedar Swamp Holdings*, 487 F. Supp. 2d at 451. Third, LegitScript has alleged at least some further circumstances of coordination between PharmacyChecker and members of the False Marketing Enterprise to respond to and address consumer complaints over incorrect or unmarked medication—a result that demonstrates the success (so to speak) of the common purpose. (Counterclaims ¶ 182 [ECF No. 299 at 32–32].) Accordingly, at this stage in the litigation, LegitScript has adequately alleged a RICO enterprise and the Motion should be denied.

### D. LegitScript alleged PharmacyChecker's racketeering activity because the False and Deceptive Statements constitute predicate acts under 18 U.S.C. § 1961(1).

"RICO is to be read broadly." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 497 (1985). Committing mail or wire fraud under 18 U.S.C. §§ 1341, 1343, constitutes "racketeering activity" for purposes of RICO. 18 U.S.C. § 1961(1); *Sun Sav. And Loan Ass'n v. Dierdorff*, 825 F.2d 187, 194 (9th Cir. 1987) (finding the defendant's four predicate acts of mail fraud were sufficient to support a RICO claim). Once a fraudulent scheme is in place, each use of wire or mail to implement or further the fraud is actionable, and any "mailing that is incident to an essential part of the scheme satisfies the mailing element." *Schmuck v. United* States, 489 U.S. 705, 712 (1989). This holds true even where the mailing itself contains "no false information." *Id.* at 715. "It is sufficient for mailing to be 'incident to an essential part of the scheme' or 'a step in [the] plot.'" *Id.* at 710–11 (internal citations omitted). To allege a "pattern of racketeering activity," plaintiffs must only plead that the "racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989).

PharmacyChecker disputes only that LegitScript failed to allege a sufficient "predicate act" because PharmacyChecker's false and misleading statements were merely "puffery or

opinion." [ECF No. 314 p. 25].[5] The Counterclaims identify numerous statements that rise above puffery or opinions "common in sales and not actionable as fraud." *Eclectic Properties East, LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 1000 (9th Cir. 2014). The distinction between puffery and not puffery is important to draw. Statements that a firm has "experienced consultants," a "seasoned team," "deep experience," or "unmatched" expertise are puffery. *See County of Marin v. Deloitte Consulting LLP*, 836 F. Supp. 2d 1030, 1038–39 (N.D. Cal. 2011); *Sterling Drug, Inc. v. FTC*, 741 F.2d 1146, 1150 (9th Cir. 1984) (puffery are claims that are "vague or highly subjective," such as "Bayer works wonders").

By contrast, PharmacyChecker's statements go to the core of its business model, relating to the safety and legality of importing pharmaceuticals from foreign pharmacies. (Counterclaims ¶¶ 184–85 [ECF No. 299 at 33–35].) For example, PharmacyChecker asserted that people in the United States "are not prosecuted" for importing medications for personal use, that less than one percent of medication orders from abroad are stopped by federal authorities, and that drugs ordered from PharmacyChecker-Accredited Pharmacies are always "dispensed by licensed pharmacies." (*Id.* at ¶ 184.) These are not the type of "vague, exaggerated, generalized or highly subjective statements regarding a product or business which do not make specific claims," but concrete, factual assertions about the safety and legality of importing foreign drugs. *County of Marin*, 836 F. Supp. at 1039 (citing *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242 (9th Cir. 1990)). Such statements induce consumers through "specific rather than general assertions," and rise above mere puffery as statements of fact on which a reasonable consumer would rely. *Cook, Perkiss & Liehe, Inc.* 911 F.2d at 246; *Newcal Indus.*, 513 F.3d at

---

[5] PharmacyChecker appears to concede that LegitScript has alleged a "pattern" of conduct by not contesting that element. In any event, PharmacyChecker cannot dispute the allegation of pattern because the False and Misleading Statements are a pattern: more than one related act that is continuing by being displayed on PharmacyChecker's website. *See Samuelson v. Jewell Sch. Dist. 8*, 725 F. Supp. 3d 1195, 1208 (D. Or. 2024) (describing RICO requirement of "pattern" of racketeering activity).

PAGE - 23 LEGITSCRIPT'S RESPONSE TO PHARMACYCHECKER'S MOTION TO
DISMISS COUNTERCLAIMS

1052–54 (statements that (1) contracts intended to be for a fixed term of sixty months would expire after that term and (2) the company would "deliver 95% up-time service in their IKON Contracts" were actionable non-puffery).

