IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **PHARMACYCHECKER.COM LLC**, | Case No. 3:22-cv-252-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **LEGITSCRIPT LLC**, | |
| Defendant. | |

Philip S. Van Der Weele, K&L Gates llp, One SW Columbia Street, Suite 1900, Portland, OR 97204; Aaron Robert Gott, Bona Law pc, 331 Second Avenue South, Suite 420, Minneapolis, MN 55401; James F. Lerner and Aaron Lawrence, Bona Law pc, 16 Madison Square Park West, Ninth Floor, New York, NY 10010; and Joseph Trujillo and Matthew R. Riley, Bona Law pc, 4275 Executive Square, Suite 200, La Jolla, CA 92037. Of Attorneys for Plaintiff.

Richard P. Sybert and Hannah Brown Goehring, Gordon Rees Scully Mansukhani llp, 1300 SW Fifth Avenue, Suite 2000, Portland, OR 97201; John T. Mills, Mercedes Colwin, and Ryan J. Sestack, Gordon Rees Scully Mansukhani llp, One Battery Park Plaza, 28th Floor, New York, NY 10004; Rachel J. Adcox, Axinn Veltrop & Harkrider llp, 1901 L Street NW, Washington, DC 20036; and Christopher J. Pallanch, Sadie Y. Concepción, and Paul M. Balmer, Tonkon Torp llp, 1300 SW Fifth Avenue, Suite 2400, Portland OR 97201. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Not every plaintiff has a right to sue under a statutory cause of action. *See FDA v. R. J. Reynolds Vapor Co.*, 606 U.S. 226, 232 (2025). Because LegitScript LLC ("LegitScript") has

failed plausibly and adequately to allege proximate causation, it does not have a right to sue PharmacyChecker.com LLC ("PharmacyChecker") under either the Lanham Act, 15 U.S.C. § 1125(a), or the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964(c). Accordingly, the Court grants without prejudice PharmacyChecker's motion to dismiss LegitScript's counterclaims.[1]

## STANDARDS

### A. Rule 12(b)(6) of the Federal Rules of Civil Procedure

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). A motion to dismiss counterclaims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is evaluated under the same standard as a motion to dismiss a plaintiff's complaint. *Edwards Vacuum, LLC v. Hoffman Instrumentation Supply, Inc.*, 556 F. Supp. 3d 1156, 1161 n.1 (D. Or. 2021). To decide a motion to dismiss counterclaims, the operative "complaint" is the counterclaims. *See Unigestion Holding, S.A. v. UPM Tech., Inc.*, 305 F. Supp. 3d 1134, 1141 (D. Or. 2018). Therefore, the Court accepts as true the facts alleged in the counterclaims and gives no presumption of truth to the allegations in the amended complaint, unless the counterclaimant "endorse[s] or rel[ies] on" those allegations. *See id.* Additionally, the Court must assume as false all factual allegations in a complaint that have

---

[1] Although PharmacyChecker argues that dismissal should be with prejudice, leave to amend generally should be given when proximate cause has been insufficiently alleged. *See, e.g.*, *Harmoni Int'l Spice, Inc. v. Hume*, 914 F.3d 648, 654 (9th Cir. 2019) (holding that district court erred in not granting leave to amend RICO claim, notwithstanding failure adequately to allege proximate cause); *HomeLight, Inc. v. Shkipin*, 694 F. Supp. 3d 1242, 1257 (N.D. Cal. 2023) (dismissing without prejudice Lanham Act claim for failure adequately to allege proximate cause).

been denied by the counterclaimant. *See Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir. 1989) ("[T]he allegations of the non-moving party must be accepted as true, while the allegations of the moving party which have been denied are assumed to be false.").

In evaluating the sufficiency of a counterclaimant's factual allegations, a court must accept as true all well-pleaded material facts alleged and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). The Court must draw all reasonable inferences from the factual allegations in favor of the counterclaimant. *Newcal Indus. v. Ikon Off. Sol.*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The Court need not, however, credit a counterclaimant's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

**B.   The Cause of Action Requirement**

In addition to establishing Article III standing, a plaintiff suing under a federal statute also must satisfy the "'cause of action' (or 'prudential standing') requirement." *Bank of Am. Corp. v. City of Miami, Fla.*, 581 U.S. 189, 197 (2017). "The question is whether the statute grants the plaintiff the cause of action that he asserts." *Id.* at 196-97. In answering that question, courts presume that a statute provides a cause of action "only to plaintiffs whose interests 'fall within the zone of interests protected by the law invoked'" and "whose injuries are proximately

caused by violations of the statute." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129, 132 (2014)).[2]

The zone-of-interests test asks whether Congress, when it enacted a private right of action, contemplated this kind of plaintiff suing to vindicate this sort of injury. *Ray Charles Found. v. Robinson*, 795 F.3d 1109, 1119-20 (9th Cir. 2015); *see also Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399-400 (1987) ("[T]he test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit."). The zone-of-interests test "is not especially demanding." *Lexmark*, 572 U.S. at 130 (quotation marks omitted).