What's more, even if the Court finds PharmacyChecker's statements were opinions (and they are more than that), they can still give rise to RICO liability. The Supreme Court has noted that expressions of opinion can "carry with it an implied assertion, not only that the speaker knows no facts which would preclude such an opinion, but that he does know facts which justify it." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 191 (2015). Especially so where "the speaker has special knowledge of facts unknown to the recipient." *Id.* at 191. The Supreme Court's explanation describes PharmacyChecker's statements to a tee. The Counterclaims highlight several statements that would lead a consumer to believe PharmacyChecker knew facts that would justify its opinion. For example, PharmacyChecker described the prohibition of international drug importation as a technicality, that the FDA's characterization of online pharmacies as "illegal" or "fake" was misleading, and that ordering medication from PharmacyChecker's verified pharmacies was "exceedingly safe." (Counterclaims ¶¶184–85 [ECF No. 299 at 33–35].) This would lead any reasonable consumer to believe PharmacyChecker had knowledge about the safety and legality of importing pharmaceuticals that justify its opinions, thereby giving rise to RICO liability.

Thus, LegitScript plausibly alleges that PharmacyChecker made false and deceptive statements that rise above mere puffery to establish racketeering activity, and that those statements create a threat of continued illegal conduct incident to an essential part of PharmacyChecker's scheme. *See Schmuck* 489 U.S. at 712; *H.J. Inc.* 492 U.S. at 239. The Motion should be denied.

IV. **LegitScript Alleged a Viable Lanham Act Claim against PharmacyChecker's Fraudulent Statements**

LegitScript has discharged its pleading requirements as to its Lanham Act claim. It has lodged plausible allegations regarding the nature of the false statements made by

PharmacyChecker as well as the resulting, proximate injury it has suffered as a result of these false statements. The Motion as to this claim should be denied.

**A.      Legal framework of the Lanham Act.**

"[T]he Lanham Act is at heart a consumer protection statute." *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 827 (9th Cir. 2011). Section 43(a) of the Lanham Act provides that a commercial actor that makes false or misleading representations regarding their commercial services "shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act." 15 U.S.C.A. § 1125. Specifically,

> There are five elements to a false advertising claim under Section 43(a) of the Lanham Act:
>
> (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product;
>
> (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience;
>
> (3) the deception is material, in that it is likely to influence the purchasing decision;
>
> (4) the defendant caused its false statement to enter interstate commerce; and
>
> (5) the plaintiff has been or is likely to be injured as a result of the false statement, *either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products.*

*Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1110 (9th Cir. 2012) (emphasis added).

**B.      LegitScript's allegations regarding PharmacyChecker's false advertising and the resulting harm to LegitScript.**

LegitScript has made plausible allegations regarding each of the five required elements for its Lanham Act claim, including for the two elements that form the basis of PharmacyChecker's Motion, i.e., specific details regarding the false statements made by PharmacyChecker (*see, e.g.*, Counterclaims ¶¶ 168, 184–87, 217–18) and the way in which those statements have proximately harmed LegitScript (*see, e.g.*, *id.* ¶¶ 201–03, 223).

LegitScript has alleged how PharmacyChecker has made statements in its advertising to U.S. consumers that the FDA's prohibition against international drug importation is merely a technicality; U.S. consumers "are not prosecuted" for importing foreign drugs; most foreign drug

orders are not stopped by federal authorities; the PharmacyChecker-accredited pharmacies are "licensed"; the FDA's characterization of online pharmacies as "illegal" or "fake" is misleading; it is safe to order from international online pharmacies; and researchers have found zero counterfeit drug orders. (*Id.* ¶¶ 184–85.)

LegitScript also has alleged the ways in which PharmacyChecker's conduct has caused proximate harm to LegitScript insofar as it "delegitimizes LegitScript's expertise, value, and products, and services in the eyes of its customers" (*id.* ¶ 202(a); *see also id.* ¶ 202(d) ("delegitimatizing LegitScript's role and reputation as a signifier of safety and compliance with all applicable laws and regulations")); "encourag[es] . . . an illegal stream of commerce [that] driv[es] merchants and potential market participants away from LegitScript's products and services in the legitimate market" (*id.* ¶ 202(b)); "diminish[es] trust in LegitScript's Healthcare Merchant Certification and discouraging [potential customers] . . . from purchasing LegitScript's products and services (*id.* ¶ 202(c)); and "diminishes demand for LegitScript's products and services" (*id.* ¶ 202(d)).