The proximate cause test, however, has more bite. That test "reflects the reality that 'the judicial remedy cannot encompass every conceivable harm that can be traced to alleged wrongdoing.'" *Id.* at 132 (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. St. Council of Carpenters*, 459 U.S. 519, 536 (1983)). This requirement seeks to "limit a person's responsibility for the consequences of that person's own acts." *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992). Accordingly, to ensure that a plaintiff who falls within the zone of interests has a cause of action under a statute, a court also must ask "whether the harm alleged has a sufficiently close connection to the conduct that the statute prohibits." *Lexmark*, 572 U.S. at 133.[3]

---

[2] Before 2014, federal courts referred to this concept as either "statutory standing" or "prudential standing." In *Lexmark*, however, the Supreme Court clarified that "the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the court's statutory or constitutional power to adjudicate the case." 572 U.S. at 128 n.4 (quoting *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 642-43, (2002)). *See also Ray Charles Found. v. Robinson*, 795 F.3d 1109, 1121 (9th Cir. 2015) ("The *Lexmark* Court made clear that whether a plaintiff's claims are within a statute's zone of interests is not a jurisdictional question." (cleaned up) (quotation omitted)).

[3] Proximate cause is a standing requirement in other areas of federal law as well. For example, federal antitrust law "rest[s] on the judgment that the antitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers

In *Lexmark*, the Supreme Court explained:

> We thus hold that a plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff. That showing is generally not made when the deception produces injuries to a fellow commercial actor that in turn affect the plaintiff. For example, while a competitor who is forced out of business by a defendant's false advertising generally will be able to sue for its losses, the same is not true of the competitor's landlord, its electric company, and other commercial parties who suffer merely as a result of the competitor's "inability to meet [its] financial obligations."

*Id.* at 133-34 (brackets in original) (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458 (2006)). In that example, there are "more immediate victim[s]" who are "better situated to sue" than the landlord and the electric company. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658 (2008). Those harms simply are "too remote from the defendant's unlawful conduct" to establish proximate cause. *Lexmark*, 572 U.S. at 133 (quotations omitted); *see also Holmes*, 503 U.S. at 268-69 (no proximate cause and no standing, when a plaintiff's harm is purely derivative of "misfortunes visited upon a third person by the defendant's acts").

## BACKGROUND[4]

PharmacyChecker operates pharmacychecker.com, a website that compares prescription drug prices offered by different pharmacies. ECF 299 (Amended Answer, Affirmative Defenses, and Counterclaims) ¶¶ 158, 161. The website shows the percentage savings among U.S.,

---

rather than by allowing every plaintiff potentially affected by the overcharge to sue only for the amount it could show was absorbed by it." *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 734-35 (1977) (establishing the "Indirect Purchaser Rule" in private antitrust damage actions).

[4] The Court recites only those facts necessary to resolve the pending motion. The Court's decision denying LegitScript's motion for summary judgment contains a more robust statement of facts. *See PharmacyChecker.com LLC v. LegitScript LLC*, 710 F. Supp. 3d 856, 863-67 (D. Or. 2024), *aff'd*, 137 F.4th 1031 (9th Cir. 2025).

Canadian, and other international drug prices and includes direct links to online pharmacies. *Id.* ¶ 161. Further, PharmacyChecker's website only links to pharmacies that PharmacyChecker has accredited through its "PharmacyChecker Verification Program" (the "Accredited Pharmacies"). *Id.* ¶ 163. The "accreditation" that PharmacyChecker issues, however, carries no legal significance, and it means only that PharmacyChecker has approved the pharmacy. *See id.* Although most Accredited Pharmacies are international, some are based in the United States. *Id.* ¶ 166.

The Accredited Pharmacies pay a flat fee to participate in the PharmacyChecker Verification Program (*i.e.*, to appear on pharmacychecker.com). *Id.* ¶ 165. To determine the order that the Accredited Pharmacies appear on the website, PharmacyChecker uses a bidding system that displays the highest bidder first. *Id.* ¶ 164. Thus, in addition to their accreditation fees, the Accredited Pharmacies pay bidding fees for their respective placements on the website. *See id.* ¶ 165. When a potential customer (or end user) clicks on a link to an Accredited Pharmacy, PharmacyChecker also charges that pharmacy a cost-per-click fee—essentially, a customer referral fee. *Id.* From January 2015 to August 2021, most of PharmacyChecker's revenues came from charging the Accredited Pharmacies accreditation, bidding, and cost-per-click fees. *Id.*

PharmacyChecker also has a frequently-asked-questions section on its website that explains its services. In that section, PharmacyChecker makes several statements regarding the legality of personal drug importation by U.S. consumers, including:

> Beginning an answer to the frequently asked question on the Website "Is it legal to order prescription drugs online?" by stating "There is no law against ordering medication online";
>
> Describing the prohibition of international drug importation as a technicality;

>   Offering legal advice or otherwise advising its U.S. consumers that people in the United States "are not prosecuted" for importing medication, so long as it is for personal use;
>
>   Advising U.S. consumers that less than one percent of medication orders from abroad are stopped by federal authorities;
>
>   Implying to U.S. consumers that drugs ordered through the PharmacyChecker-Accredited Pharmacies are always "dispensed by licensed pharmacies"; and
>
>   Advising U.S. consumers that the FDA's characterization of online pharmacies as "illegal" or "fake" is misleading to consumers.