## C.    The dismissed NABP claim in the S.D.N.Y. case alleges different harm from that alleged here.

PharmacyChecker argues that, in the S.D.N.Y. Action, "NABP made a similar Lanham Act counterclaim against PharmacyChecker" that was subsequently dismissed for failure "to allege a cognizable injury under the Lanham Act." (Motion at 26–27 [ECF No. 314 at 33–34], citing *PharmacyChecker.com LLC v. Nat'l Assoc. of Bds. of Pharmacy*, 7:19-cv-07577, Dkt. 309 (S.D.N.Y. Sept. 20, 2022) ("S.D.N.Y. Order").) NABP, however, did not make the same allegations of injury that LegitScript makes in the present action. (*Compare supra* Section IV.B. *with* S.D.N.Y. Order at 9 (identifying NABP's alleged harm as "divert[ing] resources from its core mission . . . to respond to false, misleading, and scurrilous attacks from PCC," "respond[ing] to claims from consumers who have been misled by PCC," "determining whether PCC itself violated NABP policies," and "expend[ing] time and resources to correct the 'pernicious myths' fomented by PCC as to the legality and safety of drug important").) The

S.D.N.Y. court determined that what was fatal to the NABP's Lanham Act claim was that it failed to allege injury to a commercial interest:

> NABP does not allege that it markets a particular product or service or that it is a participant in the market for pharmacy accreditation or verification such that PCC could have plausibly caused NABP to suffer any "injury to a *commercial* interest in reputation or sales," *Lexmark*, 572 U.S. at 132, via any of this activity.

(S.D.N.Y. Order at 17 (emphasis in original).)

By contrast, here, PharmacyChecker itself alleges that it is a competitor with LegitScript in the market for pharmacy accreditation. (*See* FAC [ECF No. 82] ¶ 9 ("LegitScript is a direct competitor of PharmacyChecker.com in the market for online pharmacy verification and currently has contracts with companies such as Google to provide verification for and monitoring of Google's ad platform").) Accordingly, PharmacyChecker's argument falls by the wayside. Beyond that, LegitScript has directly alleged commercial harm—i.e., that PharmacyChecker's conduct has driven away customers from LegitScript. (*See, e.g.*, Counterclaims ¶ 202.) Such allegations were absent in the NABP counterclaim and, thus, did not form the basis for the S.D.N.Y. court's dismissal of that counterclaim. To the contrary, it was NABP's *lack* of allegations of the sort LegitScript has presented in the Counterclaims that was the reason NABP's counterclaim was dismissed. The cases are not analogous on this issue, and the Court should not be swayed by arguments to the contrary.

### D. LegitScript has pleaded proximate causation of commercial injury as a result of PharmacyChecker's false advertising.

Contrary to PharmacyChecker's assertions, LegitScript has alleged injury to its commercial interests as a result of PharmacyChecker's false statements. For a plaintiff to bring a Lanham Act claim, they must have interests that "fall within the zone of interests protected by the law invoked." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). This zone of interest test is "not especially demanding"—"the benefit of any doubt goes to the plaintiff," and the test "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes

implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." *Id.* at 130 (citation omitted).

"[T]o come within the zone of interests in a suit for false advertising under § 1125(a) [Lanham Act § 43(a)], a plaintiff must allege an injury to a commercial *interest* in reputation or sales." *Lexmark* at 131–32 (emphasis added). The plaintiff "ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id.* at 133. Courts "have generally presumed commercial injury when defendant and plaintiff are direct competitors and defendant's misrepresentation has a tendency to mislead consumers." *TrafficSchool.com*, 653 F.3d at 826. A plaintiff may "establish an injury by creating a chain of inferences showing how defendant's false advertising could harm plaintiff's business." *Id.* at 825.

As stated in Section IV.B., LegitScript has alleged directly how it has been commercially injured by the false advertising of PharmacyChecker. This injury has manifested with respect to LegitScript's reputation in the industry and its ability to attract customers. (*See* Counterclaims ¶ 202.) LegitScript's business is predicated on there being certain objective standards regarding what constitutes safe and legal drugs under federal law (i.e., as set forth in the FDCA and by the FDA). PharmacyChecker directly delegitimizes LegitScript's business and compromises the online market for drugs within the United States by, instead, legitimizing and facilitating illegal transactions—often with dire effects for the online platforms that rely on third-party certification services. (*See, e.g.*, *id.* ¶ 159 & n.2 (PharmacyChecker's practices resulted in a $500 million disgorgement payment assessed by the U.S. Department of Justice for one of its prior customers.))