*Id.* ¶ 184. PharmacyChecker also represents that personal drug importation generally is safe:

>   Beginning an answer to the frequently asked question on the Website "Is it safe to order medication online from a pharmacy outside the U.S.?" by stating "Yes, as long as you buy from the safest international online pharmacies";
>
>   Highlighting that "independent researchers" found "zero" counterfeit drug orders;
>
>   Describing medication ordered from a PharmacyCheckerVerified Pharmacy as "exceedingly safe";
>
>   Stating that "Pharmacies in some countries are equally as safe if not safer than those in the U.S."; and
>
>   Directly contradicting FDA guidance regarding the risks and lack of guaranteed safety of purchasing drugs from foreign sources.

*Id.* ¶ 185 (together, with *id.* ¶ 184, the "Q&A Statements").

Meanwhile, the Food, Drug, and Cosmetics Act ("FDCA") prohibits "the introduction or delivery for introduction into interstate commerce of any food, drug, device or cosmetic that is adulterated or misbranded" and prohibits the introduction into interstate commerce of any drug not manufactured under Food and Drug Administration ("FDA") approval. 21 U.S.C. § 331(a), (d); § 335(a). The FDA has "expressed the view that virtually all importation of drugs into the United States by individual consumers violates the [FDCA], because the drugs are not approved in accordance with 21 U.S.C. § 355, are not labeled as required by 21 U.S.C. § 352, or are

PAGE 7 – OPINION AND ORDER

dispensed without a valid prescription in contravention of 21 U.S.C. § 353(b)(1)." *In re Canadian Import Antitrust Litg.*, 470 F.3d 785, 788-89 (8th Cir. 2006). In an article titled "Personal Importation," the FDA states that foreign pharmaceuticals that are manufactured abroad and imported into the United States are "unapproved" drugs under the FDCA. *See* ECF 299 ¶¶ 174-75 & n.4. The FDA adds that it "cannot ensure the safety and effectiveness of the medicine purchased over the Internet from foreign sources." *Id.* ¶¶ 174-75 & n.4. Google previously had a relationship with PharmacyChecker but terminated its contract after the federal government required Google to pay $500 million, in part for displaying advertisements for, and facilitating consumer internet traffic to, certain internet pharmacies, which had been certified and approved by PharmacyChecker. *Id.* ¶ 181.

LegitScript is a company that provides, among other services, merchant certifications to verify that an online merchant complies with applicable laws and regulations.[5] *Id.* ¶ 193. LegitScript, however, is not a direct competitor of PharmacyChecker. *Id.* ¶ 9. LegitScript does not operate a website that is similar to pharmacychecker.com, nor does LegitScript facilitate drug purchases. Rather, LegitScript's merchant certifications, after being obtained by an online merchant, may be displayed by the accredited merchant on its website. *See id.* ¶ 195.

One certification that LegitScript provides is the "Healthcare Merchant Certification," which LegitScript markets to healthcare-related businesses, such as online and mail-order pharmacies. *Id.* ¶ 194. The Healthcare Merchant Certification signifies that the business displaying the certification has met certain criteria demonstrating compliance with applicable

---

[5] Besides merchant certification, LegitScript also offers monitoring services, including monitoring merchants, online marketplaces, and advertisements to ensure compliance and reduce risk. *Id.* ¶ 200. LegitScript also offers merchant certifications in industries other than healthcare, such as cannabis and drug and alcohol addiction services. *Id.*

health laws and regulations. *Id.* ¶ 195. Thus, when an online pharmacy displays LegitScript's Healthcare Merchant Certification on that pharmacy's website, a consumer knows that it is safe and legal to purchase drugs from that pharmacy. *Id.* ¶ 196. Similarly, when a bank, advertiser, e-commerce website, payment processor, social media platform, or search engine sees LegitScript's Healthcare Merchant Certification in the chain of a transaction, or on the website of a pharmaceutical provider, that entity knows that this portion of the transaction was safe and legal, and this lends legitimacy to the entire transaction. *Id.* ¶ 197.

## DISCUSSION[6]

LegitScript asserts two counterclaims against PharmacyChecker. LegitScript's first counterclaim alleges a violation of RICO, specifically, 18 U.S.C. § 1962(c).[7] LegitScript's second counterclaim alleges a violation of § 43(a) of the Lanham Act, specifically false advertising in violation of 15 U.S.C.§ 1125(a), through PharmacyChecker's Q&A Statements.