By falsely advertising its accreditation services as based on researched, safe, licensed foreign pharmacies, importation of which is permitted under U.S. law, PharmacyChecker attempts to divert sales from LegitScript to PharmacyChecker and also attempts to lessen the goodwill associated with LegitScript's products. PharmacyChecker's business model is based on

PAGE - 28 LEGITSCRIPT'S RESPONSE TO PHARMACYCHECKER'S MOTION TO DISMISS COUNTERCLAIMS

telling internet platforms and foreign pharmacies that importation of drugs from foreign pharmacies is legal and safe. It's not legal, and every internet platform that has hired or hires PharmacyChecker for its certification services with this understanding is a potential sale that is being diverted from LegitScript. Additionally, PharmacyChecker's false advertising tends to lessen the goodwill of LegitScript's products. If current or potential customers of LegitScript believe PharmacyChecker's statements about the importation of drugs from foreign pharmacies being legal, then they call into question the very nature and need of LegitScript's certification service, lessening the goodwill of LegitScript's certification services. In both circumstances, LegitScript has been or is likely to be injured as a result of PharmacyChecker's false statements.

LegitScript's interests go far beyond the "marginally related" standard required under the zone of interests test (*Lexmark*, 572 U.S. at 130); LegitScript has a direct interest that would properly fall within the Lanham Act's protection. LegitScript's allegations—when taken as true under the motion to dismiss standard and when given the benefit of the doubt under the zone of interests test (*id.*)— establish commercial injury that is proximately caused by PharmacyChecker's false advertising.

### E.    PharmacyChecker's false statements are actionable under the Lanham Act.

PharmacyChecker's statements are of the type against which the Lanham Act protects.

#### 1.    PharmacyChecker's statements about the safety of the pharmacies it accredits are verifiably false.

As noted above, the Counterclaims allege that PharmacyChecker has made an array of false statements regarding the safety to consumers of importing foreign drugs. PharmacyChecker asserts that "[n]one of these statements contain verifiable facts." (Motion at 32 [ECF No. 314 at 39].) But this is far from the case. PharmacyChecker has asserted, categorically, that it is safe to order from international online pharmacies, that research has found zero counterfeit drug orders, and that the pharmacies it accredits are licensed. (Counterclaims ¶¶ 184–85 [ECF No. 299 at 34–35].) These statements are not mere "puffery" (Motion at 31 [ECF No. 314 at 38]), nor do any of the cases that PharmacyChecker cites to stand for this proposition.

PAGE - 29 LEGITSCRIPT'S RESPONSE TO PHARMACYCHECKER'S MOTION TO DISMISS COUNTERCLAIMS

The *Mandani v. Volkswagen Group* case that PharmacyChecker cites, (Motion at 32 [ECF No. 314 at 39]), stands only for the proposition that certain general claims of safety (i.e., that a vehicle is "safe" and "reliable") do not create *warranties* that can form the basis for an actionable express warranty (i.e., contract) claim. No. 17-cv-07287-HSG, 2019 WL 652867, at *4 (N.D. Cal. Feb. 15, 2019). This is clearly not relevant here as there is no warranty claim at issue.

Nor are LegitScript's allegations about PharmacyChecker making "general assertions of superiority," as was the case of *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1145 (9th Cir. 1997), that PharmacyChecker cites. (Motion at 32 [ECF No. 314 at 39].) While *Southland* is a Lanham Act case, the allegation that was deemed puffery was the vague, nonspecific assertion of, "Less is More." 108 F.3d at 1145. However, another assertion that was also the subject of the Lanham Act claim there, "50% Less Mowing," which was purportedly predicated on "[t]ests conducted by [the defendant's] research farm," was deemed actionable. *Id.* at 1137. This latter statement is reminiscent of the allegations here, where PharmacyChecker has made categorical assertions about its services based on purported research findings and licensing requirements.