---

[6] Among other things, LegitScript argues that PharmacyChecker's pending motion is untimely under Rule 12(b)(6) and premature under Rule 12(c) of the Federal Rules of Civil Procedure. The Court, however, finds excusable neglect. When considering this issue, courts often focus on unfair prejudice, the length and reason for delay, and whether the movant acted in good faith. *See Ahanchian v. Xenon Pictures, Inc.*, 624 F.3d 1253, 1261 (9th Cir. 2010). LegitScript concedes that PharmacyChecker's delay was in good faith. The parties also agree that part of the reason for the delay was the absence of any stated deadline contained in the Court's scheduling order for PharmacyChecker to respond to LegitScript's counterclaims. Although LegitScript argues that it has been prejudiced because PharmacyChecker had more time to consider its responses, there is no unfair prejudice. LegitScript moved to certify the Court's summary judgment decision for interlocutory appeal. ECF 294. The following month, LegitScript filed its counterclaims. ECF 299. Thus, the reason PharmacyChecker had more time to respond to the counterclaims is because the Court granted LegitScript's motions to certify its request for interlocutory appeal and to stay the action pending that appeal. ECF 302 at 14.

[7] In its RICO claim, LegitScript alleges that PharmacyChecker engaged in a pattern of racketeering activity consisting of numerous violations of federal mail and wire fraud statutes by publishing the Q&A Statements. LegitScript further contends that PharmacyChecker and its Accredited Pharmacies have formed a RICO "enterprise" for the common purpose of "deceiving U.S. consumers into purchasing drugs from foreign pharmacies in violation of U.S. law." ECF 299 ¶ 206 (citing 18 U.S.C. § 1961(4)).

Applicable to both claims, LegitScript states in eleven paragraphs how it has been allegedly harmed.[8] LegitScript alleges that its business, reputation, and goodwill have been injured by PharmacyChecker's Q&A Statements, which apparently deceive (1) U.S. drug consumers, and (2) LegitScript's potential customers into thinking that international drug importation is safe and legal, and (3) erode the standards of what is considered "legal" in the U.S. As described further below, each of these theories of harm are too attenuated. Thus, despite being arguably within the zone of interests of both statutes,[9] the Court concludes that LegitScript's allegations of proximate cause are legally insufficient.

LegitScript's first and second theories of harm start from the same premise: the Q&A Statements falsely bolster the reputation of foreign pharmacies (*e.g.*, by saying that they are licensed and generally safe and that the FDA's characterization of them as "illegal" is misleading). Under the first causation theory, the Q&A Statements allegedly encourage U.S.

---

[8] *See* ECF 299 ¶¶193-203 ("Harm to LegitScript," describing theory of proximate cause); ¶ 214 (RICO claim; "The False Marketing Enterprise and PharmacyChecker's role in directing the False Marketing Enterprise in violation of 18 U.S.C. § 1961(c) harmed LegitScript by damaging its business, reputation, and goodwill, as described more fully in Paragraphs 193-203"); ¶ 223 (Lanham Act claim; "By reason of PharmacyChecker's conduct, LegitScript has suffered and will continue to suffer, damage to its business, reputation, and goodwill, as described above in Paragraphs 193-203."). *See also* Jan. 9, 2026 Hrg. Tr. ("Tr.") 19:10-25 (counsel for LegitScript confirming that arguments supporting proximate cause for Lanham Act counterclaim "address[ ] the RICO proximate cause analysis as well").

[9] The Lanham Act's "cause of action is for competitors, not consumers." *See POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 107 (2014). Thus, "[f]or a plaintiff 'to come within the zone of interests,' consumer injury is not enough: There must be 'injury to a commercial interest in reputation or sales.'" *HomeLight*, 694 F. Supp. at 1254 (quoting *Lexmark*, 572 U.S. at 131-32). LegitScript arguably falls within the zone of interests of the Lanham Act because it allegedly suffered harm to its reputation—a paradigmatic commercial injury. *See Lexmark*, 572 U.S. at 131-32, 137. In addition, LegitScript arguably satisfies the zone of interests test for RICO. To fall within that test, a plaintiff must claim an "injury to his business or property." *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Ltd.*, 943 F.3d 1243, 1248 (9th Cir. 2019). Although the parties disagree on whether LegitScript satisfies the zone-of-interests test, the Court need not resolve that dispute at this time.

consumers to buy drugs from foreign pharmacies rather than from domestic pharmacies (*e.g.*, by advising that less than 1% of medication imports are stopped by customs and that consumers are not prosecuted for personal use imports). Because of the growing market for foreign drugs (and the shrinking market for domestic drugs), LegitScript alleges, it will lose sales of its Healthcare Merchant Certification and related services, which it markets to domestic pharmacies that comply with FDA and other U.S. regulatory standards.