By the same token, while PharmacyChecker cites to *NewCal*, the only allegation there that was deemed puffery was that the defendant would provide "flexibility" in its cost-per-copy contracts and provide lower copy costs to consumers. 513 F.3d at 1052. As with the statement above of, "Less is More," the statement regarding defendant's purported "flexibility" is vague and nonspecific; it is not "quantifiable." *Id.* at 1053. As the *NewCal* court explained, "[a] statement is considered puffery if the claim is extremely unlikely to induce consumer reliance." *Id.* Here, PharmacyChecker's assertions—as alleged in the Counterclaims—do induce consumer reliance. They are statements that assure consumers that the safety of purchasing drugs from foreign pharmacies has been researched and that the drugs they are purchasing come from foreign pharmacies that have been subject to the scrutiny required to become licensed. These are claims that are verifiably false and convey quantifiable metrics of legitimacy to consumers.

PAGE - 30 LEGITSCRIPT'S RESPONSE TO PHARMACYCHECKER'S MOTION TO DISMISS COUNTERCLAIMS

PharmacyChecker's statements regarding safety, as alleged in the Counterclaims, are proper grounds for a Lanham Act claim.

### 2. PharmacyChecker's statements about the legality of foreign drug importation are contrary to unambiguous FDA regulations.

In addition to PharmacyChecker's false statements regarding safety, LegitScript's Counterclaims also allege that PharmacyChecker has made verifiably false statements regarding what actions are permitted under the law with respect to importation of foreign drugs. (*See* Counterclaims ¶¶ 184–85.) PharmacyChecker's arguments that these are not actionable under the Lanham Act is wrong. (Motion at 33 [ECF No. 314 at 40].)

First, PharmacyChecker cites to a Ninth Circuit opinion where the court noted that, "[a]bsent a clear and unambiguous ruling from a court or agency of competent jurisdiction, statements by laypersons that purport to interpret the meaning of a statute or regulation are opinion statements, and not statements of fact," and that "[s]tatements of opinion are not generally actionable under the Lanham Act." *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999). The statements as alleged the Counterclaims are not the sort of opinion statements that generally fall outside the Lanham Act's protection; and further, the statements are contrary to unambiguous positions set forth by the FDA, with one of PharmacyChecker's statements directly challenging the FDA's determination regarding illegal and fake drugs from foreign pharmacies. (*See* Counterclaims ¶ 184(f).)

Unlike the scenario contemplated in *Coastal Abstract Serv.*, where there had not been an unambiguous determination, here, the FDA has been clear about the guidelines around importation of foreign drugs. As alleged in LegitScript's Counterclaims:

- "The Food, Drug, and Cosmetics Act (FDCA) prohibits "the introduction or delivery for introduction into interstate commerce of any food, drug, device or cosmetic that is adulterated or misbranded" and prohibits the introduction into interstate commerce of any drug not manufactured pursuant to Food and Drug Administration (FDA) approval. 21 U.S.C. § 331(a), (d); § 335(a)." (*Id.* ¶ 172.)

- "The FDA has repeatedly "expressed the view that virtually all importation of drugs into the United States by individual consumers violates the [FDCA], because the drugs are not approved in accordance with 21 U.S.C. § 355, are not labeled as

required by 21 U.S.C. § 352, or are dispensed without a valid prescription in contravention of 21 U.S.C. § 353(b)(1)." (*Id.* ¶ 173.)

- "Foreign pharmaceuticals that are manufactured abroad and imported into the United States are "unapproved" drugs under the FDCA." (*Id.* ¶ 174.)

- "The FDA's prohibition on personal importation is in part because the FDA "cannot ensure the safety and effectiveness of the medicine purchased over the Internet from foreign sources."" (*Id.* ¶ 175.)

*Compare with Sandoz Pharms. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 230–31 (3rd Cir. 1990) (where the court held that "[t]he FDA ha[d] not found conclusively that demulcents must be labelled as active or inactive ingredients within the meaning of 21 C.F.R. § 210.3(b)(7)," such that labeling said ingredient as "inactive" could be actionably false under the Lanham Act); *compare also with Dial A Car, Inc. v. Transp., Inc.*, 82 F.3d 484 (D.C. Cir. 1996) (where there was a pending dispute regarding the D.C. Taxicab Commission's order regarding proper interpretation of a local taxicab regulation such that a Lanham Act claim premised on application of that regulation was not proper).

PharmacyChecker's statements as alleged by LegitScript are contrary to the FDCA and clear guidance from the FDA (*see* Section IV.B.). These statements are "material representation[s] or description[s] [that are] false or verifiably misleading." *Sandoz Pharms. Corp.*, 902 F.2d at 231.