## A. Lanham Act

To establish proximate cause for purposes of the Lanham Act, a plaintiff must plausibly allege that its "economic or reputational injury flow[s] *directly* from the deception wrought by the defendant's advertising." *Ray Charles Found.*, 795 F.3d at 1121 (emphasis added) (quoting *Lexmark*, 572 U.S. at 133).[10] That typically "occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id.* (quoting same).

The U.S. consumers who are allegedly defrauded by the Q&A Statements under the first theory of harm are not LegitScript's customers and therefore do not "withhold trade from [LegitScript]." *Contra Lexmark*, 572 U.S. at 133. Instead, the alleged "deception produces injuries to [ ] fellow commercial actor[s]"—*i.e.*, U.S. pharmacies, that are harmed when

---

[10] For purposes of the Lanham Act, a court presumes that a plaintiff's injury is proximately caused by a defendant's false advertisement "when plaintiff competes directly with defendant." *See TrafficSchool.com*, 653 F.3d at 827. That is because "[c]ompetitors 'vie for the same dollars from the same consumer group' and a misleading ad can upset their relative consumer positions." *Id.* (quoting *Kournikova v. Gen. Media Commc'ns, Inc.*, 278 F. Supp. 2d 1111, 1117 (C.D. Cal. 2003)). That presumption, however, is inapplicable here. Among other things, LegitScript expressly denies that it is a direct competitor of PharmacyChecker. *See* ECF 299 ¶ 9 ("Denies that LegitScript is a direct competitor of PharmacyChecker.com in the market for online pharmacy verification."). Proximate cause also is shown "[w]hen a defendant harms a plaintiff's reputation by casting aspersions on its business" because "the plaintiff's injury flows directly from the audience's belief in the disparaging statements." *Lexmark*, 572 U.S. at 138. None of the allegedly false Q&A Statements, however, refer to LegitScript or its certification program.

U.S. consumers instead purchase from foreign pharmacies—"that in turn affect" LegitScript. *See id.* at 133-34. As the *Lexmark* court explained, such indirectly caused harm generally is insufficient to show the necessary proximate causation. *See id.* That lesson was reaffirmed in *Hemi Group*, in which the Supreme Court refused to extend proximate cause to "situations where the defendant's fraud on the third party . . . has made it easier for a *fourth party* . . . to cause harm to the plaintiff." *Hemi Group LLC v. City of New York*, 559 U.S. 1, 11 (2010) (emphasis in original). That is LegitScript's theory: PharmacyChecker's fraud on U.S. consumers has made it easier for U.S. pharmacies to cause harm to LegitScript by not purchasing its products.

Although LegitScript argues that its injuries follow "automatically" from the Q&A Statements, as in *Lexmark*, the facts of that "relatively unique" case demonstrate why LegitScript lacks proximate cause. *See id.* at 139-40. In *Lexmark*, the maker of a component part—a microchip that could only fit in one remanufactured toner cartridge—demonstrated proximate cause to sue the maker of the original cartridge under the Lanham Act for disparaging statements it made about the remanufacturer. The Supreme Court explained that "if the remanufacturers sold 10,000 fewer refurbished cartridges because of Lexmark's false advertising, then it would follow more or less automatically that Static Control," the component part maker, "sold 10,000 fewer microchips for the same reason." *Id.* at 140. Thus, there was no "need for any 'speculative . . . proceedings' or 'intricate, uncertain inquiries'" into proximate cause, because "the remanufacturers [were] not 'more immediate victim[s]' than Static Control." *Id.* (first quoting *Anza*, 547 U.S. at 459-60, then quoting *Bridge*, 553 U.S. at 658).

LegitScript does not allege facts plausibly showing that its injuries follow automatically from the U.S. pharmacies' injuries.[11] Unlike the claimant in *Lexmark*, LegitScript does not identify any specific product or service that it will sell fewer of as a consequence of the domestic pharmacies' loss of drug sales. *See* ECF 299 ¶¶ 202 (a), (b) (injury includes "delegitimiz[ing] LegitScript's expertise, value, and products, and services" and "driving merchants and potential market participants away from LegitScript's products and services"). The microchips in *Lexmark* were a component part of the intermediary victim's product. None of LegitScript's products or services are necessary to U.S. pharmacies' business operations or drug sales such that when U.S. pharmacy sales drop, LegitScript's sales drop proportionally and in tandem. LegitScript therefore does not plausibly allege that its product sales would decrease "more or less automatically" following lower U.S. pharmacy drug sales. *See Lexmark*, 572 U.S. at 139-40.