Furthermore, PharmacyChecker is not a run-of-the-mill layperson—it is an entity that holds itself out to consumers as an accreditor that has researched the safety and legality of foreign drug importation. This is not a situation in which there is a question about what is permissible under the FDCA or where the FDA has been unclear, and PharmacyChecker is merely expressing an opinion about an ambiguous regulatory scheme. Rather, this is a situation in which PharmacyChecker has intentionally obscured and dismissed clear FDA guidance in an effort to mislead consumers about the legality of importing foreign pharmaceuticals.

PharmacyChecker's second argument is that it is "law of the case that statements such as 'it is not against the law for U.S. consumers to order certain medications from abroad' do not qualify as false or misleading." (Motion at 33 [ECF No. 314 at 40].) PharmacyChecker is wrong.

PAGE - 32 LEGITSCRIPT'S RESPONSE TO PHARMACYCHECKER'S MOTION TO
        DISMISS COUNTERCLAIMS

The Ninth Circuit's summation in *PharmacyChecker.com LLC v. LegitScript LLC*, No. 24-2697, Dkt. 29.1 at 4–6 (9th Cir. May 23, 2025), that importation is illegal in "most circumstances," does not change the fact that the PharmacyChecker statements alleged by LegitScript are directly contradictory to unambiguous assertions by the FDA and within the FDCA.[6] Furthermore, while PharmacyChecker presents the theory of law of the case as an absolute, even its own cited authority explains that "[t]he law of the case doctrine is not an absolute bar to reconsideration of matters previously decided. The doctrine 'merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power.'" *Leslie Salt Co. v. United States*, 55 F.3d 1388, 1393 (9th Cir. 1995) (citation omitted). Here, nothing about the Ninth Circuit's order regarding the denial of summary judgment affects whether LegitScript has sufficiently pleaded its Lanham Act claim. PharmacyChecker's Motion should be denied.

## V.     Any Defects in LegitScript's Counterclaims Can be Cured by Amendment

As explained above, the Court should deny the Motion in its entirely. Even if the Court finds LegitScript's Counterclaims to be deficient at this stage, however, LegitScript requests that the Court grant leave to amend the Counterclaims. Rule 15 advises that "leave shall be freely given when justice so requires." Fed. R. Civ. Pro. 15(a)(2).

Here, justice would require granting LegitScript leave to amend its counterclaims. Allowing LegitScript to cure any potential deficiencies in its complaint would not unduly prejudice PharmacyChecker—LegitScript brought its Counterclaims in good faith and in the time provided by the Court's order. In fact, because it was PharmacyChecker that delayed in filing a motion to dismiss as to LegitScript's counterclaims, PharmacyChecker cannot claim that any further delay would cause it prejudice, lest PharmacyChecker have created the circumstances giving rise to its own asserted prejudice now.

---

[6] Additionally, while it should go without saying, that a motion for summary judgment was denied on the question of whether, as a matter of law, importation (and *facilitating* importation) is always illegal, does not mean that a motion to dismiss for *failure to state a claim* regarding statements about legality should be granted.

Nor would amendment be futile. As demonstrated above, dismissal under Rule 12(b)(6) is inappropriate because LegitScript could cure any potential deficiencies and state valid counterclaims. *E.g.*, *Harmoni*, 914 F.3d at 654 (granting leave to amend because amendment could cure insufficient proximate cause to support a RICO claim); *see also HomeLight, Inc. v. Shkipin*, 694 F. Supp. 3d 1242, 1257 (N.D. Cal. 2023) (court dismissed Lanham Act false advertising claim but granted leave to amend).

## CONCLUSION

For the reasons set forth above, PharmacyChecker's Motion to Dismiss should be denied. If, however, the Court finds the Counterclaims deficient for some reason, LegitScript respectfully asks that any dismissal be without prejudice and with leave to amend.

DATED:  October 17, 2025.

GORDON REES SCULLY MANSUKHANI, LLP

Richard P. Sybert, OSB No. 833714
 Email: rsybert@grsm.com
Hannah Brown (Pro Hac Vice)
Email: hbrown@grsm.com

TONKON TORP LLP

By:  *  /s/Paul M. Balmer                          *
Christopher J. Pallanch, OSB No. 075864
  Direct:  503.802.2104
  Email:  christopher.pallanch@tonkon.com
Sadie Y. Concepción, OSB No. 185015
  Direct:  503.802.5773
  Email:  sadie.concepcion@tonkon.com
Paul M. Balmer, OSB No. 203429
  Direct:  503.802.5745
  Email:  paul.balmer@tonkon.com

*Attorneys for Defendant LegitScript LLC*