Indeed, it is just as plausible, if not more so, that the injuries allegedly suffered by U.S. pharmacies from PharmacyChecker's Q&A Statements would prompt U.S. pharmacies to continue to use, or even increase their use of, LegitScript's Healthcare Merchant Certification. The U.S. pharmacies likely would want to counteract PharmacyChecker's allegedly false statements with a marketing campaign of their own, stressing that foreign pharmacies are not generally safe and highlighting that their Healthcare Merchant Certification demonstrates

---

[11] During oral argument, LegitScript suggested that U.S. pharmacies are deceived by PharmacyChecker's Q&A Statements and thus may elect to purchase PharmacyChecker's services instead of LegitScript's, thereby harming LegitScript. *See* Tr. 11:2-22. The counterclaims, however, fail to make factual allegations supporting this theory of causation, let alone plausible allegations. Even if they did, however, LegitScript's services and PharmacyChecker's are not the same (as LegitScript makes clear in its denial to PharmacyChecker's allegation that the two are competitors). That is, a pharmacy can obtain the Healthcare Merchant Certification from LegitScript while also paying PharmacyChecker to appear on pharmacychecker.com. Thus, it is not plausible that U.S. pharmacies encouraged to purchase PharmacyChecker's services will "automatically" forego LegitScript's. *Contra Lexmark*, 572 U.S. at 139-40.

compliance with U.S. legal standards of safety and legality for the benefit of U.S. drug consumers. Thus, LegitScript's first theory fails plausibly to allege proximate cause.[12]

The second theory also falls short. Under this theory, LegitScript alleges that PharmacyChecker's Q&A Statements deceive banks, advertisers, e-commerce websites, payment processors, social media platforms, and search engines ("Online Consumers") into believing that personal importation of drugs from foreign pharmacies is generally safe and legal, "regardless of the absence of LegitScript certification of those foreign pharmacies." ECF 299 ¶ 202(c). Thus, LegitScript alleges, Online Consumers will lose trust in LegitScript's Healthcare Merchant Certification and will be discouraged from purchasing LegitScript's products and services. *Id.* In other words, LegitScript's second theory is that Online Consumers will think that LegitScript's view of "legality" is too restrictive; because PharmacyChecker says that personal importation and foreign pharmacies are legal, Online Consumers will conclude, argues LegitScript, that its certifications are useless, and therefore it will lose business.

Unlike the U.S. pharmacy consumers, Online Consumers are potential customers of LegitScript, so a false advertisement could "cause[ ] them to withhold trade from [LegitScript]." *See Lexmark*, 572 U.S. at 133. But LegitScript has not plausibly alleged that such an injury has occurred or even is likely. The Q&A Statements do not disparage (or even discuss) certification

---

[12] The first causal theory fails for the additional reason that LegitScript acknowledges there are "more immediate victims." *See Bridge*, 553 U.S. at 658. It states, "[o]n information and belief, the [Q&A Statements] defraud U.S. consumers of their money because they make purchases of foreign drugs (which may or may not be the actual drugs or medication the consumer intended to order) that those consumers would not have made if [the Q&A Statements] had not misled those consumers into thinking that personal drug importation was not illegal under federal law." ECF 299 ¶ 189. The Court sees no reason why LegitScript—not these allegedly defrauded consumers—is "better situated to sue" PharmacyChecker. *Id.* "[D]irectly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely." *Holmes*, 503 U.S. at 269-70.

programs like LegitScript's, so LegitScript is not directly injured by Online Consumers' belief in the Q&A Statements. *Contra Lexmark*, 572 U.S. at 138 (proximate cause established when "defendant denigrates a plaintiff's product by name" or "damages the product's reputation").

LegitScript argues, however, that if Online Consumers believe the Q&A Statements, "then they call into question the very nature and need of LegitScript's certification service, lessening the goodwill of LegitScript's certification service." ECF 319 at 38. That harm, however, is not "necessarily" caused by Online Consumers' belief in the Q&A Statements, so proximate cause is lacking. *See Hemi Group, LLC v. City of New York*, 559 U.S. 1, 13 (2010) (holding that the "compensable injury . . . necessarily is the harm caused by [the] predicate acts" (quoting *Anza*, 547 U.S. at 457) (second alteration in original)). Indeed, there is nothing about the Q&A Statements that undermine LegitScript's Healthcare Merchant Certification or other products. Quite the contrary: the Q&A Statements say, for example, that "less than one percent of medication orders from abroad are stopped by federal authorities" and that international drug importation is prohibited (albeit, only technically). These statements imply that drug importation is *not* legal, and that an arbiter of legality like LegitScript would be helpful to ensure that Online Consumers do not accidentally participate in illegal activities.

Even if Online Consumers believe that LegitScript's view of legality is overly restrictive and that personal importation is perfectly legal, those beliefs would likely increase LegitScript's goodwill, causing Online Consumers to purchase more of LegitScript's products. Online Consumers might think that LegitScript acts out of an abundance of caution—an admirable trait in the compliance field, particularly when viewed in light of LegitScript's other allegations. For example, PharmacyChecker's statements allegedly caused Google to have to disgorge $500 million in profits to the U.S. Department of Justice. ECF 299 ¶ 159 & n.2. Although LegitScript

asserts that this disgorgement might discourage Google and other search engines from purchasing LegitScript's certification and other products, that conclusory speculation is not plausible. Indeed, it is just as likely, if not more so, that Google might want to contract with a company like LegitScript to ensure that its advertisements will not cause similar compliance issues in the future. This is especially true if a company like Google thinks that LegitScript will be overly cautious in selecting the pharmacies and other companies to which it will issue certifications.[13]

LegitScript also does not articulate how its relationship with Online Consumers has been or will be harmed by the Q&A Statements. LegitScript does not allege, for example, that Google abandoned any contract with LegitScript or otherwise took any action adverse to LegitScript because of the Q&A Statements.[14] Nor did LegitScript allege that fact regarding any current or former customer. Those allegations would also be nearly impossible to make—and prove. "Businesses lose and gain customers for many reasons, and it would require a complex assessment to establish what portion of [LegitScript's] lost sales were the product of [the Q&A Statements]." *Anza*, 547 U.S. at 459. Thus, even if it were plausible that the Q&A Statements encouraged Online Customers to abandon LegitScript's services, "[t]he attenuated connection between [LegitScript's] injury and [PharmacyChecker's] injurious conduct thus implicates

---

[13] As the Google example illustrates, Online Consumers are *also* "more immediate victim[s]" who are "better situated to sue" than LegitScript. *See Bridge*, 553 U.S. at 658; see also Holmes, 503 U.S. at 268-69. To the extent that Online Consumers have relied to their detriment on PharmacyChecker's false statements regarding the legality or safety of foreign pharmacies, Online Consumers "have an incentive to sue" to recover for their own injuries. *See Hemi Group*, 559 U.S. at 11-12.

[14] Indeed, LegitScript "[d]enies the allegation that LegitScript 'currently has contracts with companies such as Google to provide verification for and monitoring of Google's ad platform' as inaccurate, incomplete, and/or misleading." ECF 299 ¶ 9.

fundamental concerns" underlying the proximate cause inquiry. *See id.* at 459-60. To consider this claim, a factfinder would need to quantify the reputational harm that the Q&A Statements made to LegitScript and measure LegitScript's lost sales attributable to the Q&A Statements,[15] all while holding constant the other potential variables that might effect LegitScript's product sales. The proximate cause requirement relieves courts from this sort of guesswork. *Id.* Thus, LegitScript has not plausibly alleged that its "injury flow[s] directly from the deception wrought by the" Q&A Statements under its second theory. *Lexmark*, 572 U.S. at 133.

LegitScript's third causation theory is its weakest. LegitScript suggests that the Q&A Statements erode the "objective standards regarding what constitutes safe and legal drugs under federal law," which disrupts the market for LegitScript's accreditation business. *See* ECF 319 at 37. This is both conclusory and speculative.[16] A marketplace injury rule would "force courts to

---

[15] LegitScript argues that discovery would help identify these numbers, but LegitScript is the party with the most information about its own sales and customer base. Thus, discovery from PharmacyChecker would clarify little, if anything, about causation.

[16] This argument fails for an additional reason: LegitScript is not a "public prosecutor" and cannot enforce the FDA's labeling regulations under the Lanham Act. *See TrafficSchool.com*, 653 F.3d at 827 (quotation omitted); *Sandoz Pharms. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 230 (3d Cir. 1990) ("A competitor in a Lanham Act suit does not act as a 'vicarious avenger' of the public's right to be protected against false advertising." (quoting *Am. Home Prods. Corp. v. Johnson & Johnson*, 672 F. Supp. 135, 145 (S.D.N.Y.1987)). As the Third Circuit explained when dismissing a Lanham Act claim for false advertising in the drug labeling context:

> Jurisdiction for the regulation of OTC drug marketing is vested jointly and exhaustively in the FDA and the FTC, and is divided between them by agreement. Neither of these agencies' constituent statutes creates an express or implied private right of action, and what the FD & C Act and the FTC Act do not create directly, the Lanham Act does not create indirectly, at least not in cases requiring original interpretation of these Acts or their accompanying regulations.

*Sandoz Pharms. Corp.*, 902 F.2d at 231 (citations omitted).

PAGE 17 – OPINION AND ORDER

adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts." *See Holmes*, 503 U.S. at 269. Such a rule also would leave the proximate cause requirement toothless.[17] Because none of LegitScript's causation theories are plausible, there is no proximate cause and thus no cause of action under the Lanham Act.[18]

## B. RICO

The predicate acts for LegitScript's RICO claim are instances of alleged mail and wire fraud based on the allegedly false Q&A Statements. Thus, LegitScript's failure plausibly to allege proximate cause under the same theory of harm similarly dooms its RICO claim.[19] LegitScript, however, also argues that, under the three-factor test often used to evaluate

---

[17] It would also gut the indirect purchaser rule—or at least give competitors a way to circumvent it by simple expedient of bringing a Lanham Act claim. *See supra*, note 3.

[18] A false advertising claim under the Lanham Act also will not lie unless the defendant makes a "false statement of fact." *See Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1110 (9th Cir. 2012). PharmacyChecker argues that the Q&A Statements are not actionably false, because legal interpretations and statements of opinion are not statements of fact. *See Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999). The Court declines to decide now whether the Q&A Statements are statements of fact or opinion because the Court concludes that LegitScript has no standing to assert its Lanham Act claim.

[19] LegitScript argues, and the Court agrees, that the Court may consider whether a plaintiff's injury is foreseeable when assessing RICO standing. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 656-58 (2008) (discussing how a plaintiff's loss may nonetheless follow foreseeably from a defendant's fraudulent misrepresentation, even if the plaintiff did not rely on it directly); *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Ltd.*, 943 F.3d 1243, 1248 (9th Cir. 2019). From this principle, LegitScript argues that its case is like the case in *Bridge* because LegitScript's injuries foreseeably follow from the deception of a third party. The claims in *Bridge*, however, cleared the proximate cause hurdle that LegitScript's claims do not. *Contra Bridge*, 553, U.S. at 658 ("[H]ere, unlike in *Holmes* and *Anza*, there are no independent factors that account for respondents' injury, there is no risk of duplicative recoveries by plaintiffs removed at different levels of injury from the violation, and no more immediate victim is better situated to sue.").

PAGE 18 – OPINION AND ORDER

proximate cause for RICO standing, its alleged injuries are not too remote. Each factor, however, supports the Court's conclusion that proximate cause is lacking.[20]

"To determine whether an injury is 'too remote' to allow recovery under RICO," courts consider "(1) whether there are more direct victims of the alleged wrongful conduct who can be counted on to vindicate the law as private attorneys general; (2) whether it will be difficult to ascertain the amount of the plaintiff's damages attributable to defendant's wrongful conduct; and (3) whether the courts will have to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries." *Or. Laborers-Employers Health & Welfare Tr. Fund v. Philip Morris Inc.*, 185 F.3d 957, 963 (9th Cir. 1999). As alleged in its counterclaims, LegitScript's harm does not follow automatically from the allegedly false Q&A Statements, but at most only contingently from the harm allegedly suffered by domestic pharmacies or their potential customers. Thus, these third parties are the more direct victims of PharmacyChecker's alleged RICO violation.

Regarding the second factor, LegitScript's actual damages would be nearly impossible to prove without undue speculation. *See id.* at 964-65. LegitScript's theory is virtually immeasurable. Just one figure that LegitScript would need to calculate its damages, for example,

---

[20] *Alaska v. Express Scripts, Inc.*, 774 F. Supp. 3d 1150 (D. Alaska 2025), is inapposite for this reason. In *Alaska*, the district court deferred deciding the scope of Alaska's RICO claims against Express Scripts, a pharmacy benefits manager, for its "alleged role in the opioid crisis," until completion of jurisdictional discovery. *Id.* at 1157, 1172-73. Because it deferred ruling on the scope of "recoverable RICO injuries, . . . and because the proximate cause inquiry scrutinizes the relationship between those injuries and the defendants' conduct, the Court [explained that it] cannot yet determine whether proximate cause will be satisfied as to each of those injuries." *Id.* at 1172. Here, by contrast, the Court assumes that the full scope of RICO injuries alleged are recoverable; because proximate cause would not be satisfied as to any of LegitScript's alleged injuries, the three-factor test can be applied at the motion to dismiss stage. *See Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*, 241 F. 3d 696, 704 (9th Cir. 2001) (affirming dismissal of claim for lack of RICO standing); *Or. Laborers-Employers Health & Welfare Tr. Fund v. Philip Morris Inc.*, 185 F.3d 957, 963 (9th Cir. 1999) (same).

is the amount that PharmacyChecker's statements derogated the "public perception" on what a "legal" or "compliant" pharmacy business is, and how that derogation translates into sales lost for LegitScript. To that end, the third factor also weighs in favor of barring LegitScript's claim: because LegitScript's harm in part follows from harm to third parties, a court would be required "to adopt complicated rules apportioning damages among plaintiffs at different levels of injury from the violative acts, to obviate the risk of multiple recoveries." *See Holmes*, 503 U.S. at 269. In any event, the failure of LegitScript to satisfy the first factor, whether there are more direct victims of the allegedly wrongful conduct who can be counted on to vindicate the law as private attorneys general, is enough to show that LegitScript's alleged injuries are "too remote" to allow recovery under RICO. Finally, the core problem with LegitScript's RICO claim remains: the "proximate cause requirement not only bars RICO suits by derivative victims, or those whose injuries are 'purely contingent on the harm suffered by' direct victims but generally precludes recovery by those whose injuries are only tenuously related to the RICO violation at issue." *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 981 (quoting *Anza*, 547 U.S. at 457).

## CONCLUSION

The Court GRANTS without prejudice PharmacyChecker's motion to dismiss LegitScript's counterclaims. ECF 314. If LegitScript believes that it can cure the deficiencies identified in his Opinion and Order, LegitScript may replead not later than two weeks from the date of this decision.

**IT IS SO ORDERED**.

DATED this 27th day of January, 2026.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge